# EXHIBIT 17

COPY

## In the Matter Of:

## MACRIS vs EXPERIAN INFORMATION SOLUTIONS

## MARK MACRIS

*April 25, 2018*



800.211.DEPO (3376)
*EsquireSolutions.com*

```
 1    UNITED STATES DISTRICT COURT

 2    WESTERN DISTRICT OF NEW YORK

 3    ------------------------------------------------

 4    MARK K. MACRIS,

 5          Plaintiff,

 6    -vs-

 7    EXPERIAN INFORMATION SOLUTIONS, INC
      And SPECIALIZED LOAN SERVICING LLC,
 8
            Defendants.
 9    ------------------------------------------------

10

11          Examination Before Trial of MARK

12    MACRIS, held before Shannon Gallagher, Notary

13    Public, at The Law Offices of Kenneth Hiller,

14    6000 North Bailey Avenue, Amherst, New York,

15    on Wednesday, April 25th, 2018 at 10:00 a.m.

16    ending at 2:06 p.m. pursuant to notice.

17

18

19

20

21

22

23

24

25
```



```
 1    A P P E A R A N C E S :

 2

      ATTORNEYS FOR THE PLAINTIFF:
 3
          LAW OFFICES OF KENNETH HILLER, PLLC
 4        BY: SETH J. ANDREWS, ESQ.
          6000 North Bailey Avenue, Suite 1A
 5        Amherst, New York 14226
          (716) 564-3288
 6

 7    ATTORNEYS FOR SPECIALIZED
      LOAN SERVICING LLC:
 8
          McGLINCHEY STAFFORD
 9        BY: BRIAN S. McGRATH, ESQ.
          112 West 34th Street, Suite 1515
10        New York, New York 10120
          (646) 362-4000
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



MARK MACRIS
MACRIS vs EXPERIAN INFORMATION SOLUTIONS

April 25, 2018
3

| 1 | W I T N E S S E S | | |
|---|---|---|---|
| 2 | WITNESS | EXAMINATION | PAGE |
| 3 | MARK MACRIS | BY MR. MCGRATH | 5 |
| 4 | | | |
| 5 | | | |
| 6 | E X H I B I T S | | |
| 7 | EXHIBIT | DESCRIPTION | PAGE |
| 8 | Exhibit A | Complaint and demand | 5 |
| 9 | Exhibit B | Note | 5 |
| 10 | Exhibit C | Document | 5 |
| 11 | Exhibit D | Discovery documents | 5 |
| 12 | Exhibit E | Plaintiff's response | 5 |
| 13 | Exhibit F | Plaintiff's amended response | 5 |
| 14 | Exhibit G | Amended and restated note | 5 |
| 15 | Exhibit H | Commitment | 5 |
| 16 | Exhibit I | Loan documents | 5 |
| 17 | Exhibit J | Document | 5 |
| 18 | Exhibit K | Document | 5 |
| 19 | Exhibit L | Document | 5 |
| 20 | Exhibit M | Document | 5 |
| 21 | Exhibit N | Documents | 5 |
| 22 | Exhibit O | Document | 5 |
| 23 | Exhibit P | Reports | 5 |
| 24 | Exhibit Q | Letter | 5 |
| 25 | Exhibit R | Denial letter | 5 |



MARK MACRIS                                          April 25, 2018
MACRIS vs EXPERIAN INFORMATION SOLUTIONS                         4

1    Exhibit S            Letter              5

2    Exhibit T            Document            5

3    Exhibit U            Email exchange      5

4    Exhibit V            Disclosure          30

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



1       (Exhibits A through U were marked for

2   identification)

3

4       The following stipulations were entered

5   into by counsel:

6

7    It is hereby stipulated by and between the

8   attorneys for the respective parties hereto

9   that the oath of the Referee is waived, that

10   signing, filing and certification of the

11   transcript are waived and that all objections,

12   except as to the form of the questions, are to

13   be reserved until the time of trial.

14

15       M A R K   M A C R I S

16   270 Miller Road, Getzville, New York, having

17   been first duly sworn, was examined and

18   testified as follows:

19

20               EXAMINATION

21   BY MR. MCGRATH:

22   Q. Good morning, Mr. Macris.

23   A. Good morning.

24   Q. My name is Brian McGrath.  I'm an attorney for

25       the defendant, Specialized Loan Servicing LLC,



1       and we're here today for your deposition.  Has

2       that been explained to you today, that's why

3       you're here?

4    A. Yes.

5    Q. Before we get started I just want to go over

6       some ground rules to make this deposition

7       easier and less painful for all of us here.

8       The first ground rule is because we do have a

9       court reporter here and she's taking down

10      everything that you say, that I say, that we

11      don't want to talk over each other.

12           So if I'm talking, just indicate to me if

13      you need to interrupt.  Let me stop and then

14      you can talk.  Along those lines, because she

15      is human and needs to hear everything, try and

16      speak up, speak slowly, and answer all the

17      questions with a verbal answer as opposed to a

18      head nod or uh-uh or something like that.

19      Usually try and use something like yes, no.

20      Use a verbal response.  It usually is better

21      for the court reporter to track what you've

22      said.

23           Will you agree that if you don't

24      understand my questions today you will say I

25      don't understand and let me know you don't



1   understand the question?

2   A. Yes.

3   Q. Okay.  And you do understand that you are

4      under oath, as the court reporter just swore

5      you in?

6   A. Yes.

7   Q. And you understand that that means you have to

8      testify truthfully today?

9   A. Yes.

10  Q. Okay.  Are you physically able to sit for this

11     deposition today?  Is there anything that

12     would prevent you from sitting for this

13     deposition today?

14  A. No.

15  Q. Anything mentally that would render you unfit

16     to sit in this deposition today?

17  A. No.

18  Q. Have you consumed any alcohol or drugs in the

19     past eight hours?

20  A. No.

21  Q. And do you understand that unless directed by

22     your attorney, Mr. Andrews, that you have to

23     answer all my questions today?

24  A. Yes.

25  Q. Okay.  And the last thing, last housekeeping



```
 1    thing, we're all human, we drink coffee, we
 2    sometimes need to go to the bathroom.  If you
 3    need to take a break for any reason to use the
 4    restroom, collect your thoughts, whatever the
 5    case may be, just let me know and we will
 6    stop.
 7         The only thing that I would ask is that if
 8    I've asked a question, you answer the question
 9    first, then state you need to take a break and
10    then we'll stop for the break at that time.
11    Sound fair?
12 A. Yes.
13 Q. Okay.  Let's get on with it.  You said you're
14    at 270 Miller Road in Getzville, correct?
15 A. Yes.
16 Q. How long have you lived at that address?
17 A. Five-and-a-half years.
18 Q. So that would mean you moved there in 2012 or
19    2013?
20 A. Early 2013.
21 Q. Okay.  And prior to living at the Getzville
22    address, where did you live?
23 A. Williamsville.
24 Q. Do you have a specific address that you
25    recall?
```



1   A. 5804 Sheridan Drive.

2   Q. And how long did you live at that address?

3   A. About almost four years.

4   Q. Okay.  So that takes us to somewhere around

5      2009 you moved there?

6   A. Actually 2010, early 2010.  Close to four

7      years.

8   Q. Okay.  And prior to moving to the Sheridan

9      Drive address, where did you live?

10  A. In Cheektowaga.

11  Q. Do you have a specific address in what I

12     always thought was Cheektowaga, but apparently

13     it's Cheektowaga?

14  A. 67 Federal Avenue.

15  Q. And how long did you live at that address,

16     approximately?

17  A. Two years.

18  Q. So somewhere -- that means you moved there

19     somewhere in 2008?

20  A. Yes.

21  Q. Do you recall approximately when in 2008?

22  A. September.

23  Q. And prior to living in Cheektowaga, where did

24     you live?

25  A. Williamsville.



1   Q. Do you have a specific address?

2   A. 403 Teakwood Terrace.

3   Q. That's in Williamsburg?

4   A. No.  Williamsville.

5   Q. That's not in Amherst?

6   A. You can consider it Amherst, but it goes by

7      Williamsville.

8           MR. ANDREWS:  It's a village.

9   Q. So Williamsville is a village within the Town

10     of Amherst?

11          MR. ANDREWS:  Yeah.

12  Q. Okay.  And when did you move to the 403

13     Teakwood Terrace address?

14  A. October of 2006.

15  Q. We can stop making you go backwards because we

16     got to the property in question of this

17     lawsuit.  The 403 Teakwood Terrace address,

18     did you live there with anybody?

19  A. Yes.

20  Q. Who did you live there with?

21  A. My wife at the time.

22  Q. Okay.  And her name was or is?

23  A. Catherine.

24  Q. Anyone else live with you at the 403 Teakwood

25     address?



1   A. Our children.

2   Q. How many children do you have?

3   A. I have two.

4   Q. Okay.  Boys, girls, one of each?

5   A. A boy and a girl.

6   Q. And when you moved to the 403 Teakwood address

7      in 2006, was that a home that you had

8      purchased or were you renting?

9   A. Purchased.

10  Q. Do you recall the purchase price in 2006?

11  A. Approximately $189,000.

12  Q. And did you procure financing when you

13     officially purchased it in 2006?

14  A. Yes.

15  Q. Do you recall who financed that purchase in

16     2006?

17  A. Yes.

18  Q. Can you tell me the name of the bank or

19     lending company?

20  A. Mortgage broker.  I don't recall the bank.

21  Q. And after you purchased the home in 2006 with

22     what you believe to be mortgage broker or

23     something along those lines, did you ever

24     refinance that loan?

25  A. Yes.



1   Q. Do you recall when you refinanced it?

2   A. Yes.

3   Q. When was that?

4   A. Either January or February of 2008.

5   Q. Okay.  All right.  We'll come back to that

6       transaction.  Let's talk about -- you said at

7       the time you moved to the 403 Teakwood address

8       you were married to Catherine; is that

9       correct?

10  A. Yes.

11  Q. When did you get married to Catherine?

12  A. August of 2005.

13  Q. Are you still married to Catherine?

14  A. No.

15  Q. Are you separated or divorced?

16  A. Divorced.

17  Q. Do you recall what year you got divorced?

18  A. Finalized July of 2010.

19  Q. When you say finalized, does that mean you

20      started the divorce proceedings prior to July

21      of 2010?

22  A. Yes.

23  Q. Okay.  Do you recall when?

24  A. Probably -- back that up.  2008, late 2008,

25      November, December of 2008.



1   Q. Okay.  And late November, December of 2008,

2      that's when you initiated divorce proceedings?

3   A. Yes.

4   Q. Had anything precipitated that in advance, a

5      separation, living apart, something --

6   A. Yes.

7   Q. What was that?

8   A. Separation.

9   Q. Do you recall when you separated from your now

10      ex-wife, Catherine?

11   A. September of 2008.

12   Q. Did you do anything to prepare for this

13      deposition today?

14   A. Yes.

15   Q. What did you do to prepare for this

16      deposition?

17   A. I met with my attorney, Seth Andrews.

18   Q. Did you meet with him in person or over the

19      phone?

20   A. I met with him in person.

21   Q. And when did you meet with him in person?

22   A. Yesterday.

23   Q. Okay.  Did you review any documents during

24      that meeting that refreshed your recollection

25      on anything?



1   A. Yes.

2   Q. Okay.  What documents were those?

3   A. The initial complaint that we filed, we

4      reviewed some of the credit report information

5      from Experian.

6   Q. And again, just so I'm clear here, I'm asking

7      about specific documents that refresh your

8      recollection on anything.  So you're saying

9      the complaint and the credit reports refreshed

10     your recollection on something?

11  A. Yes.

12  Q. And do you know if the credit report that you

13     reviewed and refreshed your recollection

14     yesterday has been provided as discovery in

15     this litigation?

16  A. I don't understand the question.

17  Q. Sure.  Let me ask it better.  You reviewed a

18     credit report yesterday you said that

19     refreshed your recollection, correct?

20  A. Yes.

21  Q. Do you know if that document has been given to

22     your attorney?

23  A. Yes.

24  Q. Okay.  Do you know whether your attorney has

25     provided a copy of that to me?



1    A.  I don't know.

2               MR. MCGRATH:  Can I just ask --

3               MR. ANDREWS:  Yeah.  It's the July, 2017

4    report.  There's a May, which was

5    supplemented, and then there's a July 27,

6    2017, reinvestigation report.

7               MR. MCGRATH:  Both those have been

8    provided?  I only have a copy with me of the

9    May, 2016.

10               MR. ANDREWS:  Yeah.  You should have the

11   July.  I can give one to you.

12               MR. MCGRATH:  Okay.  On a break.  We'll

13   get to that later.  That's fine.

14

15   BY MR. MCGRATH:

16   Q.  Let's turn to this lawsuit, Mr. Macris.  I'm

17   going to hand you what's been premarked for

18   identification as Defendant's Exhibit A.  When

19   I refer to defendant, I'm referring to

20   defendant Specialized Loan Servicing LLC, just

21   for the record.

22        Experian Information Solutions is not at

23   this deposition today.  They informed counsel

24   of record that they have a tentative

25   settlement and were not appearing today but

1      reserved their rights to potentially take a

2      deposition.

3          Mr. Macris, have you seen this document

4      that has been marked for identification as

5      Defendant's Exhibit A before?

6  A. Yes.

7  Q. And can you identify what this is?

8  A. It's a complaint and demand for a jury trial.

9  Q. Okay.  And this is referring to the lawsuit

10     that you filed against my client as well as

11     Experian Information Solutions?

12 A. Yes.

13 Q. Okay.  And did you assist your attorney, Mr.

14     Andrews, in preparing this document?  Let

15     me -- strike that.  Let me ask a better

16     question.  I shouldn't strike it.  She still

17     writes what I just said.  Did you provide your

18     attorney, Mr. Andrews, information to assist

19     in the preparation of this documentation?

20 A. Yes.

21 Q. So if there is factual allegations in here on

22     behalf of plaintiff, Mr. Macris, is it fair

23     that that information was provided by you to

24     your attorney?

25 A. Yes.



1   Q. Okay.  So I'd like to direct you to the first

2       page of that document.  It's paragraph 3.  Do

3       you see that paragraph?

4   A. Yes.

5   Q. It states that defendant SLS violated the FCRA

6       by failing to conduct a thorough investigation

7       and review all relevant information after

8       receiving notice of the disputed information.

9       Do you see that?

10  A. Yes.

11  Q. What is your basis -- what is the basis for

12      that statement to the extent you know?

13  A. I notified Specialized Loan Servicing over the

14      phone.  I also notified Specialized Loan

15      Servicing with court documents that alleviate

16      me from the obligation of this mortgage.

17  Q. I'm going to show you what's been premarked

18      for identification as Exhibits B and C.  I'd

19      like you to review both at the same time.  Do

20      you recognize what's been premarked for

21      identification as Defendant's Exhibit B?

22  A. Yes.

23  Q. What do you recognize that to be?

24  A. This is the note when myself and my wife at

25      the time refinanced the mortgage.



1    Q. Okay.  So is that your signature on page 2 of

2        Exhibit B?

3    A. Yes, that is my signature.

4    Q. And below your signature is the signature of

5        Catherine Macris; is that correct?

6    A. Yes.

7    Q. And she was your wife at the time?

8    A. Yes.

9    Q. And the date of this document on the first

10       page is February 1, 2008, correct?

11   A. Yes.

12   Q. And that's consistent with your testimony a

13       few minutes ago as to when you refinanced your

14       mortgage, correct, for the Teakwood Terrace

15       address?

16   A. Yes.

17   Q. And looking at Exhibit C, do you recognize

18       what Exhibit C is?

19   A. Yes.

20   Q. What do you recognize Exhibit C to be?

21   A. This appears to be a recording from Erie

22       County Clerk's Office recording page that

23       goes -- is returned to Countrywide Home Loans,

24       who I believe was the bank at the time of the

25       refinance.



1  Q. So that's the first page of Exhibit C.  What

2     about the second page through the remainder of

3     the document that is marked as Exhibit C?  Do

4     you know what that is?

5  A. Appears to be a mortgage note.

6  Q. Okay.  And do you see any dates on that page,

7     which is Bates labeled SLS007?  Any dates on

8     there that identify the date the document --

9  A. On this page, page 2, the only date I see is

10    February 1st of 2008.

11 Q. Okay.  Turning to page SLS012 of Defendant's

12    C, do you see your name and signature?

13 A. Yes.

14 Q. And is that your name and signature?

15 A. Yes.

16 Q. And do you recall signing this document?

17 A. No.  It's ten years ago.

18 Q. Do you have any reason to think that's not

19    your signature?

20 A. I don't.

21 Q. And you recall refinancing the loan in 2008,

22    correct, in February?

23 A. I recall refinancing the loan.

24 Q. And below your name and signature appears to

25    be your ex-wife's name and signature as well

```
 1      on that page, correct?
 2   A. Yes.
 3   Q. Going back to Exhibit B, if you would turn to
 4      the second page on Exhibit B, I'd like you to
 5      read to yourself paragraph 9 and just let me
 6      know when you're done.  Are you finished
 7      reading that one?
 8   A. I'm done.
 9   Q. What do you understand in layman's terms
10      paragraph 9 to mean?
11           MR. ANDREWS:  I'm going to object --
12   A. That I am obligated to pay this debt.
13   Q. Okay.  And the last sentence of paragraph 9
14      says any one person signing this note may be
15      required to pay all of the amounts owed under
16      this note.  Do you see that?
17   A. Yes.
18   Q. So you agree that's what it says?
19   A. Yes.
20   Q. What do you understand that last sentence to
21      mean?
22           MR. ANDREWS:  Same objection.  You can
23      answer.
24   A. That if I sign this, then I am required to pay
25      this.
```



1   Q. Okay.  And you testified earlier that that is

2      your signature on that page, correct?

3   A. Yes.

4   Q. Do you recall after you signed this note and

5      mortgage, Exhibits B and C in February of

6      2008, whether you and your then wife did make

7      payments on this loan?

8   A. Yes.

9   Q. Okay.  Do you recall when you made your first

10     payment?

11  A. We made our first payment initially when we

12     got this mortgage back in 2006.

13  Q. And turning to page 1 of Exhibit B, you'll see

14     in paragraph 4 it states that the first

15     payment was due on April 1, 2008.  Do you see

16     that in paragraph 4?

17  A. Yes.

18  Q. So is that when you would have made the first

19     payment on this loan?

20  A. Yes.

21  Q. Okay.  Do you recall who you made the payment

22     to at that time?

23  A. No, I don't.

24  Q. Do you recall -- did there come a time when

25     you stopped making the payments required under



1      paragraph 2 and 4 of the note?

2  A.  Yes.

3  Q.  And do you recall when that occurred?

4  A.  I don't have a -- I do not have a specific

5      date.

6  Q.  Let's try and narrow it down, then, since

7      that's understandable.  You said you made the

8      first payment under this note by April 1,

9      2008, correct?

10 A.  Yes.

11 Q.  Do you recall whether you made the next six

12     payments?

13 A.  I made the next six payments.

14 Q.  Okay.  So that takes us to the fall of 2008;

15     is that correct?

16 A.  Yes.

17 Q.  Do you recall if you made payments for the

18     next year?  In other words -- let me take

19     that -- do you recall -- you recalled making

20     payments from April 1, 2008 through let's say

21     April 1, 2008 [sic], correct?  That puts you

22     into the fall.  Do you recall making payments

23     for the entire next year?

24 A.  No, I don't recall.

25 Q.  Okay.  But you recall that at some point you



1       stopped making payments, correct?

2   A.  Yes.

3   Q.  Okay.  Do you recall why you stopped making

4       payments?

5   A.  Yes.

6   Q.  Why is that?

7   A.  My wife at the time was supposed to make

8       payments on this.

9   Q.  Okay.  Help me understand that.  At the time

10      that the payments stopped somewhere in 2009,

11      is that when you believe the payments stopped?

12  A.  Yes.

13  Q.  Okay.  That your wife was supposed to make the

14      payments?

15  A.  Yes.

16  Q.  Was that per an agreement between you and your

17      wife?

18  A.  Yes.

19  Q.  Was this a written agreement?

20  A.  No.

21  Q.  How did that agreement come about?  What led

22      to that agreement?

23  A.  Separation.

24  Q.  Okay.  And I believe you said you separated in

25      September of 2008, correct?



1    A. Yes.

2    Q. So at that time you and your wife agreed

3       between the two of you that she would make the

4       payments on the loan?

5    A. Yes.

6    Q. But you had nothing in writing, correct?

7    A. No.

8    Q. And you've already stated that you understood

9       paragraph 9 of this to be that you had to --

10      either one of you were responsible for this

11      note, correct?

12   A. Yes.

13   Q. Okay.  How did you learn that your wife had

14      stopped making payments on the loan?

15   A. I don't recall.

16   Q. But you do recall at some point learning that

17      your wife stopped making payments?

18   A. Yes.

19   Q. Do you recall when you learned that?

20   A. She wanted to refinance the loan.

21   Q. That's something she told you?

22   A. Yes.

23   Q. How did that conversation come up?

24   A. She wanted to refinance the loan to lower the

25      mortgage payment.



1   Q.  Okay.  I understand we're going back to a

2       period of your life that's not pleasant, so I

3       appreciate your patience with these questions,

4       but they're relevant to this litigation.

5       After your wife stopped making payments on the

6       loan, did you step in and start making those

7       payments?

8   A.  No.

9   Q.  Why not?

10  A.  Because we had an agreement.

11  Q.  And the we in that is who?

12  A.  Myself and Catherine.

13  Q.  But there was no agreement with the bank to

14      that agreement, correct?

15  A.  No.

16  Q.  So at the time you and your wife entered into

17      the verbal agreement in 2008 that she would be

18      responsible for the mortgage, the bank never

19      told you that you, Mark Macris, were not

20      responsible to make payments, correct, in

21      2008?

22  A.  The verbal agreement was not in 2008.

23  Q.  Okay.

24  A.  As you stated.

25  Q.  When was the verbal agreement?



```
 1   A. I would say spring of 2009.

 2   Q. So the verbal agreement that you and your wife

 3      reached in the spring of 2009, that agreement

 4      didn't include the bank that financed the

 5      loan, did it?

 6   A. No.

 7   Q. And nobody from the bank told you in the

 8      spring of 2009 that you didn't need to make

 9      the loan payments, right?

10   A. No.

11   Q. I'd like you to take a look at Exhibit C

12      again.  If you turn to what is Bates labeled

13      SLS010, I'd like you to look and read to

14      yourself paragraph 11 and let me know when

15      you're done reading paragraph 11.  Do you

16      understand paragraph 11?

17   A. Not everything about it.

18   Q. Okay.  What, if anything, in paragraph 11 do

19      you understand?

20   A. My interpretation of it is that a borrower is

21      not released from a loan.

22   Q. Going back for a minute, are you currently

23      employed?

24   A. Yes.

25   Q. What is your occupation?
```



1    A. I am an inspector.

2    Q. What type of inspector?

3    A. Insurance inspector.

4    Q. And do you work currently for some entity?

5    A. Yes.

6    Q. What's the name of that entity?

7    A. The New York Workers' Compensation Rating

8       Board.

9    Q. Okay.  And I believe according to your

10      interrogatory responses, they're based out of

11      New York City?

12   A. Yes.

13   Q. But you work here in the Buffalo area,

14      correct?

15   A. I am a field employee.

16   Q. Okay.  Do you ever go to their office in New

17      York City?

18   A. Yes.

19   Q. How often?

20   A. Maybe once a year, once every other year.

21   Q. How long have you worked as an insurance

22      inspector for NYWCRB, the acronym --

23   A. NYWCIRB.

24   Q. Okay.  How long have you worked for them?

25   A. Six years.



1   Q. Okay.  So if my math is good you started in
2      2012?
3   A. July of 2012.
4   Q. Okay.  And prior to starting as an inspector
5      with NYWCIRB, did you work anywhere else?
6   A. Yes.
7   Q. Where did you work prior to that?
8   A. I worked for a company called Tyler Fire
9      Equipment.
10  Q. When did you work for them?
11  A. 2010 to late -- 2010 to 2012.
12  Q. Okay.  And where was Tyler Fire Equipment
13     located?
14  A. Elmira, New York.
15  Q. Elmira is a little ways away from Buffalo,
16     correct?
17  A. Yes.
18  Q. Did you work in Elmira or did you work in
19     Buffalo?
20  A. I worked in Buffalo.
21  Q. And prior to working for Tyler Equipment, did
22     you work anywhere else prior to that,
23     immediately prior to that?
24  A. Yes.
25  Q. Where was that?



1    A.  I worked in Tonawanda, New York.

2    Q.  And who did you work for in Tonawanda?

3    A.  Triad Synergy Group.

4    Q.  Do you have the approximate dates you worked

5        there?

6    A.  2009 to 2010.

7    Q.  Okay.  And what was your position at Triad

8        Synergy Group?

9    A.  Sales rep.

10   Q.  What were the sales?  What is the thing that

11       you sell for Triad Synergy Group?

12   A.  I don't understand the question.

13   Q.  Sure.  What is that type of business?

14   A.  I sold fire equipment.

15   Q.  That explains your next job I suppose.

16   A.  Yes.

17   Q.  And immediately prior to Triad Synergy Group,

18       were you employed anywhere else?

19   A.  I was an insurance broker and an insurance

20       agent.

21   Q.  Were you an independent insurance broker,

22       agent, or did you work for an insurance

23       agency?

24   A.  I worked directly for an insurance company and

25       I also worked for an insurance broker.



MARK MACRIS
MACRIS vs EXPERIAN INFORMATION SOLUTIONS

April 25, 2018
30

```
1    Q. Okay.  So let's break that down.  Were you
2       working those jobs at the same time or were
3       they -- did one follow the other?
4    A. One followed the other.
5    Q. Let's go immediately in 2009.  Which was that?
6    A. Insurance broker.
7    Q. And do you recall the approximate time period
8       for that job?
9    A. Yes.
10   Q. Okay.  What was that?
11   A. 2008 to 2009.
12   Q. Okay.  And what was the name of that insurance
13      broker?
14   A. EMS Group.
15   Q. What type of insurance was this?
16   A. What do you mean?
17   Q. Home, auto, fire, flood?  Did you have a
18      specific insurance product that you focused
19      on?
20   A. Insurance is either -- I was a licensed
21      insurance agent in the State of New York.
22      Insurance is basically either personal or
23      commercial.  I wrote commercial insurance.
24   Q. What do you mean you wrote it?
25   A. I wrote policies for commercial companies,
```



1       liability, commercial auto, Workers'

2       Compensation.

3   Q.  And these policies were written policies that

4       had clauses and provisions within them?

5       Describe for me what these written policies

6       were.

7   A.  An insurance policy is a contract.

8   Q.  Okay.

9   A.  Whether it be for general liability, property,

10       commercial auto, Workers' Comp.  There's

11       endorsements, exclusions, I could sit and talk

12       all day about it.

13   Q.  When you say you wrote them, what do you mean

14       you wrote them?

15   A.  I wrote the business.  When an agent writes an

16       insurance policy, the insurance carrier is the

17       one who actually handles the policy.  We

18       service the insured, not and the insurer.

19   Q.  Okay.  So is it fair to say in that job you

20       were familiar with reading and understanding

21       contracts?

22   A.  Yes.

23   Q.  So during the time you were an insurance

24       broker from 2008 to 2009, do you know

25       approximately how many contracts, insurance



1       contracts you reviewed or read or issued or

2       wrote?

3    A. Approximately 10 to 15.

4    Q. And immediately prior to being an insurance

5       broker, you said you were an insurance agent;

6       is that correct?

7    A. Correct.

8    Q. Okay.  And what years were you an insurance

9       agent?  And I think we're probably covered

10      with your work employment for purposes of this

11      case.

12   A. 2005 to 2008.

13   Q. And was there -- did you have a specific

14      employer?

15   A. Yes.

16   Q. Who was that?

17   A. Sentry Insurance Company.

18   Q. Where were they located?

19   A. That is spelled S-E-N-T-R-Y.

20   Q. Thank you.  And where were they located?

21   A. Stevens Point, Wisconsin.

22   Q. And did you work in Wisconsin?

23   A. No.

24   Q. Where did you work?

25   A. Buffalo.



```
 1   Q. And as opposed to your job as an insurance
 2      broker, what did you do as an insurance agent?
 3   A. An insurance broker represents multiple lines
 4      of carriers.  An insurance agent works
 5      directly for the company and is a direct
 6      writer.  I wrote insurance for Sentry
 7      Insurance as a direct writer as opposed to
 8      representing multiple companies.
 9   Q. Okay.  And so again, this means you were
10      writing contracts?
11   A. No.
12   Q. Okay.  So I thought you just said you wrote
13      insurance.  So help me understand what that
14      means.
15   A. Insurance is policy.  It's -- it's a written
16      policy.
17   Q. Okay.  Did you write these policies?
18   A. No.  I don't -- I don't write the policies.  I
19      write the business underneath either Sentry
20      Insurance or I write it -- when I was a broker
21      I would write it underneath a desired carrier
22      who would accept the risk.
23   Q. Okay.  Maybe I'm not understanding how we're
24      using the word write.  Are you using the word
25      writing in terms of underwriting or physically
```



1     writing the agreement?

2  A. I'll have to explain it in quite detail.

3  Q. Sure.  Go ahead.

4  A. When -- we'll start with Sentry Insurance.  I

5     am a licensed insurance agent in property and

6     casualty and also licensed in life accident

7     and health through the New York State

8     Department of Financial Services.  If I go to,

9     as an example, a machine shop, me working as

10    an agent for Sentry Insurance, I offer them

11    the program of an insurance policy.  Companies

12    by law have to carry insurance, property

13    liability in New York State Workers' Comp by

14    law, by insurance laws.

15        I would ask them if I could provide them

16    with a quote of their insurance.  Part of my

17    job as an agent is to verify their operations,

18    look over what their current insurance program

19    has to offer, gather information about the

20    business and the risk, give it to -- report to

21    my office in Stevens Point, Wisconsin, what

22    the risk is, what they do.

23        For Workers' Comp I have to look at what

24    their classification is, their standard

25    industry classification, and give that to my



1    underwriting staff.  The underwriting staff is

2    an insurance company as ones that look at an

3    insurance -- a potential risk and decide if

4    they want to offer an insurance policy to a

5    business.  So this takes time.  If there's

6    questions that have to be answered, I have to

7    give this information off to my underwriting

8    staff.

9        If it is an acceptable risk by the

10   insurance company, Sentry, they send to me a

11   package which I provide to the potential

12   client.  Now saying you write is an insurance

13   term.  I wrote the business.  I didn't write

14   this insurance policy, but I wrote the

15   business.  I hope that explains it.

16   Q. Okay.  Yeah.  Thank you.  What is your

17      educational background?

18   A. I have a college degree.

19   Q. Where is your college degree from?

20   A. Buffalo State College.

21   Q. And is that a BA, a BS?  What degree do you

22      have?

23   A. Bachelor of science.

24   Q. What was your major?

25   A. Criminal justice.



1   Q. You didn't want to become a lawyer?

2   A. No.

3   Q. What year did you graduate from Buff State?

4   A. 1991.

5   Q. Did you ever pursue any post college graduate

6       studies anywhere?

7   A. I took courses throughout -- after I finished

8       my degree at Buffalo State, I took a lot of

9       secondary courses, insurance courses,

10      financial planning courses through Bryant &

11      Stratton College, yes.

12  Q. And did you ever formally matriculate in any

13      program at Bryant & Stratton or any other

14      graduate school?

15  A. Yes.

16  Q. Which school?

17  A. Bryant & Stratton College.

18  Q. When did you matriculate in a graduate

19      program?

20  A. It's not a graduate program.  It's a

21      certificate.  Certified financial planner.

22  Q. When did you matriculate in the certified

23      financial planner program?

24  A. 2008.

25  Q. Did you complete that program?



1   A. I completed the course program, yes.

2   Q. Did you obtain the certification?

3   A. No, I did not obtain the certification.

4   Q. Why not?

5   A. I decided that at the time that I gained a lot

6      of great knowledge but I decided not to pursue

7      a career in the financial services as a

8      certified financial planner.

9   Q. Okay.  Any other graduate level or post

10     college programs you've taken since 2008?

11  A. No.

12  Q. Any other post college programs other than the

13     Bryant & Stratton program in 2008?

14  A. No.

15  Q. But you're not a lawyer, right?

16  A. No.

17  Q. Did you understand, going back to Exhibits B

18     and C, specifically C, did you understand that

19     pursuant to that mortgage loan you and your

20     then wife had to have property insurance on

21     the 403 Teakwood Terrace property?

22  A. Yes.

23  Q. And do you know when your wife -- sorry --

24     your ex-wife stopped making payments in 2009,

25     whether there was property insurance on the



1      property paid for by either you or your

2      wife -- ex-wife?

3  A.  I don't recall.

4  Q.  Do you have any specific recollection of

5      making property insurance payments on the 403

6      Teakwood Terrace property in 2009 or later?

7  A.  I don't.

8  Q.  Do you have any cancelled checks or invoices

9      showing that you made any property insurance

10     payments for the 403 Teakwood Terrace address

11     from 2009 to present?

12 A.  I have none.

13 Q.  But you said you understood that pursuant to

14     the mortgage that you and your then wife were

15     to maintain property insurance?

16 A.  Yes.

17 Q.  And you -- do you not recall or don't know

18     whether your ex-wife was paying for property

19     insurance from 2009 to present?

20 A.  I would say that she was paying the property

21     insurance.

22 Q.  Why would you say that?

23 A.  I would say that she was paying it because if

24     I recall, that the insurance was a separate

25     policy away from the mortgage, but I can't



1    recall the specifics of that.  I don't know.

2  Q. Do you have any documents related to what you

3    believe to be your ex-wife's making payments

4    on property insurance?

5  A. No.

6  Q. Is it possible your wife was not making

7    property insurance payments?

8  A. It is possible.

9  Q. You also -- do you understand that pursuant to

10   Exhibit C, the mortgage, that you and your

11   ex-wife had to pay property taxes on the 403

12   Teakwood Terrace property?

13 A. Yes.

14 Q. And do you recall whether property taxes were

15   paid on that property after your wife stopped

16   making the mortgage payments in 2009?

17 A. I do not recall.

18 Q. Do you have any recollection of you, yourself,

19   making the property tax payments on that

20   property from 2009 through current?

21 A. I did not.

22 Q. So just to clarify, you did not make payments,

23   the property tax payments?

24 A. I did not.

25 Q. But again, you understand that pursuant to the



1    mortgage you and your wife committed to making

2    the property tax payments, correct?

3  A. Correct.

4  Q. At the time you learned that your ex-wife

5    stopped making the mortgage payments on the

6    403 Teakwood Terrace property, were you

7    concerned that you might lose the house?

8  A. Yes.

9  Q. Why were you concerned that you might lose the

10   house?

11 A. Because my daughter was there.

12 Q. Okay.  Maybe that's an answer to a different

13   question.  Let me go back to what I was trying

14   to get at with my first question.  Why is it

15   that you believe your wife having stopped

16   making the mortgage payments could lead to you

17   losing the house?

18 A. If she doesn't make the mortgage payments then

19   the bank could take the house.  That would be

20   my guess.

21 Q. And when you say if she didn't, you testified

22   earlier that you understood that under the

23   mortgage and the note, Exhibits B and C, you

24   were also obligated to make those payments,

25   correct?



1  A. Correct.

2  Q. Okay. And you said you were worried about

3     your daughter losing her house, right?

4  A. Correct.

5  Q. You also said you had a son, right?

6  A. Yes.

7  Q. Was your son living at the property at that

8     time?

9  A. He was with me.

10  Q. We'll come back to all the -- the vision of

11     who lived where.

12  A. Sure.

13  Q. Did you lose any sleep over the possibility

14     that stopping making the mortgage payments

15     could result in loss of the house?

16  A. I don't recall.

17  Q. At that time in 2009, were you and your

18     ex-wife experiencing any financial

19     difficulties?

20  A. We were going through a divorce. Everything

21     was difficult.

22  Q. Did financial struggles contribute to the

23     strain on your marriage?

24  A. No.

25  Q. Did you have any financial struggles prior to



1      your separation from your wife?

2   A.  No.

3   Q.  Did you ever receive letters from the lender

4       or loan servicer requesting payments on the

5       mortgage loan after your wife stopped making

6       payments in 2009?

7   A.  I did not.

8   Q.  Did you ever -- in 2009, did you notify the

9       lender that you were living at a different

10      address than the property?

11  A.  No.

12  Q.  Did you understand that under the mortgage you

13      were required to provide a current mailing

14      address to your loan servicer?

15  A.  I don't recall that.

16  Q.  We can either take a break now or I can start

17      on my next topic.

18  A.  Let's keep going.

19  Q.  I am going to show you what's been marked as

20      Defendant's Exhibit D.  It's a hefty package.

21      So Defendant's Exhibit D are documents your

22      attorney provided to us during discovery.  The

23      first document is identified as a matrimonial

24      settlement agreement between Catherine M.

25      Macris and Mark K. Macris.  Do you see that?



MARK MACRIS
MACRIS vs EXPERIAN INFORMATION SOLUTIONS

April 25, 2018
43

1    A. Yes.

2    Q. Have you ever seen -- and that's the first

3       45 pages of Defendant's Exhibit D.  Have you

4       seen this document before?

5    A. Many times.

6    Q. Okay.  Does it bring back fond memories?

7    A. No.

8    Q. I didn't think so.  So this document on page 2

9       says it's an agreement made on November 4,

10      2009, between Catherine M. Macris, referred to

11      in this agreement as the wife, and Mark K.

12      Macris, referred to in this agreement as the

13      husband.  Do you see that on page 2?

14   A. Yes.

15   Q. Okay.  What do you understand these first

16      45 pages of Exhibit D to be?

17   A. We're divorced.

18   Q. Okay.  But do you understand what this

19      document is?  What would you call this

20      document?

21   A. Settlement arrangement.

22   Q. Fair to say this is your divorce agreement?

23   A. Yes.

24   Q. Okay.  And turning to page 42 of that

25      document, do you see your name and signature



1    on page 42?

2  A. Mm-hmm.

3  Q. Is that your signature?

4  A. Yes.

5  Q. And above that, do you see the name and

6    signature of Catherine M. Macris?

7  A. Yes.

8  Q. Okay.  And do you recall signing this

9    document?

10  A. Yes.

11  Q. Okay.  And on the following page, do you see

12    that this was notarized?

13  A. Yes.

14  Q. Do you understand what a notary is?

15  A. I would say a notary is somebody that verifies

16    identity to have them -- somebody comes and

17    needs a signed document, they verify identity

18    and they verify that that's the person who is

19    signing the document.

20  Q. Okay.  So is it fair to say that this notary

21    who is whatever that signature is there

22    verified your identity and signature when you

23    signed this document?

24  A. Yes.

25  Q. Have you ever notarized -- have you ever had a



1      notary notarize a document you signed where

2      you weren't in front of them when you signed

3      it?

4  A.  No.

5  Q.  Okay.  Turning to page 40 of the agreement --

6      actually, why don't you start at page 38 where

7      Article 40 starts, real property.  I'll let

8      you read this, but let me just summarize what

9      Article 40 is.  This is the section of your

10     divorce agreement that addresses what you and

11     your ex-wife agreed to do with your marital

12     property, your real property, your 403

13     Teakwood Terrace property.

14         Turning to page 40, the first full

15     paragraph on 40, it states the wife agrees

16     that within six -- from -- should have been

17     six months I presume, from the full execution

18     of this agreement, she shall secure the

19     husband's release and/or discharge from the

20     mortgage obligation presently incumbering the

21     former marital premises.  Do you see that?

22  A.  Yes.

23  Q.  What do you understand that sentence to mean?

24  A.  I understand it to be that she needs to

25     refinance the house.



1    Q. Okay.  And the next sentence says upon said

2       refinance, the husband shall immediately

3       convey his interest in the former marital

4       premises to the wife and he shall execute a

5       quick claim deed and other required transfer

6       documents.  What do you understand that

7       sentence to mean?

8    A. That if she refinances the house, then I need

9       to be alleviated from the note and the

10      mortgage of the house.

11   Q. And the next sentence, if the wife fails to

12      secure the husband's release or discharge from

13      said mortgage obligation within this time

14      period, she will cooperate in the sale of said

15      property at the best available price and upon

16      the best available terms.  Do you see that

17      sentence?

18   A. Yes.

19   Q. What do you understand that sentence to mean?

20   A. If she doesn't make the payments, then she is

21      required to sell it.

22   Q. Where does it say make the payments in that

23      sentence?

24   A. Correction.  If I don't file this quick claim

25      deed -- I don't know.  I don't know mortgage



```
 1      terms.
 2   Q. Okay.  So you're not sitting here saying today
 3      that this agreement itself relieves you of the
 4      mortgage obligation, are you?
 5   A. I don't understand the question.
 6   Q. Let me try and ask it better.  Do you
 7      understand these three sentences to say that
 8      this agreement, this divorce agreement itself,
 9      relieves you of your mortgage obligations?
10   A. Yes.
11   Q. That's what you --
12   A. It relieves me of me paying the mortgage,
13      correct.
14   Q. Okay.  So then what is the first sentence,
15      what is the purpose of that first sentence
16      where it talks about your wife shall secure
17      the husband's release and/or discharge from
18      the mortgage obligation?  What does that mean?
19           MR. ANDREWS:  Object to the extent that
20      paragraph speaks for itself, but you can
21      answer.
22   A. What I interpret it as is she needs to
23      refinance the house, she needs to refinance
24      the house, that will alleviate me from the
25      obligation of the mortgage.
```



1   Q. Once she refinances the house?

2   A. Once she refinances the house, correct.

3   Q. Okay.  And if she doesn't refinance the house

4      and secure your release, that third sentence

5      says she will cooperate with you in selling

6      the house, correct?

7   A. Correct.

8   Q. This divorce agreement, the first 45 pages of

9      Exhibit D, was your mortgage lender a party to

10     this agreement?

11  A. No.

12  Q. Is it your understanding that even though your

13     mortgage lender was not a party to this

14     agreement that this agreement can be binding

15     on your mortgage lender?

16  A. I don't know that question.  I don't know the

17     answer to that question.  I don't know if they

18     would accept this.  I don't know that.

19  Q. Okay.  So -- but again, you've stated the

20     mortgage lender was not a party to this

21     agreement?

22  A. The mortgage lender was not a party to this

23     agreement.

24  Q. Do you know if your wife ever refinanced the

25     mortgage for the property located at 403



1       Teakwood Terrace?

2   A.  I believe she tried.

3   Q.  Do you know if she ever successfully

4       refinanced?

5   A.  No.

6   Q.  No, you don't know, or no, she did not

7       successfully refinance?

8   A.  I don't know if she successfully refinanced.

9   Q.  Did your wife ever inform you after the

10      six-month period she was unable to do it and

11      would cooperate with you in selling the

12      property?

13  A.  No, she didn't say that.

14  Q.  So even though you're not aware that your wife

15      refinanced the property pursuant to page 40,

16      your understanding is you no longer had an

17      obligation on the mortgage as a result of this

18      agreement?

19  A.  She told me she was going to make the payments

20      on the mortgage, she was going to make the

21      payments on this mortgage, but she wanted to

22      refinance it.

23  Q.  Earlier we already covered under Exhibits B

24      and C you were obligated on the note and

25      mortgage separately as well, correct?



```
 1    A.  Correct.

 2    Q.  So in your agreement with the lender, you had

 3        agreed to be obligated on the note and

 4        mortgage -- the note that was secured by the

 5        mortgage on the property at 403 Teakwood

 6        Terrace?

 7    A.  In 2008, yes.

 8    Q.  Okay.  Do you have any document in 2009 when

 9        this divorce was entered between you and your

10        ex-wife where the mortgage lender agreed to

11        release you from the mortgage?

12    A.  No.

13    Q.  Do you have any written agreement from the

14        mortgage lender releasing you from Exhibit B,

15        note?

16    A.  I don't know.  This is back in 2008.

17    Q.  Since 2008 until current, sitting here today,

18        do you have any documents in your possession

19        from the mortgage lender releasing you from

20        your note obligations under Exhibit B?

21    A.  Yes.  I have a document from the court.

22    Q.  Okay.  Let me re-ask the question and get the

23        answer I'm looking for here.  Do you have any

24        agreements from the mortgage lender releasing

25        you from Exhibit B?
```



1   A. Yes.

2   Q. What is that document?

3   A. I'm going to repeat myself.  That would be the

4      court document.

5   Q. So we will go to the court document.  So

6      you're referring to a document from a court?

7   A. Correct.

8   Q. Okay.  You're not -- you don't have any

9      document from the bank itself releasing you --

10  A. Not from the actual bank.

11  Q. Do you have any documents from the actual bank

12     removing you from the mortgage, Exhibit C?

13  A. I don't have a document from the bank.  I have

14     a document from the court.

15  Q. Okay.  So you have no documents from the

16     lender or their servicer relieving you of

17     exhibits -- your obligations under Exhibit B

18     and C?

19  A. Repeat the question.

20  Q. You have no documents directly from the lender

21     or its loan servicer relieving you of the

22     obligations you undertook in Exhibits B and C?

23  A. I'm going to go back to the document from the

24     court.

25  Q. Other than the document from the court --



1    A. No, I don't.  I have the document from the

2       court.

3    Q. You have no documents directly from the lender

4       or its loan servicer?

5    A. No.

6          MR. ANDREWS:  Can we go off the record

7       for a second.

8

9          (Discussion held off the record)

10

11   Q. I'd like you to go back and look at Exhibit A,

12      which is the complaint in this action.  You

13      got that document?

14   A. Yes.

15   Q. I'd like you to look at paragraph 24.

16      Paragraph 24 you allege in or about August of

17      2012, a deed and real property transfer report

18      was filed with the Erie County Clerk's Office

19      removing plaintiff from the deed and the

20      mortgage for the property at 403 Teakwood

21      Terrace, Amherst, New York 14221.  Do you see

22      that?

23   A. Yes.

24   Q. Do you have a document from August 14, 2012,

25      that removed you from the mortgage?



1   A. I'm not sure on that.  I know that I signed a

2      document to relieve me -- release me I believe

3      from the deed to the house.

4   Q. Okay.  So let's turn to that.  That's in

5      Exhibit D.  It is page 46 of Exhibit D.  It's

6      called warranty deed with lien covenant.  It's

7      a two-page document with a third page that is

8      the transfer report.  Do you see that?

9   A. Yes.

10  Q. And that's dated February 3, 2012.  Do you see

11     that?  Is this the document you're referring

12     to in paragraph 24 of the complaint?

13  A. Yes.

14  Q. Okay.  Can you point to this document in

15     Exhibit D, pages 46, 47, or 48 where it states

16     that you're relieved from the mortgage?

17  A. I don't see it written where I am relieved

18     from the mortgage.

19  Q. So you can't point anywhere in this exhibit

20     you were removed from the mortgage?

21  A. No.  Because it's a warranty deed.

22  Q. So is the answer to my question is yes?

23  A. I don't see anywhere on this where I am

24     relieved from the mortgage on this document.

25  Q. Do you have any documents from 2012 that were

1      filed with the clerk's office that showed that

2      you are removed from the mortgage?

3   A. No.

4   Q. Okay.  So what is the basis for that statement

5      in paragraph 24, that in or about August 14,

6      2012, you were removed from the mortgage?

7   A. That's what it says, correct.

8   Q. What is the basis for that statement?

9   A. I'm not sure.

10  Q. So you're not sure about your allegation?

11  A. Correct.

12  Q. I'd like you to look at paragraph 32 of the

13     complaint.  It states that the plaintiff

14     allegedly defaulted on the subject debt.  Did

15     you or did you not, you and your wife, default

16     on the subject debt?

17  A. What do you mean default?

18  Q. Stop making payments.

19  A. Yes, I believe that the payments were not made

20     sometime after 2009.

21  Q. Okay.  So what's the basis for saying

22     allegedly in that paragraph?

23  A. That I allegedly did not make the payments on

24     the subject debt.

25  Q. Okay.  Earlier you testified that after your



MARK MACRIS
MACRIS vs EXPERIAN INFORMATION SOLUTIONS

April 25, 2018
55

```
 1        separation from your wife and your verbal

 2        agreement in the spring of 2009 you have not

 3        made a payment on the mortgage loan that is

 4        Exhibits B and C since that time, correct?

 5   A.   Correct.

 6   Q.   Okay.  So again, I say what's allegedly that

 7        you did not make payments on the subject note?

 8        Let me ask a better question.  Are you

 9        suggesting in paragraph 32 that your wife made

10        payments on the loan after she defaulted --

11        after you and her defaulted?

12   A.   I don't know if she made payments on the loan.

13   Q.   But you know that you, who is the plaintiff in

14        this action, did not make payments on the

15        subject loan after 2009?

16   A.   Repeat.

17   Q.   You know that you, who is the plaintiff in

18        this action, has not made a mortgage loan

19        payment on Exhibits B and C since 2009?

20   A.   Yes.

21   Q.   Paragraph 34, you allege in or about May of

22        2016, plaintiff received a call from SLS

23        requesting his financial information.

24        Plaintiff informed SLS that he does not have

25        any information to the subject debt.  This is
```



 1      in May of 2006, you informed my client you do
 2      not have any obligations on the subject debt.
 3           MR. ANDREWS:   2016.
 4           MR. MCGRATH:   Sorry.  I will agree I
 5      misstated that.
 6   Q. In May of 2016, you informed SLS that you did
 7      not have any obligation on the subject debt.
 8      What was your basis for that statement in May
 9      of 2016?
10   A. That I was in possession of a court document
11      alleviating me from this mortgage signed by a
12      judge.
13   Q. Okay.  Your next sentence states that
14      plaintiff further stated that he had been
15      removed from the deed and mortgage in August
16      of 2012.  Again, I ask what document do you
17      have that shows you were removed from the
18      mortgage in August of 2012?
19   A. I'm not a mortgage person, so if I'm off the
20      deed, I don't know if I'm off the mortgage or
21      not.  I can't answer that question, but I have
22      a court document signed by a judge that says
23      that I am off of it.
24   Q. We'll get to that court document, but that's
25      the next part of the sentence, and that's from



1   November of 2014.  We'll get to what that

2   actually says, but that's in November of 2014?

3   A. Correct.

4   Q. What I'm asking is what was the basis for your

5   assertion in the first part of that sentence

6   that in August of 2012 you had been removed

7   from the mortgage?

8   A. I advised SLS I had no obligation to this

9   mortgage debt when they contacted me, that I

10  removed myself from the deed and I removed

11  myself from the obligation of -- I removed

12  myself from the property.  As far as the

13  mortgage, I don't know.

14  Q. Okay.  The deed document you're referring to,

15  it's in Exhibit D, pages 46 through 48.

16  A. Yes.

17  Q. Is my client a party to that document?

18  A. SLS isn't on here.

19  Q. What about any bank?

20  A. No, I don't see any bank.

21  Q. Okay.  So that document, which is Exhibit D,

22  pages 46 through 48, is between you and your

23  ex-wife, correct?

24  A. I don't know a lot about warranty deeds, but

25  I'm assuming that this agreement is a



1    warranty -- a warranty deed is for me to

2    remove myself from the property and the parcel

3    of land and has to be approved by the Erie

4    County Clerk's Office.  I'm assuming and

5    guessing this is an agreement that has to be

6    approved by the Erie County Clerk's Office.

7  Q. Okay.  The signatures on this document, the

8    warranty deed with lien covenant, they include

9    your signature and your ex-wife's signature,

10   correct?

11 A. Correct.

12 Q. Do they include any signatures from SLS?

13 A. No.

14 Q. What about any lender?  Do you see any lender

15   signature approving this document?

16 A. No.

17 Q. And you started stating nothing in this

18   document -- you can't point to something in

19   this document that removes you from the

20   mortgage?

21 A. Correct.

22 Q. So going back to my question, what is the

23   basis for your statement in paragraph 34 that

24   you had been removed from the deed, that part

25   I understand, you just referred to Exhibit D,



1    pages 46 through 48, but you also say and

2    mortgage.

3  A. I assumed.  If I'm removed from the deed, and

4    I have this court document, that I'm

5    alleviated from the -- I am alleviated from

6    the mortgage.

7  Q. Okay.  Again, let's keep to 2012 when there

8    wasn't a court document.

9  A. Correct.

10 Q. In 2012, what was your basis for stating that

11   you had been removed from the mortgage?

12 A. I don't know.  I can't answer that question.

13 Q. But you did state that in August of 2012 you

14   didn't have a written agreement from SLS or

15   any bank releasing you from the mortgage?

16 A. Correct.

17 Q. Is it your understanding under Exhibits B and

18   C that you're obligated on those documents

19   unless the lender releases you from those

20   obligations?

21 A. I would say so, yes.

22       MR. MCGRATH:  Why don't we take a quick

23   break here.

24

25       (Recess taken)



```
 1      BY MR. MCGRATH:
 2   Q. Welcome back, Mr. Macris.
 3   A. Thank you.
 4   Q. During the break did you discuss the substance
 5      of your testimony with anybody?
 6   A. I spoke with my attorney, Seth Andrews.
 7   Q. Without revealing what you discussed with your
 8      attorney, Mr. Andrews, did you discuss the
 9      substance of your testimony?
10   A. No.
11   Q. Okay.  Mr. Macris, let's turn to Exhibits E
12      and F.  Mr. Macris, have you seen Exhibits E
13      and F before today?
14   A. I believe so, yes.
15   Q. Okay.  What do you understand Exhibits E and F
16      to be in your own words, if you know?
17   A. In my own words this is my objection to what
18      Specialized Loan Servicing is saying, that
19      they are right.  That is my guess.
20   Q. Fair enough.  You're not an attorney.  Exhibit
21      E is plaintiff's response to defendant
22      Specialized Loan Servicing LLC's request for
23      admission, and I just read that off the
24      document itself.  Exhibit F is plaintiff's
25      amended response to defendant Specialized Loan
```



1    Servicing LLC's request for admissions.

2       Mr. Macris, these requests for admissions,

3    which are labeled 1 through 6, relate to

4    documents that SLS asked you questions about.

5    So request number one was to admit plaintiff

6    acknowledged and executed the note and

7    mortgage that are subject of the debt, annexed

8    hereto as Exhibit A, so that's referring to

9    what we've marked in this deposition as

10   Exhibits B and C.

11   A. Okay.

12   Q. And you admitted that those -- that you did

13      execute those documents, that you admitted

14      that in what is labeled as Exhibit E and you

15      admitted that in your testimony earlier?

16   A. Yes.

17   Q. Okay.  Request number two says admit plaintiff

18      failed to uphold his obligations under the

19      subject debt.  Your response on this one, your

20      attorney served some objections and ultimately

21      it states that plaintiff denies this.

22   A. Are we looking at E or F?

23   Q. They are the same, so you can look at E or F.

24   A. Okay.  Can you repeat.

25   Q. The request in number two is for you to admit



1        that you failed to uphold your obligations

2        under the subject debt.  In both E and F, you

3        deny that?

4    A. Yes.

5    Q. Okay.  You stated earlier that you didn't make

6        payments after 2009 under Exhibits B or C,

7        Defendant's Exhibits B or C, correct?

8    A. Correct.

9    Q. And you stated earlier that you were obligated

10       to make payments under B and C in 2008 when

11       you executed them, correct?

12   A. Correct.  It's either me or my wife.

13   Q. Let's go back to Exhibits B and C, because we

14       covered that earlier.  It's both independently

15       obligated.  We read that provision.

16   A. Correct.

17   Q. Do you recall that now?

18   A. Yes.

19   Q. Okay.  So if you didn't make payments and you

20       stated earlier today your wife did not make

21       payments starting in 2009, does that not

22       constitute a failure to uphold obligations

23       under the subject note?

24   A. Correct.

25   Q. Okay.  So can you then explain why you denied



1    that?

2  A. Because I was alleviated from the mortgage by

3    court.

4  Q. Okay.  So let's break that down a bit because

5    you keep saying alleviated from the mortgage.

6    Are you aware that Exhibits B and C are

7    separate documents?

8  A. Yes.

9  Q. One is a note and one is a mortgage?

10 A. Explain the difference between both of them.

11 Q. Sure.  Let me ask you if you understand what a

12    mortgage is.  Do you understand what a

13    mortgage is?

14 A. A mortgage is I borrow money from the bank and

15    I have to pay the bank back for a house, for a

16    property, my understanding of it.

17 Q. Okay.  So if you borrow money to buy a house

18    and you have to pay a bank back, is that not

19    what Exhibit B covers?

20 A. Yes.

21 Q. Okay.  So you're unaware that Exhibit C is a

22    legally distinct document?  That's called a

23    mortgage and it's securing Exhibit B with

24    property?

25 A. Well, of course I agree with you, but I don't



1      know.

2   Q. Okay.  So the distinction between a note and a

3      mortgage is not something you're fluent in?

4   A. No.

5   Q. Okay.  Going to request number three, admit

6      that plaintiff has been in default under the

7      subject debt since October 1, 2009, and that's

8      the same in E and F, as is your answer is the

9      same in E and F.  After your attorney's

10     objections, you state that you deny that?

11  A. I don't know what the status of it was, so

12     that's why I'm denying it.

13  Q. Sitting here today you don't have any evidence

14     that you, yourself, has made a mortgage

15     payment since October 1, 2009, to current?

16  A. Correct.

17  Q. Okay.  Questions 4 and 5 are where these get

18     interesting, more interesting.  In Exhibit E

19     for question number four, request number four,

20     it says admit plaintiff signed the loan

21     modification application dated December 20,

22     2011, annexed hereto as Exhibit B.  Do you see

23     that question?

24  A. Yes.

25  Q. And in Exhibit E, after asserting objections,



1        you state plaintiff denies.  Do you see that?

2    A.  What part?

3    Q.  The very end of your response.

4    A.  Okay.  Yes.

5    Q.  Now to make sense of this before we turn on to

6        F, let's look at what Exhibit B is.  I'm going

7        to hand you what's been marked as Defendant's

8        Exhibit K.  That might be the wrong one.  I'm

9        going to hand you Exhibit G and Exhibit H.  So

10       if you look at Exhibits G and H, Exhibit G is

11       a document that states it is an amended and

12       restated note.  Do you see that?

13   A.  Yes.

14   Q.  And on the last page, SLS038, do you see your

15       name typed with a signature above it?

16   A.  My name is on there with a signature.

17   Q.  And it's dated 12/20/11 next to a signature

18       above your name?

19   A.  Next to my name, not above.

20   Q.  I'm sorry.  Yes.  Do you see that?

21   A.  Yes.

22   Q.  Okay.  And then in Exhibit H, this is titled

23       commitment to modify mortgage, and on the last

24       page SLS035 it has Catherine Macris with a

25       signature dated 4/20/2010, and Mark K. Macris



1    with a signature above it that's dated

2    12/20/11.  Do you see that?

3  A. Yes.

4  Q. Okay.  And there's one more piece to the

5    puzzle.  It's Exhibit I.  Exhibit I, the front

6    page is a series of bar codes and it's called

7    loan modification, and it's Bates labeled

8    SLS025.  Do you see that?

9  A. Mm-hmm.

10 Q. Then next page is Bates labeled SLS026, and

11   the document is titled loan modification

12   agreement.  Do you see that?

13 A. Yes.

14 Q. Okay.  And then turning to page SLS028, at the

15   top it says signed and accepted this 20th day

16   of December, 2011, and it has your name typed

17   on a line with a signature above that typed

18   name.  Do you see that?

19 A. Yes.

20 Q. And below that it is a notary block.  Do you

21   see that?

22 A. Yes.

23 Q. And the notary states that in State of New

24   York, County of Erie, on this 20th day of

25   December, 2011, before me the undersigned, a



1    notary public in and for said state personally

2    appeared Mark K. Macris.  Do you see that?

3  A. Yes.

4  Q. Known to me or proved to me on the basis of

5    satisfactory evidence to be the person or

6    persons whose name or names is are subscribed

7    to the foregoing instrument and acknowledge

8    that he executed the same.  Do you see that?

9  A. Yes.

10  Q. And then that's signed by a notary whose name

11    is Rebecca Everleth.  It states she was

12    qualified as a notary in Niagara County, and

13    gives her notary number, and at the time her

14    notary commission expired in April 26th of

15    2015.  Do you see that?

16  A. Yes.

17  Q. Okay.  Let's just start with this document.

18    Is that your signature?

19  A. I don't recall signing this document.

20  Q. Okay.  That's an answer to a question I didn't

21    ask.  My question is does that appear to be

22    your signature?

23  A. That does not appear to be my signature.

24  Q. Okay.  So in the notary block if that's not

25    your signature, then that notary block signed

1       by Ms. Everleth, she's incorrect?

2   A.  If you say so, yes.

3   Q.  I am asking you if that -- if you didn't sign

4       that, then her statement that you appeared

5       before her and signed it would be incorrect?

6   A.  I don't remember signing this document.  That

7       appears to not be my signature.

8   Q.  Okay.  That wasn't my question.  My question

9       is if that's not your signature then Ms.

10      Everleth is not being truthful in that notary

11      statement, is she?

12  A.  If that's the notary law, yes.

13  Q.  I'm not asking about notary law.  We read what

14      it says.  She states that in New York, County

15      of Erie, on the 20th day of December, 2011,

16      before me before said state personally

17      appeared Mark K. Macris known to me or proved

18      to me on the basis of satisfactory evidence to

19      be the person whose name is subscribed to the

20      foregoing instrument and acknowledge that he

21      executed the same.  Do you understand what

22      that says?

23  A.  Yes.

24  Q.  She's saying you appeared in front of her on

25      that date and signed this document?



MARK MACRIS
MACRIS vs EXPERIAN INFORMATION SOLUTIONS

```
 1    A.  Correct.
 2    Q.  So again, my question was if you are stating
 3        that that is not your signature, then her
 4        statement is incorrect?
 5    A.  Correct.
 6    Q.  Okay.  Do you have any reason to understand
 7        why Ms. Everleth, a notary, would make that
 8        statement if it was not true?
 9    A.  No.
10    Q.  Do you know Ms. Everleth?
11    A.  No.
12    Q.  Is it your understanding a notary -- you
13        described it earlier, the notary's purpose is
14        to verify identity that someone is signing a
15        document is who they say they are, correct?
16    A.  Correct.
17    Q.  So if that wasn't your signature, this notary
18        did not do her job in your own words?
19    A.  Correct.
20    Q.  Is it your testimony today that you did not
21        sign this or you don't remember signing this?
22    A.  I don't recall signing this document.
23    Q.  Is it possible you signed it?
24    A.  I don't recall signing the document.
25    Q.  Okay.  But is it possible you did?
```



1   A. I can't answer that question.

2   Q. So it's not possible that you signed this

3      document?

4   A. I don't recall signing a document that is

5      dated six, seven years ago.  I don't recall

6      signing this document.

7   Q. Okay.  But if you don't recall, isn't it

8      possible that you did sign it?

9   A. It's possible.

10  Q. Looking at request number five -- sorry.

11     Request number four, where we asked for you to

12     admit that you signed the loan modification

13     application dated December 20, 2011, annexed

14     hereto as Exhibit B, which is referring to

15     this document, you state that you deny that in

16     Exhibit E?  So in Exhibit E, you deny that you

17     signed this document.  That's what you say in

18     Exhibit E.  You deny it?

19  A. Yes.

20  Q. Okay.  Let's turn to Exhibit F, same request,

21     number four, now again, Exhibit F is your

22     amended answer, so it's amending Exhibit E.

23     If you look at page 3 on request number four,

24     you've changed your answer from denying that

25     you signed that, Exhibit I, to now you say



1    that plaintiff admits that the signature bears

2    his name and is notarized, but does not recall

3    signing the document.  Do you see that?

4  A. Yes.

5  Q. Okay.  What caused this change from Exhibit E

6    to F?

7  A. I don't recall signing this document.  If I

8    don't recall signing something, then how can I

9    specifically say to you that I signed it or I

10    didn't sign it?

11  Q. I agree.  So go back and look at Exhibit E and

12    look at request number four.  Exhibit E, you

13    specifically say you did not sign it.

14  A. That is not my signature.  That's not my

15    signature.

16  Q. Okay.  So which is the correct answer, is it

17    Exhibit E or Exhibit F?  Is it it's not your

18    signature or you don't recall?

19  A. Both.  That is not how I make my signature.  I

20    don't recall signing this document.

21  Q. Okay.  But in Exhibit F, you state that it --

22    you admit that the signature bears your name

23    and is notarized.

24  A. It has my name.

25  Q. In Exhibit E you outright denied it?



1   A. What part are you referring to on E?

2   Q. Request number four, the final two words of

3      your response, plaintiff denies.

4   A. That appears to not be my signature.  I don't

5      recall signing the document.

6   Q. Okay.  But you said just a minute ago that if

7      you can't recall whether you signed it, you

8      can't state that yes, you signed it, or no,

9      you didn't.  That's your testimony.  We can

10     read it back.

11  A. Correct.  If I don't recall signing something,

12     then how can I say yes or no?

13  Q. But you did say no in Exhibit E.

14         MR. ANDREWS:  I am going to object.  We

15     supplemented the response, so he has provided

16     you with his response.  You keep asking him.

17     What is it --

18         MR. MCGRATH:  State your objection and

19     move on.  Answer the question.

20         MR. ANDREWS:  Repeat the question.

21

22     (The question was read)

23

24  Q. Can you answer the question?

25  A. I don't recall signing this document in 2011.



1   I am looking at the signature of this

2   document.  It does not appear to be my

3   signature.  I don't recall signing this

4   document.  It has my name, there's a notary on

5   there, and there is a signature.  That does

6   not appear to be my signature and I don't

7   recall signing the document.

8   Q. Sitting here today, do you stand by your

9   response in Exhibit E, that you deny -- where

10   you say plaintiff denies having signed Exhibit

11   I?

12   A. If I can't recall, I can't answer that

13   question.  I can't say yes or no.  But what I

14   am saying is that that signature here does not

15   appear to be my signature.  I am left-handed.

16   I don't sign my name that way.

17   Q. So the answer to my question is yes or no, you

18   stand by the answer you provided in Exhibit E?

19   A. I can't answer that question.  I can't answer

20   that question.

21   Q. Why can't you answer the question of whether

22   you stand by your response in Exhibit E?

23         MR. ANDREWS:  Object again.  Request

24   number four --

25         MR. MCGRATH:  This is not your



1    deposition.  I'd like an answer.

2  A.  Repeat the question.

3

4         (The question was read)

5

6  A.  As to what?

7  Q.  Request number four.

8  A.  I can't recall.  I can't recall.

9  Q.  You can't --

10 A.  Signing this document.

11 Q.  You can't recall sitting here today whether

12    you stand by your response to --

13         MR. ANDREWS:  Objection.  That's not

14    what he testified to.

15         MR. MCGRATH:  Do not interrupt my

16    question, counsel.

17 Q.  You do not recall sitting here today whether

18    you stand by your answer to request number

19    four in Exhibit E?

20 A.  That information here that you're referring to

21    has my name and there is a notary on it, and

22    there is a signature above my name.  I don't

23    recall signing the document.  So how can I

24    answer yes or no to your statement?  If I

25    can't recall, I can't say yes, I can't say no.



1    I don't recall signing it.  It doesn't look

2    like my signature.

3  Q. I'm asking you about your answer.

4  A. I already gave you my answer.

5  Q. No.  Your answer in Exhibit E, request number

6    four, where you deny having signed the loan

7    modification application dated December 20,

8    2011.  I am asking whether you stand by that

9    answer?

10        MR. ANDREWS:  I'm going to instruct him

11   not to answer anymore.  He's answered your

12   question numerous times.  Just because you

13   don't like the answer, ask a different

14   question.  He answered the same question

15   multiple times now.  We'll get the court on

16   the phone now.

17        MR. MCGRATH:  Are you directing the

18   witness not to answer a question that's been

19   posed that does not implicate privilege?

20        MR. ANDREWS:  Absolutely.  He's provided

21   you the answer.

22        MR. MCGRATH:  The answer is you're

23   directing your witness not to answer the

24   question that does not recall for the

25   revelation --



1          MR. ANDREWS:  He already answered the

2    question.

3          MR. MCGRATH:  Counsel, my question is

4    are you directing your witness not to answer a

5    question that does not call for the revelation

6    of attorney client privilege?

7          MR. ANDREWS:  You can just ask the same

8    question over and over and get the same

9    response.  We'll sit here for the seven hours.

10          MR. MCGRATH:  I'm going to object to you

11    to speaking objections and coaching --

12          MR. ANDREWS:  I'm not coaching.

13          MR. MCGRATH:  Counsel, I am going to

14    move on.  It's my deposition, not yours.

15          MR. ANDREWS:  That's fine.

16          MR. MCGRATH:  You are not allowed to

17    coach your witness.

18          MR. ANDREWS:  There's no coaching going

19    on.

20          MR. MCGRATH:  You absolutely just

21    coached the witness.

22          MR. ANDREWS:  Absolutely no coaching

23    going on.

24          MR. MCGRATH:  I'm going to instruct you

25    not to coach your witness.



MARK MACRIS                                                     April 25, 2018
MACRIS vs EXPERIAN INFORMATION SOLUTIONS                                    77

1              MR. ANDREWS:  Duly noted.

2

3      BY MR. MCGRATH:

4    Q. Mr. Macris, back to my question you have not

5       answered, do you stand by your answer to

6       request number four in Exhibit E?  Yes or no?

7    A. I don't recall signing the document.

8    Q. The question is yes or no, do you stand by

9       your answer in request number four in Exhibit

10      E?

11   A. I can't answer that question.  I don't recall

12      signing the document.  If I don't recall

13      signing a document, counselor, how can I say

14      yes or no?

15   Q. Mr. Macris, I'm not asking you about whether

16      you signed the document.  I'm asking you about

17      your answer to question number four in Exhibit

18      E.

19             MR. ANDREWS:  Can we go off the record.

20

21      (Discussion held off the record)

22

23   BY MR. MCGRATH:

24   Q. Mr. Macris, is your answer to question number

25      four the answer you provided in Exhibit E or



1        F?

2    A.  F.  I'm going to read.  I, Mark Macris, admit

3        that the signature bears his name and is

4        notarized but does not recall signing the

5        document.

6    Q.  Thank you.  So does that mean that you do

7        not -- that your answer in request number four

8        in Exhibit E is no longer your answer?

9    A.  It's F.  I don't recall signing the document.

10   Q.  So the answer to my question is yes, Exhibit F

11       is your answer to request number four?

12   A.  Yes.  I don't recall signing the document.

13       Let's move on.

14   Q.  I get to decide when we move on.

15   A.  I'm sorry.  Go ahead.

16   Q.  Request number five, in Exhibit E, it asks

17       admit plaintiff signed the amended and

18       restated note dated December 20, 2011.  That

19       is Exhibit G.  It's page SLS038.  You see your

20       answer in Exhibit E is you deny that you

21       signed that document on page SLS038, that was

22       your answer in Exhibit E?

23   A.  That's not my signature.

24   Q.  My question is in Exhibit E, you deny that

25       that's your signature, right, that you deny



1    signing it, right?

2  A. That is not my signature, correct.

3        MR. ANDREWS:  He's asking your response.

4  A. Okay.  I'm on Exhibit E.

5  Q. Request number five, the question was admit

6     plaintiff signed the amended and restated note

7     dated December 20, 2011?

8  A. Yes.

9  Q. And your answer was plaintiff denies?

10 A. Yes.

11 Q. Is that your answer to that question?

12 A. Yes.

13 Q. Turn to Exhibit F, same question, as we had

14    with request number four, your answer changes.

15    In Exhibit F, your amended response, you state

16    plaintiff admits that the signature bears his

17    name but does not recall signing the document.

18    So again, so we don't go back and forth on

19    this, is Exhibit E or Exhibit F your answer to

20    question number five?

21 A. Okay.  I think you're trying to confuse me.  I

22    am going to tell you that this here, this

23    signed document, I think you're trying to

24    confuse me.

25 Q. That's not the document we're talking about.



1   We're talking about Exhibit G.  Mr. Macris,

2   I'm not trying to confuse you.  I'm trying to

3   understand your answers.  You gave us two sets

4   of answers to these two questions.

5  A. Correct.

6  Q. And I'm trying to understand what changed.

7   After I figure out what changed, which of

8   those answers is your testimony today.  We're

9   clear on that?

10 A. Sure.

11 Q. Okay.  What I'm asking is is your answer to

12  request number five that you provided in

13  Exhibit E or F, the answer that you stand by

14  today?

15 A. F.

16 Q. Okay.  Again, like I asked with question four,

17  what brought about the change to your response

18  to question five?

19 A. What exhibit are you looking at?

20 Q. So you have to look at Exhibits E and F.  In

21  E, which your attorney provided to us in

22  January of this year, January 18th, you

23  provided a different answer than your attorney

24  provided to us yesterday.  What I'm asking is

25  what happened between January and April that



1      caused you to change your answer?

2  A.  What request are you looking at?

3  Q.  Number five.

4  A.  If I can't remember signing a document, I

5      don't remember what I signed last week just as

6      an example or whatever.  If I can't recall

7      signing a document, then how can I say that

8      that is my signature or I signed it yes or no?

9      If I can't recall, I cannot answer that

10     question.

11         Could it be?  Yes.  Could it be no?  It

12     could be no.  If I can't recall, I can't

13     specifically say yes, I signed that, or no, I

14     didn't sign that.  I don't recall.  That

15     signature does not appear to be my signature.

16     That's my answer.

17 Q.  Okay.  I agree with your theory, except in

18     Exhibit E you did specifically deny signing

19     it.

20 A.  Well if I can't recall, then maybe it's not

21     mine.  If I can't recall, then I deny it.

22 Q.  But you just said you can't -- if you can't

23     recall, you can't --

24 A.  You're making an assumption.

25 Q.  I'm asking you --



1        MR. ANDREWS:  Don't argue back and
2     forth.  Just answer his question.
3  Q. I'm asking you a question on your answer,
4     which was if you can't recall, you can't say
5     yes or no --
6  A. I cannot say yes or no, correct.
7  Q. And yet, in Exhibit E you did say no.
8  A. Yes, I said no.
9  Q. Okay.  So back to my question, between January
10    and April, what caused you to change your mind
11    from no, to I don't recall?
12 A. Nothing.  Because I don't recall signing the
13    document.
14 Q. But nothing changed from January to April that
15    brought about this changed answer?
16 A. No.
17 Q. Okay.  I am going to hand you what's been
18    premarked as Defendant's Exhibit J.  You can
19    start stacking these up, because we're -- I
20    don't want you to get confused there.  Have
21    you ever seen what has been marked as
22    Defendant's Exhibit J before?
23 A. No.
24 Q. Just looking at Exhibit J, you'll see at the
25    top it's dated April 29, 2010?



MARK MACRIS
MACRIS vs EXPERIAN INFORMATION SOLUTIONS

April 25, 2018
83

1   A. Yes.

2   Q. And looking at the second page, SLS024, the

3      document is signed by Catherine M. Macris.  Do

4      you see that?

5   A. Yes.

6   Q. And that was your -- that is your ex-wife,

7      right?

8   A. Yes.

9   Q. All right.  You can set that exhibit aside.

10     Actually going back to Exhibit J, your ex-wife

11     stated in April 29, 2010, she says

12     unfortunately at this time Mr. Macris refused

13     to sign his portion of the loan modification.

14     Do you recall discussing a loan modification

15     with your ex-wife in April of 2010?

16  A. I recall discussing a loan modification.  I

17     don't know the specific period of time,

18     though.  I would say it was probably sometime

19     around this time, but -- yes.

20  Q. Your wife stated, at least as of this date,

21     you refused to sign a loan modification.  Is

22     that with your memory of your conversations?

23  A. Absolutely.

24  Q. Why did you refuse to sign a loan

25     modification?



1  A. I was instructed by my attorney to not sign a

2     loan modification.

3  Q. Your attorney, being your divorce attorney?

4  A. Emilio, correct.

5  Q. Did your wife simply take that answer and go

6     away or did she continue to try to get you to

7     sign the loan application?

8  A. I don't recall what she did.

9  Q. Okay.  I'm going to hand you what's been

10    premarked as Defendant's Exhibit N.  Within it

11    is page Bates labeled SLS039 and it is a

12    letter to BAC Home Loan Servicing LP, and it's

13    signed by Catherine M. Schaefer.  Have you

14    ever seen this document before?

15 A. No.

16 Q. Is Catherine M. Schaefer the current name of

17    your ex-wife?

18 A. Yes.

19 Q. In this letter, your ex-wife discusses her

20    attempts to modify the mortgage with the

21    lender.

22 A. Yes.

23 Q. And in the end of the first full paragraph,

24    she states finally, December of 2009, he

25    signed the paperwork and then returned them to



1   me just recently.  Do you see that?

2   A. December of 2011.

3   Q. Sorry.  What did I say?

4   A. 2009.

5   Q. Sorry.  That's correct.  2011.  Let's read the

6      whole paragraph for the record.  My husband

7      walked out on me and kids in October, 2008.  I

8      struggled for two years to keep things afloat

9      by myself with no child support or assistance.

10         In early 2010, I applied to modify my

11      mortgage, I received the paperwork, filled it

12      out, and gave Mr. Macris the paperwork to

13      sign.  He refused after pleading with him to

14      do so.  That was just your testimony a few

15      minutes ago?

16   A. Correct.

17   Q. She then states finally, December of 2011, he

18      signed the paperwork and then returned them to

19      me just recently.  Do you recall that?

20   A. No.

21   Q. So are you asserting that your wife -- ex-wife

22      is incorrect in stating that?

23   A. Yes.

24   Q. That is not a true statement?

25   A. I don't remember giving her any of this



1       paperwork.  I don't recall that.

2    Q. So I want to be precise here.  Do you not

3       recall whether that's true or is that not

4       true, that last sentence?  You've established

5       earlier they're two separate things.

6    A. Right.  I don't recall -- I don't know about

7       this letter.  What Catherine Schaefer is

8       stating that I signed the paperwork and then

9       returned to me, I just don't remember that.

10      How could I remember something like that from

11      seven, six years ago or so?  So I believe that

12      her statement is incorrect.

13   Q. Because you don't remember that?

14   A. Like I said, we'll go back to it, I don't

15      remember signing those loan modifications.

16      Yes, it bears my name and there is a notary on

17      there.  That signature has my name but does

18      not appear to be my signature.

19   Q. Back to my original question, is it your

20      testimony today that Ms. Schaefer's statement

21      is incorrect because it did not happen or

22      because you do not remember?

23   A. I don't remember.

24   Q. In paragraph 4, she states that mortgage

25      checks are being sent to his address and as we



MARK MACRIS                                      April 25, 2018
MACRIS vs EXPERIAN INFORMATION SOLUTIONS              87

1    went to cash these checks so I could continue
2    to pay the mortgage, he conned, stole the
3    monies from me even though he knows the money
4    came from my bank account.  He says because
5    his name, end all caps, is on the check, he
6    gets half, so what does a single mom do?
7    Setting aside her emotion in that, that was
8    not particularly pleasant for you, what do you
9    believe she is saying, that you conned her of
10   money with the mortgage payments?
11 A. I don't know.  I don't know why she put this
12   information to BAC Home Loan.
13 Q. Did you have any process where mortgage checks
14   were sent to your address?
15 A. I can't recall that.  I -- the -- I don't
16   recall, no.
17 Q. So as you sit here today under oath, you don't
18   recall a process where your ex-wife mailed you
19   mortgage checks to pay the mortgage?
20 A. She mailed me mortgage checks?  No.
21 Q. Earlier today we discussed a foreclosure
22   action that was brought against you initially
23   and your ex-wife to foreclose on the property
24   at 403 Teakwood Terrace.  Do you recall that
25   line of questioning?



1    A.  Yes.

2    Q.  And you kept stating in earlier questions on

3        your complaint that there was a judicial

4        order, a court order that relieved you of your

5        obligations on the mortgage?

6    A.  Correct.

7    Q.  I'd like you to look again, Mr. Macris, at

8        what has been marked as Defendant's Exhibit D.

9        Defendant's Exhibit D is several documents,

10       it's all collated into one.  These were

11       materials that your attorney provided to us in

12       discovery.

13            Starting with the document -- at the top

14       of the document -- on the upper right it's

15       called summons and notice.  Let me find that

16       for you in this document.  For ease of the

17       deposition, I've put two Post-it notes on the

18       pages in D I want you to refer to.  Looking

19       first at the first section of Exhibit D, it's

20       the summons and notice, it's electronically

21       stamped in Erie County Clerk's Office

22       3/16/2015.  Do you see that page?

23   A.  Yes.

24   Q.  If you continue reading that, behind that

25       summons and notice is a document called



1   verified complaint.  All together with

2   exhibits -- the summons and notice and

3   verified complaint, we'll count the pages here

4   so there's no confusion, it's 37 pages.  I'm

5   just stating that so our transcript can be

6   clear on what we're looking at.

7        So looking on the first page and the fifth

8   page, the first page is called summons and

9   notice and the fifth is called verified

10  complaint.  This is a court document,

11  plaintiff is US Bank National Association, as

12  trustee for the SROF-2013-SE Remic, R-E-M-I-C,

13  trust one versus Mark Macris, Catherine

14  Macris, and John Doe and Mary Doe.  Do you see

15  that?

16  A. Yes.

17  Q. Have you ever seen these two documents?

18  A. Yes.

19  Q. What do you understand them to be?

20  A. That the house is going to be foreclosed on

21     and there's a legal process on how they need

22     to foreclose on the house.  That's what I'm

23     interpreting information as.

24  Q. And you're named in this as a defendant,

25     right?



MARK MACRIS
MACRIS vs EXPERIAN INFORMATION SOLUTIONS

April 25, 2018
90

1    A. Yes.

2    Q. What is your understanding of what foreclosure

3       means in your own mind?

4    A. Foreclosure means that after a certain amount

5       of time when you don't pay the bank what is

6       owed on your obligation, that they have a

7       right legally to take it from you.

8    Q. Okay.  That's pretty good.  And after

9       receiving these documents, did you go to court

10      on this action?

11   A. After I received these documents?

12   Q. Correct.

13   A. Not initially, no.

14   Q. Did you ever go to court?

15   A. Yes, I did go to court.

16   Q. Do you recall when you went to court?  Just to

17      help you out here, these documents were filed

18      March 16th of 2015.

19   A. I would say maybe -- guessing maybe a couple

20      months after that.

21          MR. ANDREWS:  Just so the record is

22      clear, are you asking if he filed anything or

23      made an appearance?

24          MR. MCGRATH:  Just went to court.

25   A. I did go to court.



1    Q. Do you recall going to court in what's called

2       a foreclosure settlement conference in June of

3       2015?

4    A. Mm-hmm.  Yes, I do.

5    Q. Okay.  And at that settlement conference, do

6       you recall what happened?

7    A. Yes.

8    Q. And what happened?

9    A. I appeared before the court with my divorce

10      attorney, I believe, and explained to them

11      that I don't have any legal right to this

12      property anymore, I signed over the deed, and

13      that I should follow up with I believe -- I

14      believe at the time follow up with the

15      foreclosure attorneys, because they were the

16      ones handling the mortgage and the note and

17      everything that goes along with that.

18         They asked me if I was planning on keeping

19      the house I believe, I said no, I haven't

20      lived in that house in six or seven years.

21      That was -- if I can recall, that was what the

22      conversation was about.

23   Q. Okay.  At the time you went to the conference

24      in June of 2015, was your daughter still

25      living with your ex-wife at that time?



MARK MACRIS
MACRIS vs EXPERIAN INFORMATION SOLUTIONS

April 25, 2018
92

1   A. Yes.

2   Q. And at that time, was your son still living

3      with you?

4   A. Yes.

5   Q. Okay.  So earlier you stated that your concern

6      over the foreclosure is that your daughter

7      would lose her home, correct?

8   A. Correct.

9   Q. So when you went to the conference in June of

10     2015 and were asked about retaining the house,

11     at that time were you still concerned about

12     retaining the house for your daughter?

13   A. I believe that I knew she was going to have

14     other plans to leave the house and get an

15     apartment, so I didn't have any concerns about

16     the house.

17   Q. When you say she, you mean your daughter or

18     your ex-wife?

19   A. My daughter was only three.  My ex-wife.

20   Q. Okay.  So your daughter was three in 2015?

21   A. I'm sorry.  My daughter was born in 2007, so

22     she was eight.

23   Q. Okay.  Do you recall what happened after --

24     were you told at that conference -- strike

25     that.  She never strikes it.  She writes down



1    strike that.  What were you told after that

2    conference in 2015 regarding your assertion

3    that you were removed from your obligations on

4    the property?

5  A. That I should -- that I should follow up with

6    Davidson Fink, who was the foreclosure

7    attorneys.

8  Q. Okay.  So at that conference the court didn't

9    tell you you were relieved of your

10   obligations?

11 A. No.

12 Q. I'm going to give you what has been premarked

13   as Exhibit U.  Mr. Macris, I've handed you

14   what's been premarked as Exhibit U.  These are

15   copies of an email exchange between you and

16   Davidson Fink, that your attorney, Mr.

17   Andrews, provided to our office yesterday.

18   Have you seen these emails before?

19 A. Yes.

20 Q. Okay.  Starting at the end of the chain,

21   page 3, which is actually the beginning of the

22   chain, correct?  That's how emails work?  It

23   puts the oldest one at the bottom?

24 A. Yes.

25 Q. May 18, 2015, a Kurt Odenbach from Davidson



1       Fink wrote to you that he was in receipt of

2       your email to Aaron Prestige because I am now

3       the attorney handling the file.  I have

4       reviewed the matter and agree that we can drop

5       you from the above reference, I think he means

6       referenced, action, we will be able to do so

7       at the next file pleading.  Do you see that?

8   A.  Yes.

9   Q.  Okay.  What did you understand that to be?

10  A.  I understood that to be that the foreclosure

11      attorney was going to not hold me responsible

12      for the mortgage and the debt at 403 Teakwood

13      Terrace.

14  Q.  Does that email state that?

15  A.  No.

16  Q.  Let's continue up the chain, or I guess your

17      response.  You respond to him on June 23,

18      2015, good morning, Mr. Odenbach, please

19      forward me the appropriate documentation that

20      will honor my divorce agreement, alleviating

21      me from the obligation and delinquency of this

22      debt.  You cite the index number.

23          You state after appearing at the unified

24      court system 8th judicial district foreclosure

25      conference on 6/19/2015, I was advised by



1      counsel and the clerk of this court to obtain

2      the appropriate paperwork for this matter from

3      your office.  My appearance at this conference

4      was to show you court certified copies of my

5      divorce agreement that was approved by the

6      Honorable John O'Donnell, State of New York

7      Supreme Court.  Thank you, Mark K. Macris.

8      Did I read that correctly?

9   A. Yes.

10  Q. And the exhibit is in the record.  That's

11     consistent with your testimony earlier, that

12     you went to a conference on June 19, 2015,

13     right?

14  A. Correct.

15  Q. It's almost directly verbatim to your

16     testimony about what happened at the

17     conference, right?

18  A. Yes.

19  Q. You said you showed up and had a divorce

20     decree and they told you to show up with the

21     appropriate paperwork, right?

22  A. Yes.

23  Q. And Mr. Odenbach responds to that email much

24     later, September 10, 2015, so now we're up to

25     the first page of the document, he says Mr.



1        Macris, I apologize for the delay on this

2        matter, but I have been working with my client

3        to try to convince them that we can drop you

4        from the action.  The issue, and I apologize

5        for not raising it before, is that you signed

6        the note, and thus are still obligated to

7        repay the debt owed.

8            If you could provide me with your divorce

9        decree, then I may be able to convince them to

10       waive the pursuit of the deficiency and drop

11       you from our action.  Did I read that

12       accurately?

13   A.  Yes.

14   Q.  What did you understand that to mean?

15   A.  I had phone conversations with Mr. Kurt

16       Odenbach, not only email conversations but

17       phone conversations, and Mr. Odenbach informed

18       me through phone conversations that he has to

19       go through a process to alleviate me from this

20       debt and mortgage, legally to convince the

21       bank to drop me from what is owed and the

22       obligation of this mortgage.

23           He said there's a long process to do that,

24       but he's working on it, yes.

25   Q.  Okay.  Did Mr. Odenbach ever provide you



1    written confirmation that the lender agreed to

2    waive your obligations under the note?

3 A. I asked for it, but he said he can't give that

4    information.

5 Q. So the answer is you do not have written --

6 A. I don't have the written -- I don't have that

7    written statement or agreement from Mr.

8    Odenbach.

9 Q. Okay.  But as you've stated earlier, you were

10    dropped as a defendant in the foreclosure,

11    right?

12 A. Yes.

13 Q. And what I am understanding Mr. Odenbach's

14    email is there's two separate things that he

15    was working on for you.

16 A. Yes.

17 Q. Okay.  And what were those two separate

18    things?

19 A. To drop me from this foreclosure action and

20    hold me not responsible for this mortgage.

21 Q. Okay.

22 A. And there's a legal process on how he has to

23    do it.

24 Q. And you ultimately got dropped from the

25    foreclosure action, correct?



1   A. Yes.

2   Q. And now let's turn to the second tab in

3      Exhibit D.  It's my second flag.  It's a court

4      document labeled order of reference, and it's

5      dated at the top Erie County Clerk,

6      November 20, 2015.  On the second page, midway

7      down it says ordered that Mark Macris be

8      dropped from the caption as said defendant is

9      no longer a necessary party.  Do you see that?

10  A. Mm-hmm.

11  Q. Is that what you were referring to earlier,

12     the court order you had?

13  A. Yes.

14  Q. Does that sentence say you are relieved of

15     your obligations on the note?

16  A. That sentence doesn't say that, no.

17  Q. Does that sentence say you have been removed

18     from the mortgage?

19  A. It's not spelled out that way, no.

20  Q. Okay.  So looking at this entire order of

21     reference, which is four pages, can you point

22     to anywhere within those four pages where the

23     court orders that you be removed from the

24     mortgage?

25  A. This is a legal document.  I'm not an



1      attorney.

2   Q. Understood.

3   A. So the conversations and correspondence I had

4      with Davidson Fink was that this will

5      alleviate you from the mortgage obligation on

6      Teakwood Terrace.  I'm not an attorney.  I

7      can't read through this and interpret a legal

8      document.

9   Q. Okay.  Understood.  But earlier you testified

10      that in your complaint, which is Exhibit A,

11      where you state in paragraph 24 and again in

12      paragraph 34 that you were removed from the

13      deed and mortgage and has a court order of

14      November, 2015 that acknowledges such.  You

15      said that court order is what removed you from

16      the mortgage.

17   A. Correct.  That's what they told me.

18   Q. And that's what you state in the complaint?

19   A. Yes.  They said this is how they will remove

20      me from the mortgage.  Foreclosure attorney

21      Mr. Odenbach has to go to the bank to do that.

22   Q. And so my question is you said this document

23      is what you're referring to as having removed

24      you from the mortgage.  My question to you

25      again is in these four pages of the order of



1  reference, can you point to a sentence,

2  paragraph, or clause that specifically states

3  you are removed from the mortgage?

4  A. Sure.  My name isn't here anymore.

5  Q. So you've been dropped as a defendant.  That's

6  what you're pointing to?

7  A. Right.

8  Q. But I'm asking you if there's a sentence in

9  there that says you've been removed from the

10  mortgage?

11 A. Is there an exact wording that I have been

12  removed from the mortgage?

13 Q. Yes.

14 A. According to this document, Catherine Macris

15  is the defendant and there's a referee named

16  Jason Dipasquale, who is supposed to compute

17  the action for principal and interest on the

18  note and mortgage on this loan.  My name is

19  removed.  According to this legal document I

20  am not a defendant anymore.

21 Q. Correct.  We agree.

22 A. That is what the foreclosure attorneys told

23  me, as soon as this document is done, I don't

24  have any further obligation to this debt or

25  this mortgage or note.  That was the process.



1  Q. Again, going back to your testimony earlier,

2     as you understood Mr. Odenbach's email dated

3     September 10, 2015, which is Defendant's

4     Exhibit U, to be that there were two issues,

5     one relieving you of your obligations on the

6     note and mortgage, and two, dropping you from

7     the case?

8  A. Correct.

9  Q. And is it not fair to say that what this

10    document is does drop you from the case?

11 A. Dropped me from everything.

12 Q. Where does it say that second part?

13 A. That's what the attorneys told me.

14 Q. So is the answer to my question it doesn't say

15    that in this document?

16 A. It doesn't say it in the document but that's

17    what they told me.

18 Q. So the answer is it does not say that --

19 A. It does not say in this document Mark K.

20    Macris is alleviated from the debt.  It states

21    I am not a defendant anymore and that there is

22    another attorney who has to calculate the

23    money that is owed to the bank, and I don't

24    owe the money to the bank because my name

25    isn't on there.  I'm not on here.  I'm done.



1    Q. So that's your interpretation of this order of

2       reference, that you're relieved from the note

3       and mortgage?

4    A. From the attorney's office, correct.  I am not

5       an attorney, but that's what they advised me.

6    Q. Understood.  But you testified already, unless

7       you want to change it, it does not say that in

8       this document?

9    A. It doesn't say that, no.

10   Q. Let's move on.  I have two more topics to

11      cover.  Do want to take a break or keep going?

12   A. Keep going.

13   Q. Did there come a time when you disputed my

14      clients reporting you as delinquent on the

15      mortgage loan for the property at 403 Teakwood

16      Terrace?

17   A. Yes.

18   Q. Do you recall approximately when you disputed

19      that, first disputed that?

20   A. I guess I have to ask you a question.  Are you

21      talking a written dispute or phone dispute?

22   Q. Let's start with the earliest dispute, whether

23      it was written or by phone.

24   A. Mm-hmm.  It was -- I -- probably first by

25      phone I would say.



1   Q. Do you recall approximately when?

2   A. I would say initial correspondence was

3      January, February, 2016, somewhere around

4      there.

5   Q. Do you recall what prompted you to call them

6      to dispute your being reported as delinquent

7      on that loan?

8   A. Do I recall contacting them?  Yes.

9   Q. Sorry.  Bad question.  Do you recall what it

10     was that raised this issue for you that you

11     needed to dispute the credit report?

12  A. When you get a bill in the mail that says I

13     owe $159,000 and I'm -- that I owe Specialized

14     Loan Servicing, yeah, I'm going to act on it.

15  Q. Okay.  So you received correspondence from

16     Specialized Loan Servicing stating you owed

17     money on the mortgage loan for the 403

18     Teakwood Terrace?

19  A. Correct.

20  Q. Do you recall when you received that document?

21  A. Around that timeframe, 2016 or so.

22  Q. Do you still have copies of that

23     correspondence?

24  A. I do.  I don't have them with me, but I have

25     copies of correspondence that I received from



1      SLS, correct.

2  Q.  And did you turn over the copies of that

3      correspondence to your attorney, Mr. Andrews?

4  A.  Not at that time, no.

5  Q.  Okay.  I'm going to direct Mr. Andrews that

6      material be produced and I'm going to hold the

7      deposition open to the extent that I need to

8      ask additional questions on those documents

9      that are responsive to document requests that

10     were served in this action.

11         Okay.  So after receiving those letters,

12     you contacted SLS by phone?

13 A.  Yes.

14 Q.  And do you recall what you said generally?

15 A.  I spoke to a couple of representatives from

16     SLS, one being named Tony, Bianca, and Linda.

17     They never give me their last name, they

18     weren't allowed to give me a last name.

19 Q.  Did they give you a badge number?

20 A.  They did gave me ID numbers.  I don't have

21     them, but I did write them down and document

22     who I spoke to.  But yes, I did call them

23     about their correspondence with me.

24 Q.  Okay.  And how did they respond to your verbal

25     questions as to your obligations on this loan?



1      Let me ask a better question.  What did they

2      say?

3  A.  They say that I owe whatever the amount was, I

4      believe I remember a statement saying

5      $159,000, and that I owe for this mortgage.

6      We are -- SLS is a mortgage servicer, they're

7      not the bank, and they're responsible for

8      collecting money on this debt.

9  Q.  Okay.  So in those calls you had they didn't

10     tell you you were not responsible for the

11     mortgage debt?

12 A.  No, they did not tell me that.

13 Q.  Okay.  And did you then follow up with SLS in

14     writing?

15 A.  Yes.

16 Q.  Okay.  Do you recall when?

17 A.  I would say approximately April of 2016.

18     Don't hold me to that date.  I know it was

19     sometime in that time period in 2016 I

20     responded -- I disputed it with them, that I

21     don't owe the debt.

22 Q.  You're acting like it's a pop quiz.

23 A.  I'm usually pretty good at dates.

24 Q.  I'm going to hand you what's been marked as

25     Defendant's Exhibit T.  For sake of moving the



1    deposition along, I marked all the

2    correspondence back and forth on your credit

3    dispute and loan modification process with SLS

4    as one document, as Exhibit T, however, they

5    are separate documents.

6        So we will start with the very first page,

7    Mr. Macris.  This is an undated letter from

8    you to SLS.  Do you believe this to be that

9    first written correspondence, somewhere in

10   April of 2016?

11   A.  Right.

12   Q.  Okay.  So in this letter, you ask SLS to look

13       at the order of reference, the affirmation of

14       Kurt Odenbach, an affidavit of Cynthia

15       Wallace.  You state I am ordered to be removed

16       from the mortgage obligation of 403 Teakwood

17       Terrace.

18   A.  Correct.

19   Q.  You also state please remove any derogatory

20       credit information listed in my credit reports

21       as being reported?

22   A.  Correct.

23   Q.  Sorry to make you look at Exhibit D again, but

24       Exhibit D includes the order of reference that

25       you reference in there and it also includes



1  the -- it should -- the affidavit of Cynthia

2  Wallace.  So this first flag here is called

3  plaintiff's affidavit and it's got a stamp

4  Cynthia Wallace in there.  So in your letter

5  you state that you're relieved of the mortgage

6  based on the affirmation of Kurt Odenbach and

7  the affidavit of Cynthia Wallace.

8      While I look for the affirmation of Mr.

9  Odenbach, can you show me -- we already

10  covered the order of reference, you've already

11  stated under oath today that it does not use

12  the words you're removed from the mortgage in

13  that document?

14  A. Yes.

15  Q. So can you look through the affidavit of

16  Cynthia Wallace and show me where her

17  affidavit states that you are removed from the

18  mortgage?

19  A. This isn't addressed to me.  I'm not a

20  defendant.  I'm not on here.

21  Q. Okay.  I'm not sure -- my question is you

22  state in this letter that upon the affidavit

23  of Cynthia Wallace, you were ordered to be

24  removed from the mortgage obligation.  I'm

25  asking you where in that document it says you



MARK MACRIS
MACRIS vs EXPERIAN INFORMATION SOLUTIONS

April 25, 2018
108

```
 1        were --
 2   A.  This document I was not referring to when I
 3        filed this dispute.
 4   Q.  What document are you referring to?
 5   A.  The order of reference, this one.
 6   Q.  The order of reference, okay.  You state three
 7        documents, you state order of reference,
 8        affirmation of Kurt Odenbach, and the
 9        affidavit of Cynthia Wallace as ordering you
10        to be removed.
11            So what you're referring to in this
12        email -- in this letter when you say I am
13        ordered to be removed from the mortgage,
14        you're saying that's pursuant to the order of
15        reference, which we already discussed?
16   A.  Yes.  Not this one.
17   Q.  Okay.  And not the affirmation of Kurt
18        Odenbach?
19   A.  He is the one who advised me to -- that is --
20        that's why I put affirmation of Kurt Odenbach.
21   Q.  Right.  But --
22   A.  I had correspondence with Kurt Odenbach for
23        this house.  He said I will get you off of
24        this, but this is the process.
25   Q.  Okay.  Understood.  But when you're stating I
```



1     am ordered to be removed from the mortgage,

2     you are saying the order that you're referring

3     to is the order of reference signed by Judge

4     James Dylan?

5  A. Correct.

6  Q. Okay.  And we went through that document and

7     we don't need to go through it again, but you

8     conceded the document doesn't use those words

9     you are to be removed from the mortgage,

10    correct?

11 A. The document doesn't say that -- the document

12    says that I am not a defendant and I don't owe

13    the money anymore.  That is what the attorneys

14    told me.

15 Q. Where did it say you didn't owe the money

16    anymore in the order of reference?

17 A. Right here.  Second last page, order that this

18    action -- ordered that this action be in the

19    same hereby as referred to as Jason Dipasquale

20    as referee to ascertain and compute the amount

21    due except attorneys fees to plaintiff in this

22    action for principal and interest on the note

23    and the mortgage, this all here.

24 Q. So where in what you are reading does it say

25    you are not relieved --



```
1    A. I'm not a defendant anymore.  The bank

2       alleviated me and said I don't have to pay

3       this debt anymore.  That is what Kurt Odenbach

4       told me, he can get me out of the obligation

5       of this mortgage and note, this is how he has

6       to do it.  He called me up, I remember I was

7       sitting at Panera Bread and he said you're

8       free and clear, got to wait for the paperwork.

9       Mr. Odenbach called me and told me that.

10   Q. I understand what you believe to be the

11      situation.  I asked where in here does it

12      specifically state you're relieved --

13   A. I can't interpret a legal document.  I'm not

14      an attorney.

15          MR. ANDREWS:  He's asking you for the

16      verbiage.

17   A. This is the verbiage, that.

18   Q. But you would agree this document does not

19      state in specific words that you are relieved

20      of the note and mortgage?

21   A. It doesn't say Mark Macris is relieved from

22      the note and mortgage.  It does not state that

23      in the order of reference.

24   Q. Okay.  Let's move on to -- back to Exhibit T,

25      the second page of Exhibit T is a letter from
```



1    SLS to you dated May 23, 2016.  Have you seen

2    that letter before?

3  A. Yep.

4  Q. And that's SLS's response to your inquiry that

5    you should not be listed as owing the money on

6    the note and mortgage, correct?

7  A. Correct.

8  Q. And in their letter, I'm not asking if you

9    agree, they say that's incorrect, we

10   determined you executed the note and mortgage

11   and are responsible for the note and mortgage,

12   correct?

13 A. That's what they're saying, correct.

14 Q. Okay.  The next page, page 3, is another

15   letter from SLS to you and to your ex-wife,

16   Catherine Macris, it's dated July 28, 2016.

17   Have you ever seen this document before?

18 A. Yes.

19 Q. Okay.  My first question on this is the 270

20   Miller Road address, I believe you said that

21   is where you were living in 2013 to current,

22   correct?

23 A. Yes.

24 Q. That's in Getzville?

25 A. Yes.



1    Q. So if this letter is dated Amherst and not

2       Getzville, would it still arrive?

3    A. Yes.

4    Q. So you received this letter?

5    A. Yes.

6    Q. And this is one of the letters you're

7       referring to that you -- a similar letter

8       initially triggered your inquiry that you got

9       from SLS saying you owed money on this loan?

10      Is that what this letter is saying?

11   A. One of the letters.  I had online access to

12      their -- see correspondence from them there,

13      too.

14   Q. Okay.  Moving to the next letter, which starts

15      as dated September 15, 2016, again from SLS,

16      this one is to -- addressed to you and to your

17      ex-wife, again, at the 270 Miller Road

18      address?

19   A. Mm-hmm.

20   Q. This is a letter discussing their review of

21      loss mitigation options, or -- do you

22      understand what that means, loss mitigation

23      options?  They're trying to look at ways to

24      resolve the amounts due on the debt, right?

25   A. Mm-hmm.



1  Q. And that's what this letter is explaining what

2     they looked at?

3  A. Yes.

4  Q. And then the next letter, that letter was five

5     pages, the next is dated August 29, 2016.

6  A. Mm-hmm.

7  Q. Again, addressed to you and your ex-wife,

8     Catherine, at your address, 270 Miller Road,

9     and this is a letter stating that they

10     received documentation regarding mortgage

11     assistance but they did not have all the

12     documents they needed to process the

13     application.  That's what this is saying,

14     right?

15  A. Yes.

16  Q. My question is did you submit loan

17     modification application paperwork that

18     generated this letter?

19  A. No.

20  Q. So as you sit here today, do you know why you

21     received this response?

22  A. Because they called me and demanded my

23     financial information.  That's why.

24  Q. Okay.  And did you provide it?

25  A. Absolutely not.



1   Q. Okay.  That covers that document because that

2      letter goes to the very last page.  Do you

3      want to look at the very last page?

4   A. Mm-hmm.

5   Q. Have you ever seen this last page dated

6      January 20, 2017?

7   A. Yes.

8   Q. Do you know what this is?

9   A. Acquisition or abandonment of secured

10      property.

11   Q. Do you know what this means?

12   A. I really don't.

13   Q. Okay.  All right.  You can set that aside.  Is

14      it fair to say after you disputed SLS's credit

15      reporting to you, their position was they were

16      reporting it correctly because you still owed

17      on the note and mortgage?

18   A. Yes.

19   Q. In your complaint you state that because you

20      believe that reporting was incorrect, it

21      affected your credit report, correct?

22   A. It destroyed my credit report.

23   Q. I am going to show you Defendant's Exhibits Q,

24      R, and S.  These are three letters that your

25      attorney provided to SLS in discovery



1  regarding credit decisions you received in

2  2016.  Have you seen these letters before, Q,

3  R, and S?

4  A. Yes.

5  Q. Starting with Q, what is Q?

6  A. Q is a document from Capital One whereas I

7  requested an increase on my credit line.

8  Q. Okay.  And the result was they did not approve

9  that?

10 A. Correct.

11 Q. Okay.  And do they state anywhere on this

12 letter that the reason they denied that credit

13 line increase was because SLS was reporting

14 you delinquent on your mortgage loan?

15 A. It's stating my credit score isn't high

16 enough.

17 Q. Okay.  So back to my question, no, they

18 don't --

19 A. They don't reference SLS on this document.

20 Q. Okay.  Taking a look at Exhibit R, can you

21 identify what Exhibit R is?

22 A. Application from Bank of America.

23 Q. Okay.  And this is Bank of America's denial

24 letter to your application for a Bank of

25 America cash rewards platinum plus Visa card,



1    correct?

2    A. Yes.

3    Q. And this is denying it.  Again, same question,

4       did they state anywhere in Exhibit R that you

5       were denied this credit card because SLS was

6       reporting you as delinquent on your mortgage

7       loan?

8    A. Doesn't state that, no.

9    Q. Okay.  Turning to S, can you identify what S

10      is?

11    A. Credit card application from Chase Bank.

12    Q. Okay.  And this is a denial of that

13      application.  Again, my question, same as

14      before, does it state specifically here you

15      were denied because SLS was reporting you

16      delinquent on your mortgage loan?

17    A. Yes.

18    Q. It does?  Where does it state that?

19    A. It says I have a foreclosure or repossession

20      or an early lease -- lease termination.

21    Q. Okay.  I see that.  I'm asking does it state

22      anywhere SLS is reporting you?

23    A. No.

24    Q. You fairly point out that one of the -- the

25      first item they state here is you have a



1    foreclosure or repossession or early lease

2    termination, right?  That's a compound

3    sentence?

4  A. Yes.

5  Q. It doesn't say which of those three, does it?

6  A. It doesn't say which of those three, but I

7    know it was on my credit report.

8  Q. The letter itself doesn't say which of the

9    three, right?

10  A. I don't know if -- I don't know the fair

11    credit reporting act or anything about that.

12    I don't know if a lender or bank or if you're

13    going to go buy a car or apply for a credit

14    card, to my knowledge, is that they can't

15    specifically list the name of a creditor on a

16    denied application.  I don't know that.  We

17    can assume, but is a creditor allowed to be

18    listed on a denial credit?  I don't know.

19  Q. I don't want to assume.  I want to go back to

20    my question, that that's a compound sentence

21    fragment, right?

22  A. Yes.

23  Q. So it's not identifying which of those three?

24  A. No, it's not.

25  Q. And in this there are three other sentence



1    fragments, correct, as part of the denial

2    decision?

3  A. Yes.

4  Q. The second is your credit report reflects

5    charge-offs or bad debt?

6  A. Correct.

7  Q. To your knowledge, did SLS charge off your

8    loan?

9  A. No.

10 Q. Do you know what bad debt collection is

11    referring to in that statement?

12 A. I don't know.

13 Q. The next sentence fragment is your credit

14    report reflects delinquent past, present

15    obligations.  Do you see that?

16 A. Yes.

17 Q. Do you know what that's referring to?

18 A. Sure.

19 Q. What's that referring to?

20 A. That I have trade lines on my credit report

21    that I haven't paid.

22 Q. Okay.  At that time, August 2nd of 2016, was

23    SLS the only thing on your credit report that

24    was delinquent?

25 A. No.



1  Q. What else was delinquent at that time in

2     August of 2016?

3  A. I had an American Express Card at that time

4     that was delinquent.

5  Q. Anything else in August of 2016?

6  A. Specialized Loan Servicing, American Express,

7     I had an auto loan that was paid but I had

8     some missed payments on it.  I don't remember

9     all the other ones.  There might have been one

10    or two small accounts, but I remember I had a

11    loan through Toyota Motor Credit that was paid

12    in early 2013.  The car wasn't repossessed but

13    I had some late payments on that, and American

14    Express and Specialized Loan Servicing.

15    That's my best recollection.

16 Q. So as I'm understanding your testimony, in

17    August of 2016, SLS reporting the mortgage

18    loan delinquency was not the only delinquent

19    reporting on your account, your credit report?

20 A. Correct.

21 Q. And the last line says credit report shows

22    delinquency, public record, or bankruptcy.  Do

23    you see that?

24 A. Yes.

25 Q. Do you know what that means or is referring



```
 1      to?

 2   A. I think it's a pretty broad statement.

 3   Q. I agree.

 4   A. I don't know.  It just says there's

 5      delinquency, but it could refer to one of the

 6      other points.

 7   Q. Okay.

 8   A. It could refer to one of the other points, I

 9      have delinquency and that's a statement by

10      Chase.

11   Q. Okay.  As of August 2, 2016, had you ever

12      filed for bankruptcy in your entire life?

13   A. No.

14   Q. Had you ever filed for bankruptcy?

15   A. No.

16   Q. Okay.  You can set those aside.  Showing you

17      what has been premarked as Defendant's Exhibit

18      P.  Okay.  Have you ever seen Defendant's

19      Exhibit P before?

20   A. Yes.

21   Q. And you'll agree Defendant's Exhibit P is

22      comprised of two different documents, correct?

23      It is comprised of a credit report as of

24      May 19, 2016, and that constitutes the first

25      17 pages, and then it includes a report dated
```



1        July 27, 2016?

2    A. Yes.

3    Q. Okay.  As you understand it, what are these

4        two documents showing?

5    A. This is my credit report as provided by

6        Experian dated 5/19/2016.  The second document

7        dated July 27, 2016, is a dispute result from

8        a dispute I filed.

9    Q. Okay.

10   A. With Experian.

11   Q. Looking at the May 19, 2016, report, turning

12       to page 7 of that report, at the top it's

13       reporting on American Express, right?

14   A. Yes.

15   Q. And that's the credit card that you were

16       referring to in your earlier testimony that

17       you were delinquent on?

18   A. Precisely.

19   Q. And do you see in the payment status it's

20       listed as charge-off?

21   A. Yes.

22   Q. Okay.  Do you know what charge-off means?

23   A. Yes.

24   Q. What do you understand charge-off to mean?

25   A. Charge-off means that I still owe the money



1    but the bank isn't actively or entity isn't

2    actively pursuing me for the debt.  They wrote

3    it off but I still owe the money.  That's what

4    I know.

5    Q. I litigate in this area and I'll tell you that

6       is the best answer I've heard a layperson give

7       on a charge-off.  Do you understand the credit

8       score implications of a loan that's been

9       charged off?

10   A. Yes.

11   Q. What do you understand the affect on your

12      credit score of a charge-off loan?

13   A. 35 percent of your FICO score is your payment

14      history.  If you have a charge-off, your

15      payment history is the highest percentage of

16      how they tabulate your FICO or vantage.  I

17      don't even want to talk about vantage score,

18      but 35 percent of your FICO score is from your

19      payment history.

20          Now if you have a charge-off that will

21      severely impact your credit score.  I don't

22      know by how many points, but it will impact

23      your credit score.

24   Q. Another really good answer to a question that

25      a lot of people don't understand.

1  A. Thank you.

2  Q. Do you know approximately how long a

3     charge-off stays on your credit report?

4  A. Seven years.

5  Q. Okay.  So is it fair to say this would be

6     considered a derogatory remark on your credit

7     report?

8  A. Yes.

9  Q. And that this report would bring down your

10    credit score?

11 A. Yes.

12 Q. And you stated you can't state and probably no

13    one can how much brings that down?

14 A. Some expert probably can, but yeah.

15 Q. Down below it says Capital One?

16 A. Yes.

17 Q. This is an account that was -- it's listed as

18    open 3/1/2012 and account status listed as

19    closed, and in the payment status, do you see

20    it says paid, was past due 150 days?  Do you

21    see that?

22 A. Yes.

23 Q. Do you recall this credit account?

24 A. Yes.

25 Q. And was it, in fact, delinquent more than



1        150 days?

2   A.  No.

3   Q.  So this was an incorrect reporting on your

4        credit report?

5   A.  Yes.

6   Q.  Okay.  But as reported in May 19, 2016, that

7        would be considered a derogatory remark,

8        correct?

9   A.  Correct.

10  Q.  Turning to page 9, do you see child support

11       enforcement at the bottom?

12  A.  Mm-hmm.

13  Q.  What is that?

14  A.  I pay child support, $200 a month for my

15       daughter.

16  Q.  Okay.  So it states in payment status current,

17       was a collection account, insurance claim,

18       government claim, or terminated for default.

19       Do you know what that means?

20  A.  No.

21  Q.  Did you ever default on your child support

22       payments?

23  A.  No.

24  Q.  Would you agree that as reported here that

25       would be -- that could constitute a derogatory



1        mark on your credit report?

2   A.   Correct.

3   Q.   Okay.   Turning to page 10, credit first NA.

4        Do you see that?

5   A.   Mm-hmm.

6   Q.   It was an account opened on 8/1/2010 and it's

7        marked as closed.   Do you see the payment

8        status, it says charge-off?

9   A.   Yes.

10  Q.   Is that an accurate reporting?   Was that one

11       charged off?

12  A.   Yes.

13  Q.   So that would have the same negative affect as

14       the American Express charge-off in terms of it

15       being a derogatory mark on your credit report?

16  A.   A derogatory mark, yes.

17  Q.   Okay.   Page 12, Specialized Loan Servicing, do

18       you see it states there past due amount,

19       balance and payment status is listed as

20       foreclosure, proceedings started?

21  A.   Mm-hmm.   Yes.

22  Q.   And your position is that is an incorrect

23       reporting because you believe to have been

24       relieved from the note and mortgage

25       obligations on that loan?



```
 1   A. Correct.

 2   Q. Okay.  Turning to the next page, page 13,

 3      looking at the Toyota Motor Credit, is this

 4      the one you're referring to that has the past

 5      due?

 6   A. Correct.

 7   Q. And it reflects past due 60 days?

 8   A. Yes.

 9   Q. And that account is now reflected as closed?

10   A. Yes.

11   Q. Is it your understanding that a past due

12      60 days would be considered a derogatory mark

13      on your credit report?

14   A. Yes.

15   Q. And the last one on this report, it's Verizon,

16      and it's account status closed, and a payment

17      status, it says legally paid in full for less

18      than the full balance.  Can you explain that

19      one?

20   A. I'll try.

21   Q. Okay.

22   A. This account was my old phone service on

23      Teakwood Terrace when I was married.  My wife,

24      going through a divorce, I believe what she

25      did was she got rid of the Verizon service
```



1    somehow, some way, they sent her a bill and

2    she agreed on an amount that was owed.  But

3    Verizon had it in my name so it was reported

4    on my credit.

5  Q. Okay.  Is it your understanding that when you

6    pay less than the full balancing on a loan to

7    settle a debt that could be considered a

8    derogatory mark on a credit report?

9  A. Unless you can get the creditor to agree to

10   not report it that way.

11 Q. So unless you get that creditor, it would be

12   considered a derogatory remark on a credit

13   report?

14 A. I would say that's an inaccurate statement.

15 Q. Which part?

16 A. If I can get them to agree to not report any

17   interrogatory mark on your credit report in

18   writing, then that's not derogatory.

19 Q. If you can't get them to agree to report it as

20   not paid in --

21 A. Yeah, then they could report it as potentially

22   negative, which they did.

23 Q. Okay.  So as reported on this credit report,

24   that would be considered a derogatory mark on

25   this credit report?



1   A.  Yes.

2   Q.  Turning to the July report, again, we can go

3       through these quicker.  On page 4, the first

4       item is the American Express, this is the

5       charge-off we already discussed?

6   A.  Yes.

7   Q.  It's reporting it the same way?

8   A.  Yes.

9   Q.  And this notes that this account is scheduled

10      to continue on record until March 20, '22.  Do

11      you see that?

12  A.  Yes.

13  Q.  So is it your understanding this remark will

14      stay on until March of 2022?

15  A.  That's what this report says.

16  Q.  Turning to page 5, again, we have the

17      charge-off for credit first NA?

18  A.  Yes.

19  Q.  Above that we have the child support report?

20  A.  Yes.

21  Q.  Next page, page 6, we have the Specialized

22      Loan Servicing?

23  A.  Yes.

24  Q.  And one thing I want to note, on page 4 and 5,

25      the American Express, the credit first, and



1      the child support, the responsibility for each

2      of those is listed as individual, correct?

3  A.  Yes.

4  Q.  And that means that account is fully in your

5      name, right?

6  A.  Yes.

7  Q.  Whereas the SLS, you see it's a joint with

8      Catherine Macris?

9  A.  Yes.

10 Q.  So it's your understanding you both signed the

11     note and mortgage?

12 A.  In 2008, yes.

13         MR. MCGRATH:  Okay.  And I think that

14     ends that document.  Okay.  Let me take five

15     minutes and then I will go to my last set of

16     questions and we'll get out of here.

17         THE WITNESS:  Okay.

18

19              (Recess taken)

20

21     BY MR. MCGRATH:

22 Q.  Welcome back, Mr. Macris.

23 A.  Thank you.

24 Q.  During the break did you discuss the substance

25     of your testimony today with anybody?



```
 1   A.  No.  Seth and I talked about the weather.  I

 2       wanted to talk about the NFL draft but we ran

 3       out of time.

 4   Q.  To the extent you don't already like me a lot,

 5       I'm a Dolphins fan.  Mr. Macris, I am going to

 6       ask you some final questions on the credit

 7       disputes that you had with SLS and the affect

 8       it had on your life.  In your initial

 9       disclosure statement that your attorney

10       provided, it's called 26A1 disclosure, you

11       state that you will provide testimony

12       regarding your conversations with co-workers,

13       family, neighbors relative, I don't know if

14       that's a typo, whether it's neighbors relative

15       to telephone conversations or it's supposed to

16       be neighbors and relatives, to telephone

17       conversations and/or letters received from the

18       defendant.  Can you tell me what you -- what

19       conversations you're referring to, which

20       defendant and --

21   A.  Can I see that?

22   Q.  Yes.

23

24       (Exhibit V was marked for identification)

25
```



1   Q. All right.  Handing you what's been marked as

2      Defendant's Exhibit V.  As I said, this is the

3      initial disclosure that your attorney filed on

4      your behalf in this action where it states

5      factual information that you intend to offer

6      in this case.  If you look on page 1, Mark

7      Macris will provide testimony regarding the

8      following.

9          We've covered A, we've covered B.  I don't

10     need to ask you about those.  But it's C, you

11     say his conversations with co-workers, family,

12     neighbors relative to telephone conversations

13     and/or letters received from the defendant.

14     What are you referring to?

15  A. I discussed my matters with SLS with family

16     members, friends, and the whole complete total

17     dissatisfaction of this whole matter.

18  Q. Okay.  So you say co-workers, family, and

19     neighbors.  Who are these co-workers, family,

20     or neighbors that you discussed these matters

21     with?

22  A. Okay.  I will narrow it down to my family

23     members.  Do you want their names?

24  Q. I believe in your interrogatories you stated

25     your mother and sister I believe?



1  A. My mother, my sister, and my brother, and a

2     couple of friends.

3  Q. And what are the friends?  Who are the

4     friends?

5  A. Frederick Stone.

6  Q. Who is Frederick Stone?

7  A. A friend of mine.

8  Q. Okay.

9  A. Charles Siminski, S-I-M-I-N-S-K-I.

10 Q. Okay.  Anyone else?

11 A. I would say no.

12 Q. Are any of these people co-workers?

13 A. No.

14 Q. So did you have conversations with co-workers?

15 A. No, not with co-workers.

16 Q. Okay.  Can you tell me about your

17    conversations regarding your conversations and

18    letters with defendant SLS that you had?

19    Let's start with your mother.

20 A. My mother is my mother, and I over the course

21    of many months while this was going on, I

22    mean, she was my shoulder to cry on, and she

23    hoped -- obviously, I'm her son, I am her

24    youngest son, she wishes for the best for me

25    and a positive outcome.



1         I spoke with her many times in person,

2    over the phone, just relayed to her my

3    feelings and my distress with this matter.

4    Same with my sister.

5   Q. Okay.  Let's start with your mother.  Other

6    than things you told her, does she have any

7    independent information about your complaint

8    that you filed, your federal complaint?

9   A. She knows what's going on.

10        MR. ANDREWS:  She means factually.

11  Q. Other than things you told her, does she have

12   factual information relevant to your claims in

13   your complaint?

14  A. No.

15  Q. What about your sister?

16  A. No.

17  Q. Brother?

18  A. No.

19  Q. So for all three of those, you're referring to

20   you telling them about what was going on with

21   your credit issues?

22  A. Correct.

23  Q. They didn't have any independent factual

24   information that they were sharing with you?

25  A. I didn't give them any documents or anything



1       like that.

2    Q. And they didn't have any additional documents

3       that would be relevant to this action?

4    A. No.

5    Q. Okay.  What about Fred Stone?

6    A. No.  Same with Fredrick and Charles.

7    Q. Okay.  So all five of these people, what

8       you're referring to here is you communicating

9       information to them about your experiences?

10   A. Yes.

11   Q. So none of those five people have independent

12      factual information relevant to the case?

13   A. No.

14   Q. Okay.  Turning back to Exhibit A, the

15      complaint.  In paragraph 7, you state

16      defendants, Experian and SLS, negligently and

17      willfully violated various provisions of the

18      FCRA and plaintiff is entitled to an award of

19      actual damages, punitive damages, attorneys

20      fees, and costs.  I'm just going to ask you

21      about the actual damages related to the credit

22      reporting of SLS.  Can you tell me what those

23      actual damages are to you?

24          MR. ANDREWS:  Just -- just with respect

25      to the credit report you're asking?



1          MR. MCGRATH:   Yes.

2   Q. With the credit report, how SLS reporting you

3      as delinquent on that loan and your view that

4      you were relieved of those obligations, what

5      are the damages that have resulted from that

6      credit reporting?

7   A. Are you asking me for a monetary amount or --

8      I don't understand.

9   Q. Either.  Any damages you've suffered,

10      financial, emotional, any other type of damage

11      that I can't contemplate?

12   A. Emotional.

13   Q. Can you tell me a bit more about the emotional

14      damages?  What kind of emotional damages are

15      you referring to?

16   A. Emotional damages to me.

17   Q. That damage being what?

18   A. Fear, anxiety, not able to sleep, not able to

19      adequately provide for my children.  I'm a

20      single father with two children, problems

21      concentrating on work.  I'm going to elaborate

22      on that quite a bit.  My job requires me --

23      I'm a field inspector for New York State

24      Workers' Comp.  My job is to go to companies

25      directed by the New York Board to verify



1       operations for classification of risk.  Are

2       you familiar with that?

3    Q. Not really.

4    A. I don't want to bore you with New York State

5       Workers' Comp.  That's my expertise.

6    Q. Whatever you need to tell me to explain your

7       fear, anxiety, sleep --

8    A. I'm going to tell you because it's my

9       expertise.  In New York State and other states

10      companies are classified for Workers' Comp.

11      Way back in 1914 when this system was

12      established, by law companies are required to

13      carry coverage, which we all know, but when

14      you pay for your premiums it's based on what

15      type of work that you do, whether you're a

16      restaurant, manufacturing company, a machine

17      shop, there's over 600 different

18      classifications of work in the State of New

19      York.

20          My board handles the classification

21      system.  I am a field employee.  I work in

22      Western New York, so I get assignments to me

23      to go visit companies.  I don't make

24      appointments.  I'm an inspector.  By insurance

25      law and their contract, they have to abide by

1   a board inspection.

2        So my job is to walk into a big

3   manufacturing company, I have business cards,

4   I have an ID card, and I have a badge.  I tell

5   them who I am, purpose of my visit, and I ask

6   to meet with somebody who has an understanding

7   of the business operations.  Not many people

8   can do my job, sir.  I might get called into a

9   boardroom and sit in front of eight or nine

10  people questioning who I am, why I'm here, and

11  my organization in general.

12       Like I said, not many people can do my job

13  to develop a quick rapport with these people

14  and tell them the purpose of my visit.  This

15  thing put me through, excuse my language,

16  hell.  I couldn't sleep at night, my blood

17  pressure was up, probably 150 to 160.

18       And yes, I was a trained EMT.  I worked

19  ten years on an ambulance, so I can definitely

20  attest to having high blood pressure and know

21  what the ramifications and affect of a high

22  blood pressure are.

23       So a lot of times I lost my composure.

24  Here I am sitting in a meeting with ten

25  people, they're all starting at me wanting to



1   know why I'm here, and my job is to ask

2   specific questions to a company to do a

3   verification of operations and to develop that

4   quick rapport.

5       I lost my composure, I froze up quite a

6   few times.  I had to -- tense, and the anxiety

7   overtook me quite a bit.  So not only do I

8   have to develop a quick rapport with people, I

9   have to ask definitive questions about a risk

10  or operation.  More or less I have to verify

11  what they do, what their process is, what do

12  they make, what are the raw materials, what

13  types of equipment do they have, how many

14  employees work in their operation.

15      Not only that, I have to generally do a

16  walkthrough of the facility to do verification

17  and document raw materials, equipment, and

18  gather all this information together.  Not

19  only that, but correspond with the insured,

20  which is the company, to let them know the

21  purpose of my inspection.

22      There's two folds to this.  Not only did I

23  have problems with my job of going to

24  companies to do this, I had to make repeat

25  visits, phone calls.  The third part of it is



1   once I gathered my information on this

2   company, I have to develop a comprehensive

3   report.  Very interesting.

4       I have to take my written notes, my

5   documents, and file a report based on what

6   they tell me, their operations, what they do,

7   raw materials, how they build products,

8   whatever.  That information has to go to

9   Manhattan.  So I have to do that.

10      That's my job.  If they have questions

11  about my reports or anything, they get back to

12  me.  They send me an email back, Mark, we need

13  you to clarify this operation or it's being

14  returned for whatever reason.

15      This whole thing devastated me.  I

16  couldn't sleep at night, anxiety, high blood

17  pressure.  I had problems doing my job.  Not

18  only that, I had my children to take care of.

19  I have a ten-year-old daughter who is my life.

20  My son is 18 now, and he's kind of on his own.

21  But when you're a single father, you have to

22  provide for your children.

23      I don't have a wife or relatives that I

24  live with.  When those people demanded my

25  financial information, demanded, this Tony,



1   arrogant -- I'll start swearing about it.

2   Arrogant SOB.  We need this, we need that.

3   Like no, you're not getting my financial

4   information.

5       How do I know you're not going to garnish

6   my wages, call my work, take my car?  What

7   happens if they take my car, it's a

8   possession, you owe $153,000 or whatever, how

9   do I know they're not going to do that?  If I

10  don't have a car, sir, how am I going to work?

11  So that's what it did to me when I was

12  working.

13      And of course I had to come home and take

14  care of my children.  I suffered immensely.  I

15  leaned on my family and friends, as stated in

16  the names that I gave you.  Anxiety, fear,

17  embarrassment, humiliation.  Humiliation.  I

18  was cleared of this and I got these people

19  calling me, sending me letters, documents, you

20  owe this money.

21      No, I don't.  They call me, your house is

22  getting foreclosed on September 27, 2016, what

23  are you going to do about it?  That's how I

24  felt.  It still bothers me.  How do I know

25  they're still not going to come after me for



1    this debt?  That's how I felt, and I still

2    feel this way.  It's a very sore subject with

3    me.  It will bother me for the rest of my

4    life.  Any other questions?

5  Q. Yes.  Did you ever receive treatment for let's

6    start with anxiety?

7  A. No.

8  Q. Were you ever diagnosed clinically with

9    anxiety?

10 A. No.

11 Q. Were you ever prescribed medication for

12   anxiety?

13 A. No.

14 Q. What about loss of sleep?  Were you ever

15   diagnosed with insomnia?

16 A. No.

17 Q. Were you ever treated for insomnia?

18 A. No.

19 Q. Were you ever prescribed medication for

20   insomnia?

21 A. No.

22 Q. What about fear?  Were you ever diagnosed with

23   a mental health issue colloquially defined as

24   fear or excessive fear?

25 A. No.



```
1    Q. Ever treated for it?

2    A. No.

3    Q. Prescribed any medication for it?

4    A. No.

5    Q. Were you ever formally diagnosed with high

6       blood pressure?

7    A. No.

8    Q. Were you ever --

9    A. I could say myself.

10   Q. Other than yourself, were you --

11   A. No.

12   Q. Were you ever treated for high blood pressure

13      medically?

14   A. No.

15   Q. Were you ever prescribed any medications for

16      high blood pressure?

17   A. No.

18   Q. Did you experience any of these conditions,

19      fear, anxiety, loss of sleep, high blood

20      pressure, when you were going through your

21      divorce?

22   A. No.

23   Q. None of them?

24   A. Not really, no.

25   Q. Were you ever diagnosed -- you said you had
```



```
 1        problems at work, keeping your focus.  Were
 2        you ever diagnosed with attention deficit
 3        disorder?
 4   A.  No.
 5   Q.  Were you ever treated for it?
 6   A.  No.
 7   Q.  Were you ever prescribed medication for it?
 8   A.  No.
 9   Q.  Okay.  You mentioned phone calls from SLS and
10        your worries about things that they -- that
11        you wondered as to what they would do, such as
12        taking your car.  Did they ever explicitly
13        threaten to take your car?
14   A.  No.
15   Q.  Did they ever explicitly threaten to garnish
16        your wages?
17   A.  No.
18   Q.  Did they ever explicitly threaten you with a
19        recourse to collect that debt other than
20        foreclosure?
21   A.  They threatened me with foreclosure, they
22        threatened me to get my financial information.
23        I'm not going to ask them what they're going
24        to do with the financial information, but I'm
25        assuming, this is an assumption, is that if I
```



```
 1       give them my financial information, bank
 2       accounts, retirement accounts, my work, how do
 3       I know they're not going to go after my
 4       income, my work, my possessions?  I don't know
 5       that.
 6   Q.  Okay.  That's your speculation, though?  They
 7       didn't --
 8   A.  Speculation and assumption, correct.
 9   Q.  Did you lose any business deals as a result of
10       being denied a business loan because of your
11       credit score?
12   A.  I don't have a business.
13   Q.  So the answer would --
14   A.  No.
15   Q.  From 2009 until the filing of your complaint,
16       did you ever have a purchase offer on a piece
17       of property, real property?
18   A.  No.
19   Q.  So is it fair to say you didn't have any
20       mortgage loan application denied from 2009
21       until the time you filed the complaint?
22   A.  Correct.
23   Q.  And we went through the credit report.  There
24       were other things on your credit report that
25       reflect derogatory marks on your credit?
```



MARK MACRIS
MACRIS vs EXPERIAN INFORMATION SOLUTIONS

April 25, 2018
145

1   A. Yes.

2   Q. At the time you filed the complaint April 28th

3      of last year, did you have any other debts

4      besides the debt of issue in this case?

5   A. As far as?

6   Q. Personal or real property debt, any debts

7      whatsoever?

8   A. Some credit card debt.

9   Q. As of the time you filed this complaint

10     April 28, 2017, do you recall approximately

11     the balances you owed on those debts?

12  A. From 2017 until now?

13  Q. No.  As of 2017, April 28, 2017, when you

14     filed the complaint, do you recall

15     approximately how much debt you had?

16  A. My car loan, some credit card debt, maybe 10

17     to 15,000 with the car loan and some credit

18     card debt in April of 2017.

19  Q. Okay.  And as of April 28, 2017, what was your

20     annual income for the previous year, 2016 at

21     your current position approximately?

22  A. 65,000.

23  Q. And how much as of April 28, 2017, were your

24     housing costs for your address at 270 Miller?

25  A. $800 for the house, utilities, couple hundred



1      dollars for utilities, insurance.

2    Q. So 800 is the rent exclusive of utilities?

3    A. Yes.  The house is owned by my sister and I'm

4      renting the house.

5    Q. Okay.  Mr. Macris, if you didn't understand my

6      questions today, you told me that, correct?

7    A. Yes.

8    Q. Okay.  So unless you told me that, can I

9      assume you understood my questions today?

10   A. Yes.

11   Q. Are there any answers you provided today that

12     you'd like to change at this time?

13   A. Not at this time, no.

14   Q. Have you told me everything that you believe

15     to be critical in support of your claim in

16     your complaint?

17   A. Yes.

18   Q. Are there any other documents you could review

19     or look at that would provide me more

20     information?

21   A. Not at this time, no.

22   Q. Is there anything else you'd like to tell me

23     about this case?

24   A. Well I think I explained the emotional damages

25     that this caused me.  I'm going to reiterate



1    that information a little bit more.  I am

2    still suffering from it and talking to my

3    friends, family, helps.  I'm one of those

4    people that believe in you have to take care

5    of yourself and I just -- it's tough being a

6    single father enough and raising children by

7    myself, but I'm working my way through it.

8    That's all.

9         MR. MCGRATH:  Subject to the

10   possibility, and I don't think it's a high

11   one, that I would need to reopen it based on

12   the letters that he provided, and I say that

13   because there was one letter, all be it later

14   in time --

15        MR. ANDREWS:  Yeah.  We'll have him

16   search through for something else he has that

17   he didn't produce.  We'll send it over to you.

18        MR. MCGRATH:  Yeah.  Subject to me

19   needing to ask additional questions, which I

20   think is low, I have no further questions.

21

22        (Deposition concluded at 2:06 p.m.)

23              *  *  *  *  *  *

24

25



1  STATE OF NEW YORK)

2                    )  ss

3  COUNTY OF ERIE   )

4

5

6  I, Shannon Gallagher, Notary Public, in and
   for the County of Erie, State of New York, do
7  hereby certify:

8  That the witness whose testimony appears
   hereinbefore was, before the commencement of
9  their testimony, duly sworn to testify the
   truth, the whole truth and nothing but the
10 truth; that said testimony was taken pursuant
   to notice at the time and place as herein set
11 forth; that said testimony was taken down by
   me and thereafter transcribed into
12 typewriting, and I hereby certify the
   foregoing testimony is a full, true and
13 correct transcription of my shorthand notes so
   taken.

14

15 I further certify that I am neither counsel
   for nor related to any party to said action,
16 nor in anyway interested in the outcome
   thereof.

17

18 IN WITNESS WHEREOF, I have hereunto
   subscribed my name and affixed my seal this
19 4th day of May, 2018.

20 _____
21 Shannon Gallagher
   Notary Public-State of New York

22

23

24

25



Word Index
Mark Macris

**Exhibits**

2130195 .
EXHIBITA

2130195 .
EXHIBITB

2130195 .
EXHIBITC

2130195 .
EXHIBITD

2130195 .
EXHIBITE

2130195 .
EXHIBITF

2130195 .
EXHIBITG

2130195 .
EXHIBITH

2130195 .
EXHIBITI

2130195 .
EXHIBITJ

2130195 .
EXHIBITK

2130195 .
EXHIBITN

2130195 .
EXHIBITP

2130195 .
EXHIBITQ

2130195 .
EXHIBITR

2130195 .
EXHIBITS

2130195 .
EXHIBITT

2130195 .
EXHIBITU

2130195 .
EXHIBITV

**$**

$153,000
140:8

$159,000
103:13
105:5

$189,000
11:11

$200
124:14

$800
145:25

**1**

**1**
18:10
21:13,15
22:8,20,
21 61:3
64:7,15
131:6

**10**
32:3
95:24
101:3
125:3
145:16

**11**
26:14,15,
16,18

**12**
125:17

12/20/11
65:17

66:2

**13**
126:2

**14**
52:24
54:5

**14221**
52:21

**15**
32:3
112:15

**15,000**
145:17

**150**
123:20
124:1
137:17

**160**
137:17

**16th**
90:18

**17**
120:25

**18**
93:25
139:20

**18th**
80:22

**19**
95:12
120:24
121:11
124:6

**1914**
136:11

**1991**
36:4

**1st**
19:10

**2**

**2**
18:1 19:9
22:1
43:8,13
120:11

**20**
64:21
70:13
75:7
78:18
79:7 98:6
114:6
128:10

**2005**
12:12
32:12

**2006**
10:14
11:7,10,
13,16,21
21:12
56:1

**2007**
92:21

**2008**
9:19,21
12:4,24,
25 13:1,
11 18:10
19:10,21
21:6,15
22:9,14,
20,21
23:25
25:17,21,
22 30:11
31:24
32:12
36:24
37:10,13
50:7,16,

17 62:10
85:7
129:12

**2009**
9:5 23:10
26:1,3,8
29:6
30:5,11
31:24
37:24
38:6,11,
19 39:16,
20 41:17
42:6,8
43:10
50:8
54:20
55:2,15,
19 62:6,
21 64:7,
15 84:24
85:4
144:15,20

**2010**
9:6
12:18,21
28:11
29:6
82:25
83:11,15
85:10

**2011**
64:22
66:16,25
68:15
70:13
72:25
75:8
78:18
79:7
85:2,5,17

**2012**
8:18
28:2,3,11
52:17,24



53:10,25
54:6
56:16,18
57:6
59:7,10,
13

**2013**
8:19,20
111:21
119:12

**2014**
57:1,2

**2015**
67:15
90:18
91:3,24
92:10,20
93:2,25
94:18
95:12,24
98:6
99:14
101:3

**2016**
15:9
55:22
56:3,6,9
103:3,21
105:17,19
106:10
111:1,16
112:15
113:5
115:2
118:22
119:2,5,
17
120:11,24
121:1,7,
11 124:6
140:22
145:20

**2017**
15:3,6

114:6
145:10,
12,13,18,
19,23

**2022**
128:14

**20th**
66:15,24
68:15

**22**
128:10

**23**
94:17
111:1

**24**
52:15,16
53:12
54:5
99:11

**26A1**
130:10

**26th**
67:14

**27**
15:5
121:1,7
140:22

**270**
5:16  8:14
111:19
112:17
113:8
145:24

**28**
111:16
145:10,
13,19,23

**28th**
145:2

**29**
82:25

83:11
113:5

**2:06**
147:22

**2nd**
118:22

_____

**3**

_____

**3**
17:2
53:10
70:23
93:21
111:14

**3/1/2012**
123:18

**3/16/2015**
88:22

**32**
54:12
55:9

**34**
55:21
58:23
99:12

**35**
122:13,18

**37**
89:4

**38**
45:6

_____

**4**

_____

**4**
21:14,16
22:1  43:9
64:17
86:24
128:3,24

5

4/20/2010
65:25

**40**
45:5,7,9,
14,15
49:15

**403**
10:2,12,
17,24
11:6  12:7
37:21
38:5,10
39:11
40:6
45:12
48:25
50:5
52:20
87:24
94:12
102:15
103:17
106:16

**42**
43:24
44:1

**45**
43:3,16
48:8

**46**
53:5,15
57:15,22
59:1

**47**
53:15

**48**
53:15
57:15,22
59:1

_____

**5**

64:17
128:16,24

**5/19/2016**
121:6

**5804**
9:1

_____

**6**

_____

**6**
61:3
128:21

**6/19/2015**
94:25

**60**
126:7,12

**600**
136:17

**65,000**
145:22

**67**
9:14

_____

**7**

_____

**7**
121:12
134:15

_____

**8**

_____

**8/1/2010**
125:6

**800**
146:2

**8th**
94:24



**9**

9
  20:5,10,
  13 24:9
  124:10

**A**

Aaron
  94:2

abandonment
  114:9

abide
  136:25

absolutely
  75:20
  76:20,22
  83:23
  113:25

accept
  33:22
  48:18

acceptable
  35:9

accepted
  66:15

access
  112:11

accident
  34:6

account
  87:4
  119:19
  123:17,
  18,23
  124:17
  125:6
  126:9,16,
  22 128:9

129:4

accounts
  119:10
  144:2

accurate
  125:10

accurately
  96:12

acknowledge
  67:7
  68:20

acknowledged
  61:6

acknowledges
  99:14

Acquisition
  114:9

acronym
  27:22

act
  103:14
  117:11

acting
  105:22

action
  52:12
  55:14,18
  87:22
  90:10
  94:6
  96:4,11
  97:19,25
  100:17
  104:10
  109:18,22
  131:4
  134:3

actively
  122:1,2

actual
  51:10,11
  134:19,
  21,23

additional
  104:8
  134:2
  147:19

address
  8:16,22,
  24 9:2,9,
  11,15
  10:1,13,
  17,25
  11:6 12:7
  18:15
  38:10
  42:10,14
  86:25
  87:14
  111:20
  112:18
  113:8
  145:24

addressed
  107:19
  112:16
  113:7

addresses
  45:10

adequately
  135:19

admission
  60:23

admissions
  61:1,2

admit
  61:5,17,
  25 64:5,
  20 70:12
  71:22
  78:2,17
  79:5

admits
  71:1
  79:16

admitted
  61:12,13,
  15

advance
  13:4

advised
  57:8
  94:25
  102:5
  108:19

affect
  122:11
  125:13
  130:7
  137:21

affected
  114:21

affidavit
  106:14
  107:1,3,
  7,15,17,
  22 108:9

affirmation
  106:13
  107:6,8
  108:8,17,
  20

afloat
  85:8

agency
  29:23

agent
  29:20,22
  30:21
  31:15
  32:5,9
  33:2,4
  34:5,10,
  17

agree
  6:23
  20:18
  56:4
  63:25
  71:11
  81:17
  94:4
  100:21
  110:18
  111:9
  120:3,21
  124:24
  127:9,16,
  19

agreed
  24:2
  45:11
  50:3,10
  97:1
  127:2

agreement
  23:16,19,
  21,22
  25:10,13,
  14,17,22,
  25 26:2,3
  34:1
  42:24
  43:9,11,
  12,22
  45:5,10,
  18 47:3,8
  48:8,10,
  14,21,23
  49:18
  50:2,13
  55:2
  57:25
  58:5
  59:14
  66:12
  94:20
  95:5 97:7

agreements



50:24

agrees
  45:15

ahead
  34:3
  78:15

alcohol
  7:18

allegation
  54:10

allegations
  16:21

allege
  52:16
  55:21

allegedly
  54:14,22,
  23 55:6

alleviate
  17:15
  47:24
  96:19
  99:5

alleviated
  46:9 59:5
  63:2,5
  101:20
  110:2

alleviating
  56:11
  94:20

allowed
  76:16
  104:18
  117:17

ambulance
  137:19

amended
  60:25
  65:11
  70:22

78:17
79:6,15

amending
  70:22

America
  115:22,25

America's
  115:23

American
  119:3,6,
  13 121:13
  125:14
  128:4,25

Amherst
  10:5,6,10
  52:21
  112:1

amount
  90:4
  105:3
  109:20
  125:18
  127:2
  135:7

amounts
  20:15
  112:24

and/or
  45:19
  47:17
  130:17
  131:13

Andrews
  7:22
  10:8,11
  13:17
  15:3,10
  16:14,18
  20:11,22
  47:19
  52:6 56:3
  60:6,8
  72:14,20

73:23
74:13
75:10,20
76:1,7,
12,15,18,
22 77:1,
19 79:3
82:1
90:21
93:17
104:3,5
110:15
133:10
134:24
147:15

annexed
  61:7
  64:22
  70:13

annual
  145:20

answers
  80:3,4,8
  146:11

anxiety
  135:18
  136:7
  138:6
  139:16
  140:16
  141:6,9,
  12 142:19

anymore
  75:11
  91:12
  100:4,20
  101:21
  109:13,16
  110:1,3

apartment
  92:15

apologize
  96:1,4

apparently
  9:12

appearance
  90:23
  95:3

appeared
  67:2
  68:4,17,
  24 91:9

appearing
  15:25
  94:23

appears
  18:21
  19:5,24
  68:7 72:4

application
  64:21
  70:13
  75:7 84:7
  113:13,17
  115:22,24
  116:11,13
  117:16
  144:20

applied
  85:10

apply
  117:13

appointment
s
  136:24

approve
  115:8

approved
  58:3,6
  95:5

approving
  58:15

approximate
  29:4 30:7

approximate
ly
  9:16,21
  11:11
  31:25
  32:3
  102:18
  103:1
  105:17
  123:2
  145:10,
  15,21

April
  21:15
  22:8,20,
  21 67:14
  80:25
  82:10,14,
  25 83:11,
  15 105:17
  106:10
  145:2,10,
  13,18,19,
  23

area
  27:13
  122:5

argue
  82:1

arrangement
  43:21

arrive
  112:2

arrogant
  140:1,2

Article
  45:7,9

ascertain
  109:20

asks
  78:16

asserting



64:25
85:21

**assertion**
57:5 93:2

**assignments**
136:22

**assist**
16:13,18

**assistance**
85:9
113:11

**Association**
89:11

**assume**
117:17,19
146:9

**assumed**
59:3

**assuming**
57:25
58:4
143:25

**assumption**
81:24
143:25
144:8

**attempts**
84:20

**attention**
143:2

**attest**
137:20

**attorney**
5:24 7:22
13:17
14:22,24
16:13,18,
24 42:22
60:6,8,20
61:20
76:6

80:21,23
84:1,3
88:11
91:10
93:16
94:3,11
99:1,6,20
101:22
102:5
104:3
110:14
114:25
130:9
131:3

**attorney's**
64:9
102:4

**attorneys**
5:8 91:15
93:7
100:22
101:13
109:13,21
134:19

**August**
12:12
52:16,24
54:5
56:15,18
57:6
59:13
113:5
118:22
119:2,5,
17 120:11

**auto**
30:17
31:1,10
119:7

**Avenue**
9:14

**award**
134:18

**aware**
49:14
63:6

———————

**B**
———————

**BA**
35:21

**BAC**
84:12
87:12

**Bachelor**
35:23

**back**
12:5,24
20:3
21:12
25:1
26:22
37:17
40:13
41:10
43:6
50:16
51:23
52:11
58:22
60:2
62:13
63:15,18
71:11
72:10
77:4
79:18
82:1,9
83:10
86:14,19
101:1
106:2
110:24
115:17
117:19
129:22
134:14

136:11
139:11,12

**background**
35:17

**backwards**
10:15

**bad**
103:9
118:5,10

**badge**
104:19
137:4

**balance**
125:19
126:18

**balances**
145:11

**balancing**
127:6

**bank**
11:18,20
18:24
25:13,18
26:4,7
40:19
51:9,10,
11,13
57:19,20
59:15
63:14,15,
18 87:4
89:11
90:5
96:21
99:21
101:23,24
105:7
110:1
115:22,
23,24
116:11
117:12
122:1

144:1

**bankruptcy**
119:22
120:12,14

**bar**
66:6

**based**
27:10
107:6
136:14
139:5
147:11

**basically**
30:22

**basis**
17:11
54:4,8,21
56:8 57:4
58:23
59:10
67:4
68:18

**Bates**
19:7
26:12
66:7,10
84:11

**bathroom**
8:2

**bears**
71:1,22
78:3
79:16
86:16

**beginning**
93:21

**behalf**
16:22
131:4

**Bianca**
104:16



**big**
137:2

**bill**
103:12
127:1

**binding**
48:14

**bit**
63:4
135:13,22
138:7
147:1

**block**
66:20
67:24,25

**blood**
137:16,
20,22
139:16
142:6,12,
16,19

**board**
27:8
135:25
136:20
137:1

**boardroom**
137:9

**bore**
136:4

**born**
92:21

**borrow**
63:14,17

**borrower**
26:20

**bother**
141:3

**bothers**
140:24

**bottom**
93:23
124:11

**boy**
11:5

**Boys**
11:4

**Bread**
110:7

**break**
8:3,9,10
15:12
30:1
42:16
59:23
60:4 63:4
102:11
129:24

**Brian**
5:24

**bring**
43:6
123:9

**brings**
123:13

**broad**
120:2

**broker**
11:20,22
29:19,21,
25 30:6,
13 31:24
32:5
33:2,3,20

**brother**
132:1
133:17

**brought**
80:17
82:15
87:22

**Bryant**
36:10,13,
17 37:13

**BS**
35:21

**Buff**
36:3

**Buffalo**
27:13
28:15,19,
20 32:25
35:20
36:8

**build**
139:7

**business**
29:13
31:15
33:19
34:20
35:5,13,
15 137:3,
7 144:9,
10,12

**buy**
63:17
117:13

────────────

C

────────────

**calculate**
101:22

**call**
43:19
55:22
76:5
103:5
104:22
140:6,21

**called**
28:8 53:6
63:22

66:6
88:15,25
89:8,9
91:1
107:2
110:6,9
113:22
130:10
137:8

**calling**
140:19

**calls**
105:9
138:25
143:9

**cancelled**
38:8

**Capital**
115:6
123:15

**caps**
87:5

**caption**
98:8

**car**
117:13
119:12
140:6,7,
10
143:12,13
145:16,17

**card**
115:25
116:5,11
117:14
119:3
121:15
137:4
145:8,16,
18

**cards**
137:3

**care**
139:18
140:14
147:4

**career**
37:7

**carrier**
31:16
33:21

**carriers**
33:4

**carry**
34:12
136:13

**case**
8:5 32:11
101:7,10
131:6
134:12
145:4
146:23

**cash**
87:1
115:25

**casualty**
34:6

**Catherine**
10:23
12:8,11,
13 13:10
18:5
25:12
42:24
43:10
44:6
65:24
83:3
84:13,16
86:7
89:13
100:14
111:16
113:8



129:8

caused
71:5 81:1
82:10
146:25

certificate
36:21

certification
5:10
37:2,3

certified
36:21,22
37:8 95:4

chain
93:20,22
94:16

change
71:5
80:17
81:1
82:10
102:7
146:12

changed
70:24
80:6,7
82:14,15

charge
118:7

charge-off
121:20,
22,24,25
122:7,12,
14,20
123:3
125:8,14
128:5,17

charge-offs
118:5

charged
122:9

125:11

Charles
132:9
134:6

Chase
116:11
120:10

check
87:5

checks
38:8
86:25
87:1,13,
19,20

Cheektowaga
9:10,12,
13,23

child
85:9
124:10,
14,21
128:19
129:1

children
11:1,2
135:19,20
139:18,22
140:14
147:6

cite
94:22

City
27:11,17

claim
46:5,24
124:17,18
146:15

claims
133:12

clarify
39:22

139:13

classificat
ion
34:24,25
136:1,20

classificat
ions
136:18

classified
136:10

clause
100:2

clauses
31:4

clear
14:6 80:9
89:6
90:22
110:8

cleared
140:18

clerk
95:1 98:5

clerk's
18:22
52:18
54:1
58:4,6
88:21

client
16:10
35:12
56:1
57:17
76:6 96:2

clients
102:14

clinically
141:8

Close
9:6

closed
123:19
125:7
126:9,16

co-workers
130:12
131:11,
18,19
132:12,
14,15

coach
76:17,25

coached
76:21

coaching
76:11,12,
18,22

codes
66:6

coffee
8:1

collated
88:10

collect
8:4
143:19

collecting
105:8

collection
118:10
124:17

college
35:18,19,
20 36:5,
11,17
37:10,12

colloquiall
y
141:23

commercial
30:23,25

31:1,10

commission
67:14

commitment
65:23

committed
40:1

communicati
ng
134:8

Comp
31:10
34:13,23
135:24
136:5,10

companies
30:25
33:8
34:11
135:24
136:10,
12,23
138:24

company
11:19
28:8
29:24
32:17
33:5
35:2,10
136:16
137:3
138:2,20
139:2

Compensatio
n
27:7 31:2

complaint
14:3,9
16:8
52:12
53:12
54:13



88:3
89:1,3,10
99:10,18
114:19
133:7,8,
13 134:15
144:15,21
145:2,9,
14 146:16

**complete**
36:25
131:16

**completed**
37:1

**composure**
137:23
138:5

**compound**
117:2,20

**comprehensive**
139:2

**comprised**
120:22,23

**compute**
100:16
109:20

**conceded**
109:8

**concentrating**
135:21

**concern**
92:5

**concerned**
40:7,9
92:11

**concerns**
92:15

**concluded**
147:22

**conditions**
142:18

**conduct**
17:6

**conference**
91:2,5,23
92:9,24
93:2,8
94:25
95:3,12,
17

**confirmation**
97:1

**confuse**
79:21,24
80:2

**confused**
82:20

**confusion**
89:4

**conned**
87:2,9

**considered**
123:6
124:7
126:12
127:7,12,
24

**consistent**
18:12
95:11

**constitute**
62:22
124:25

**constitutes**
120:24

**consumed**
7:18

**contacted**
57:9

104:12

**contacting**
103:8

**contemplate**
135:11

**continue**
84:6 87:1
88:24
94:16
128:10

**contract**
31:7
136:25

**contracts**
31:21,25
32:1
33:10

**contribute**
41:22

**conversation**
24:23
91:22

**conversations**
83:22
96:15,16,
17,18
99:3
130:12,
15,17,19
131:11,12
132:14,17

**convey**
46:3

**convince**
96:3,9,20

**cooperate**
46:14
48:5
49:11

**copies**
93:15
95:4
103:22,25
104:2

**copy**
14:25
15:8

**correct**
8:14 12:9
14:19
18:5,10,
14 19:22
20:1 21:2
22:9,15,
21 23:1,
25 24:6,
11 25:14,
20 27:14
28:16
32:6,7
40:2,3,25
41:1,4
47:13
48:2,6,7
49:25
50:1 51:7
54:7,11
55:4,5
57:3,23
58:10,11,
21 59:9,
16 62:7,
8,11,12,
16,24
64:16
69:1,5,
15,16,19
71:16
72:11
79:2 80:5
82:6 84:4
85:5,16
88:6
90:12
92:7,8

93:22
95:14
97:25
99:17
100:21
101:8
102:4
103:19
104:1
106:18,22
109:5,10
111:6,7,
12,13,22
114:21
115:10
116:1
118:1,6
119:20
120:22
124:8,9
125:2
126:1,6
129:2
133:22
144:8,22
146:6

**Correction**
46:24

**correctly**
95:8
114:16

**correspond**
138:19

**correspondence**
99:3
103:2,15,
23,25
104:3,23
106:2,9
108:22
112:12

**costs**
134:20



145:24

**counsel**
5:5 15:23
74:16
76:3,13
95:1

**counselor**
77:13

**count**
89:3

**Countrywide**
18:23

**County**
18:22
52:18
58:4,6
66:24
67:12
68:14
88:21
98:5

**couple**
90:19
104:15
132:2
145:25

**courses**
36:7,9,10

**court**
6:9,21
7:4 17:15
50:21
51:4,5,6,
14,24,25
52:2
56:10,22,
24 59:4,8
63:3
75:15
88:4
89:10
90:9,14,
15,16,24,

25 91:1,9
93:8
94:24
95:1,4,7
98:3,12,
23 99:13,
15

**covenant**
53:6 58:8

**cover**
102:11

**coverage**
136:13

**covered**
32:9
49:23
62:14
107:10
131:9

**covers**
63:19
114:1

**credit**
14:4,9,
12,18
103:11
106:2,20
114:14,
21,22
115:1,7,
12,15
116:5,11
117:7,11,
13,18
118:4,13,
20,23
119:11,
19,21
120:23
121:5,15
122:7,12,
21,23
123:3,6,
10,23

124:4
125:1,3,
15 126:3,
13 127:4,
8,12,17,
23,25
128:17,25
130:6
133:21
134:21,25
135:2,6
144:11,
23,24,25
145:8,16,
17

**creditor**
117:15,17
127:9,11

**Criminal**
35:25

**critical**
146:15

**cry**
132:22

**current**
34:18
39:20
42:13
50:17
64:15
84:16
111:21
124:16
145:21

**Cynthia**
106:14
107:1,4,
7,16,23
108:9

_____
D
_____

**damage**

135:10,17

**damages**
134:19,
21,23
135:5,9,
14,16
146:24

**date**
18:9
19:8,9
22:5
68:25
83:20
105:18

**dated**
53:10
64:21
65:17,25
66:1
70:5,13
75:7
78:18
79:7
82:25
98:5
101:2
111:1,16
112:1,15
113:5
114:5
120:25
121:6,7

**dates**
19:6,7
29:4
105:23

**daughter**
40:11
41:3
91:24
92:6,12,
17,19,20,
21 124:15
139:19

**Davidson**
93:6,16,
25 99:4

**day**
31:12
66:15,24
68:15

**days**
123:20
124:1
126:7,12

**deals**
144:9

**debt**
20:12
54:14,16,
24 55:25
56:2,7
57:9
61:7,19
62:2 64:7
94:12,22
96:7,20
100:24
101:20
105:8,11,
21 110:3
112:24
118:5,10
122:2
127:7
141:1
143:19
145:4,6,
8,15,16,
18

**debts**
145:3,6,
11

**December**
12:25
13:1
64:21
66:16,25



68:15
70:13
75:7
78:18
79:7
84:24
85:2,17

**decide**
35:3
78:14

**decided**
37:5,6

**decision**
118:2

**decisions**
115:1

**decree**
95:20
96:9

**deed**
46:5,25
52:17,19
53:3,6,21
56:15,20
57:10,14
58:1,8,24
59:3
91:12
99:13

**deeds**
57:24

**default**
54:15,17
64:6
124:18,21

**defaulted**
54:14
55:10,11

**defendant**
5:25
15:19,20
17:5

60:21,25
89:24
97:10
98:8
100:5,15,
20 101:21
107:20
109:12
110:1
130:18,20
131:13
132:18

**Defendant's**
15:18
16:5
17:21
19:11
42:20,21
43:3 62:7
65:7
82:18,22
84:10
88:8,9
101:3
105:25
114:23
120:17,
18,21
131:2

**defendants**
134:16

**deficiency**
96:10

**deficit**
143:2

**defined**
141:23

**definitive**
138:9

**degree**
35:18,19,
21 36:8

**delay**

96:1

**delinquency**
94:21
119:18,22
120:5,9

**delinquent**
102:14
103:6
115:14
116:6,16
118:14,24
119:1,4,
18 121:17
123:25
135:3

**demand**
16:8

**demanded**
113:22
139:24,25

**denial**
115:23
116:12
117:18
118:1

**denied**
62:25
71:25
115:12
116:5,15
117:16
144:10,20

**denies**
61:21
65:1 72:3
73:10
79:9

**deny**
62:3
64:10
70:15,16,
18 73:9
75:6

78:20,24,
25 81:18,
21

**denying**
64:12
70:24
116:3

**Department**
34:8

**deposition**
6:1,6
7:11,13,
16 13:13,
16 15:23
16:2 61:9
74:1
76:14
88:17
104:7
106:1
147:22

**derogatory**
106:19
123:6
124:7,25
125:15,16
126:12
127:8,12,
18,24
144:25

**Describe**
31:5

**desired**
33:21

**destroyed**
114:22

**detail**
34:2

**determined**
111:10

**devastated**
139:15

**develop**
137:13
138:3,8
139:2

**diagnosed**
141:8,15,
22 142:5,
25 143:2

**difference**
63:10

**difficult**
41:21

**difficulties**
41:19

**Dipasquale**
100:16
109:19

**direct**
17:1
33:5,7
104:5

**directed**
7:21
135:25

**directing**
75:17,23
76:4

**directly**
29:24
33:5
51:20
52:3
95:15

**discharge**
45:19
46:12
47:17

**disclosure**
130:9,10
131:3



discovery
14:14
42:22
88:12
114:25

discuss
60:4,8
129:24

discussed
60:7
87:21
108:15
128:5
131:15,20

discusses
84:19

discussing
83:14,16
112:20

discussion
52:9
77:21

disorder
143:3

dispute
102:21,22
103:6,11
106:3
108:3
121:7,8

disputed
17:8
102:13,
18,19
105:20
114:14

disputes
130:7

dissatisfac
tion
131:17

distinct
63:22

distinction
64:2

distress
133:3

district
94:24

divorce
12:20
13:2
41:20
43:22
45:10
47:8 48:8
50:9 84:3
91:9
94:20
95:5,19
96:8
126:24
142:21

divorced
12:15,16,
17 43:17

document
14:21
16:3,14
17:2 18:9
19:3,8,16
42:23
43:4,8,
19,20,25
44:9,17,
19,23
45:1
50:8,21
51:2,4,5,
6,9,13,
14,23,25
52:1,13,
24 53:2,
7,11,14,
24 56:10,

16,22,24
57:14,17,
21 58:7,
15,18,19
59:4,8
60:24
63:22
65:11
66:11
67:17,19
68:6,25
69:15,22,
24 70:3,
4,6,15,17
71:3,7,20
72:5,25
73:2,4,7
74:10,23
77:7,12,
13,16
78:5,9,
12,21
79:17,23,
25 81:4,7
82:13
83:3
84:14
88:13,14,
16,25
89:10
95:25
98:4,25
99:8,22
100:14,
19,23
101:10,
15,16,19
102:8
103:20
104:9,21
106:4
107:13,25
108:2,4
109:6,8,
11
110:13,18
111:17

114:1
115:6,19
121:6
129:14
138:17

documentati
on
16:19
94:19
113:10

documents
13:23
14:2,7
17:15
39:2
42:21
46:6
50:18
51:11,15,
20 52:3
53:25
59:18
61:4,13
63:7 88:9
89:17
90:9,11,
17 104:8
106:5
108:7
113:12
120:22
121:4
133:25
134:2
139:5
140:19
146:18

Doe
89:14

dollars
146:1

Dolphins
130:5

draft

130:2

drink
8:1

Drive
9:1,9

drop
94:4
96:3,10,
21 97:19
101:10

dropped
97:10,24
98:8
100:5
101:11

dropping
101:6

drugs
7:18

due
21:15
109:21
112:24
123:20
125:18
126:5,7,
11

duly
5:17 77:1

Dylan
109:4

_____

E

_____

earlier
21:1
40:22
49:23
54:25
61:15
62:5,9,
14,20

69:13
86:5
87:21
88:2 92:5
95:11
97:9
98:11
99:9
101:1
121:16

**earliest**
102:22

**early**
8:20 9:6
85:10
116:20
117:1
119:12

**ease**
88:16

**easier**
6:7

**educational**
35:17

**elaborate**
135:21

**electronica lly**
88:20

**Elmira**
28:14,15,
18

**email**
93:15
94:2,14
95:23
96:16
97:14
101:2
108:12
139:12

**emails**

93:18,22

**embarrassme nt**
140:17

**Emilio**
84:4

**emotion**
87:7

**emotional**
135:10,
12,13,14,
16 146:24

**employed**
26:23
29:18

**employee**
27:15
136:21

**employees**
138:14

**employer**
32:14

**employment**
32:10

**EMS**
30:14

**EMT**
137:18

**end**
65:3
84:23
87:5
93:20

**endorsement s**
31:11

**ends**
129:14

**enforcement**
124:11

**entered**
5:4 25:16
50:9

**entire**
22:23
98:20
120:12

**entitled**
134:18

**entity**
27:4,6
122:1

**equipment**
28:9,12,
21 29:14
138:13,17

**Erie**
18:21
52:18
58:3,6
66:24
68:15
88:21
98:5

**established**
86:4
136:12

**Everleth**
67:11
68:1,10
69:7,10

**evidence**
64:13
67:5
68:18

**ex-wife**
13:10
37:24
38:2,18
39:11
40:4
41:18
45:11

50:10
57:23
83:6,10,
15 84:17,
19 85:21
87:18,23
91:25
92:18,19
111:15
112:17
113:7

**ex-wife's**
19:25
39:3 58:9

**exact**
100:11

**EXAMINATION**
5:20

**examined**
5:17

**excessive**
141:24

**exchange**
93:15

**exclusions**
31:11

**exclusive**
146:2

**excuse**
137:15

**execute**
46:4
61:13

**executed**
61:6
62:11
67:8
68:21
111:10

**execution**
45:17

**exhibit**
15:18
16:5
17:21
18:2,17,
18,20
19:1,3
20:3,4
21:13
26:11
39:10
42:20,21
43:3,16
48:9
50:14,20,
25 51:12,
17 52:11
53:5,15,
19 57:15,
21 58:25
60:20,24
61:8,14
63:19,21,
23 64:18,
22,25
65:6,8,9,
10,22
66:5
70:14,16,
18,20,21,
22,25
71:5,11,
12,17,21,
25 72:13
73:9,10,
18,22
74:19
75:5
77:6,9,
17,25
78:8,10,
16,19,20,
22,24
79:4,13,
15,19
80:1,13,
19 81:18



82:7,18,
22,24
83:9,10
84:10
88:8,9,19
93:13,14
95:10
98:3
99:10
101:4
105:25
106:4,23,
24
110:24,25
115:20,21
116:4
120:17,
19,21
130:24
131:2
134:14

exhibits
5:1 17:18
21:5
37:17
40:23
49:23
51:17,22
55:4,19
59:17
60:11,12,
15 61:10
62:6,7,13
63:6
65:10
80:20
89:2
114:23

Experian
14:5
15:22
16:11
121:6,10
134:16

experience

142:18

experiences
134:9

experiencin
g
41:18

expert
123:14

expertise
136:5,9

expired
67:14

explain
34:2
62:25
63:10
126:18
136:6

explained
6:2 91:10
146:24

explaining
113:1

explains
29:15
35:15

explicitly
143:12,
15,18

Express
119:3,6,
14 121:13
125:14
128:4,25

extent
17:12
47:19
104:7
130:4

───────

F

facility
138:16

fact
123:25

factual
16:21
131:5
133:12,23
134:12

factually
133:10

failed
61:18
62:1

failing
17:6

fails
46:11

failure
62:22

fair
8:11
16:22
31:19
43:22
44:20
60:20
101:9
114:14
117:10
123:5
144:19

fairly
116:24

fall
22:14,22

familiar
31:20

136:2

family
130:13
131:11,
15,18,19,
22 140:15
147:3

fan
130:5

father
135:20
139:21
147:6

FCRA
17:5
134:18

fear
135:18
136:7
140:16
141:22,24
142:19

February
12:4
18:10
19:10,22
21:5
53:10
103:3

federal
9:14
133:8

feel
141:2

feelings
133:3

fees
109:21
134:20

felt
140:24
141:1

FICO
122:13,
16,18

field
27:15
135:23
136:21

figure
80:7

file
46:24
94:3,7
139:5

filed
14:3
16:10
52:18
54:1
90:17,22
108:3
120:12,14
121:8
131:3
133:8
144:21
145:2,9,
14

filing
5:10
144:15

filled
85:11

final
72:2
130:6

finalized
12:18,19

finally
84:24
85:17

financed
11:15



26:4

**financial**
34:8
36:10,21,
23 37:7,8
41:18,22,
25 55:23
113:23
135:10
139:25
140:3
143:22,24
144:1

**financing**
11:12

**find**
88:15

**fine**
15:13
76:15

**finished**
20:6 36:7

**Fink**
93:6,16
94:1 99:4

**fire**
28:8,12
29:14
30:17

**Five-and-a-half**
8:17

**flag**
98:3
107:2

**flood**
30:17

**fluent**
64:3

**focus**
143:1

focused
30:18

**folds**
138:22

**follow**
30:3
91:13,14
93:5
105:13

**fond**
43:6

**foreclose**
87:23
89:22

**foreclosed**
89:20
140:22

**foreclosure**
87:21
90:2,4
91:2,15
92:6 93:6
94:10,24
97:10,19,
25 99:20
100:22
116:19
117:1
125:20
143:20,21

**foregoing**
67:7
68:20

**form**
5:12

**formally**
36:12
142:5

**forward**
94:19

**fragment**
117:21

118:13

**fragments**
118:1

**Fred**
134:5

**Frederick**
132:5,6

**Fredrick**
134:6

**free**
110:8

**friend**
132:7

**friends**
131:16
132:2,3,4
140:15
147:3

**front**
45:2 66:5
68:24
137:9

**froze**
138:5

**full**
45:14,17
84:23
126:17,18
127:6

**fully**
129:4

_____

**G**

_____

**gained**
37:5

**garnish**
140:5
143:15

**gather**

34:19
138:18

**gathered**
139:1

**gave**
75:4 80:3
85:12
104:20
140:16

**general**
31:9
137:11

**generally**
104:14
138:15

**generated**
113:18

**Getzville**
5:16
8:14,21
111:24
112:2

**girl**
11:5

**girls**
11:4

**give**
15:11
34:20,25
35:7
93:12
97:3
104:17,
18,19
122:6
133:25
144:1

**giving**
85:25

**good**
5:22,23
28:1 90:8

94:18
105:23
122:24

**government**
124:18

**graduate**
36:3,5,
14,18,20
37:9

**great**
37:6

**ground**
6:6,8

**Group**
29:3,8,
11,17
30:14

**guess**
40:20
60:19
94:16
102:20

**guessing**
58:5
90:19

_____

**H**

_____

**half**
87:6

**hand**
15:17
65:7,9
82:17
84:9
105:24

**handed**
93:13

**Handing**
131:1



**handles**
  31:17
  136:20

**handling**
  91:16
  94:3

**happen**
  86:21

**happened**
  80:25
  91:6,8
  92:23
  95:16

**head**
  6:18

**health**
  34:7
  141:23

**hear**
  6:15

**heard**
  122:6

**hefty**
  42:20

**held**
  52:9
  77:21

**hell**
  137:16

**helps**
  147:3

**hereto**
  5:8 61:8
  64:22
  70:14

**high**
  115:15
  137:20,21
  139:16
  142:5,12,
  16,19

  147:10

**highest**
  122:15

**history**
  122:14,
  15,19

**hold**
  94:11
  97:20
  104:6
  105:18

**home**
  11:7,21
  18:23
  30:17
  84:12
  87:12
  92:7
  140:13

**honor**
  94:20

**Honorable**
  95:6

**hope**
  35:15

**hoped**
  132:23

**hours**
  7:19 76:9

**house**
  40:7,10,
  17,19
  41:3,15
  45:25
  46:8,10
  47:23,24
  48:1,2,3,
  6 53:3
  63:15,17
  89:20,22
  91:19,20
  92:10,12,

  14,16
  108:23
  140:21
  145:25
  146:3,4

**housekeeping**
  7:25

**housing**
  145:24

**human**
  6:15 8:1

**humiliation**
  140:17

**hundred**
  145:25

**husband**
  43:13
  46:2 85:6

**husband's**
  45:19
  46:12
  47:17

_____

**I**

_____

**ID**
  104:20
  137:4

**identification**
  5:2 15:18
  16:4
  17:18,21
  130:24

**identified**
  42:23

**identify**
  16:7 19:8
  115:21
  116:9

**identifying**
  117:23

**identity**
  44:16,17,
  22 69:14

**immediately**
  28:23
  29:17
  30:5 32:4
  46:2

**immensely**
  140:14

**impact**
  122:21,22

**implicate**
  75:19

**implications**
  122:8

**inaccurate**
  127:14

**include**
  26:4
  58:8,12

**includes**
  106:24,25
  120:25

**income**
  144:4
  145:20

**incorrect**
  68:1,5
  69:4
  85:22
  86:12,21
  111:9
  114:20
  124:3
  125:22

**increase**
  115:7,13

**incumbering**
  45:20

**independent**
  29:21
  133:7,23
  134:11

**independently**
  62:14

**index**
  94:22

**individual**
  129:2

**industry**
  34:25

**inform**
  49:9

**information**
  14:4
  15:22
  16:11,18,
  23 17:7,8
  34:19
  35:7
  55:23,25
  74:20
  87:12
  89:23
  97:4
  106:20
  113:23
  131:5
  133:7,12,
  24 134:9,
  12 138:18
  139:1,8,
  25 140:4
  143:22,24
  144:1
  146:20
  147:1

**informed**
  15:23



55:24
56:1,6
96:17

**initial**
14:3
103:2
130:8
131:3

**initially**
21:11
87:22
90:13
112:8

**initiated**
13:2

**inquiry**
111:4
112:8

**insomnia**
141:15,
17,20

**inspection**
137:1
138:21

**inspector**
27:1,2,3,
22 28:4
135:23
136:24

**instruct**
75:10
76:24

**instructed**
84:1

**instrument**
67:7
68:20

**insurance**
27:3,21
29:19,21,
22,24,25
30:6,12,

15,18,20,
21,22,23
31:7,16,
23,25
32:4,5,8,
17 33:1,
2,3,4,6,
7,13,15,
20 34:4,
5,10,11,
12,14,16,
18 35:2,
3,4,10,
12,14
36:9
37:20,25
38:5,9,
15,19,21,
24 39:4,7
124:17
136:24
146:1

**insured**
31:18
138:19

**insurer**
31:18

**intend**
131:5

**interest**
46:3
100:17
109:22

**interesting**
64:18
139:3

**interpret**
47:22
99:7
110:13

**interpretat
ion**
26:20
102:1

**interpretin
g**
89:23

**interrogato
ries**
131:24

**interrogato
ry**
27:10
127:17

**interrupt**
6:13
74:15

**investigati
on**
17:6

**invoices**
38:8

**issue**
96:4
103:10
141:23
145:4

**issued**
32:1

**issues**
101:4
133:21

**item**
116:25
128:4

_____

**J**

_____

**James**
109:4

**January**
12:4
80:22,25
82:9,14
103:3

114:6

**Jason**
100:16
109:19

**job**
29:15
30:8
31:19
33:1
34:17
69:18
135:22,24
137:2,8,
12 138:1,
23
139:10,17

**jobs**
30:2

**John**
89:14
95:6

**joint**
129:7

**judge**
56:12,22
109:3

**judicial**
88:3
94:24

**July**
12:18,20
15:3,5,11
28:3
111:16
121:1,7
128:2

**June**
91:2,24
92:9
94:17
95:12

**jury**

16:8

**justice**
35:25

_____

**K**

_____

**keeping**
91:18
143:1

**kids**
85:7

**kind**
135:14
139:20

**knew**
92:13

**knowledge**
37:6
117:14
118:7

**Kurt**
93:25
96:15
106:14
107:6
108:8,17,
20,22
110:3

_____

**L**

_____

**labeled**
19:7
26:12
61:3,14
66:7,10
84:11
98:4

**land**
58:3

**language**



137:15

**late**
12:24
13:1
28:11
119:13

**law**
34:12,14
68:12,13
136:12,25

**laws**
34:14

**lawsuit**
10:17
15:16
16:9

**lawyer**
36:1
37:15

**layman's**
20:9

**layperson**
122:6

**lead**
40:16

**leaned**
140:15

**learn**
24:13

**learned**
24:19
40:4

**learning**
24:16

**lease**
116:20
117:1

**leave**
92:14

**led**

23:21

**left-handed**
73:15

**legal**
89:21
91:11
97:22
98:25
99:7
100:19
110:13

**legally**
63:22
90:7
96:20
126:17

**lender**
42:3,9
48:9,13,
15,20,22
50:2,10,
14,19,24
51:16,20
52:3
58:14
59:19
84:21
97:1
117:12

**lending**
11:19

**letter**
84:12,19
86:7
106:7,12
107:4,22
108:12
110:25
111:2,8,
15 112:1,
4,7,10,
14,20
113:1,4,
9,18

114:2
115:12,24
117:8
147:13

**letters**
42:3
104:11
112:6,11
114:24
115:2
130:17
131:13
132:18
140:19
147:12

**level**
37:9

**liability**
31:1,9
34:13

**licensed**
30:20
34:5,6

**lien**
53:6 58:8

**life**
25:2 34:6
120:12
130:8
139:19
141:4

**Linda**
104:16

**lines**
6:14
11:23
33:3
118:20

**list**
117:15

**listed**
106:20

111:5
117:18
121:20
123:17,18
125:19
129:2

**litigate**
122:5

**litigation**
14:15
25:4

**live**
8:22 9:2,
9,15,24
10:18,20,
24 139:24

**lived**
8:16
41:11
91:20

**living**
8:21 9:23
13:5 41:7
42:9
91:25
92:2
111:21

**LLC**
5:25
15:20

**LLC's**
60:22
61:1

**loan**
5:25
11:24
15:20
17:13,14
19:21,23
21:7,19
24:4,14,
20,24
25:6

26:5,9,21
37:19
42:4,5,14
51:21
52:4
55:3,10,
12,15,18
60:18,22,
25 64:20
66:7,11
70:12
75:6
83:13,14,
16,21,24
84:2,7,12
86:15
87:12
100:18
102:15
103:7,14,
16,17
104:25
106:3
112:9
113:16
115:14
116:7,16
118:8
119:6,7,
11,14,18
122:8,12
125:17,25
127:6
128:22
135:3
144:10,20
145:16,17

**Loans**
18:23

**located**
28:13
32:18,20
48:25

**long**
8:16 9:2,



15 27:21,
24 96:23
123:2

**longer**
49:16
78:8 98:9

**looked**
113:2

**lose**
40:7,9
41:13
92:7
144:9

**losing**
40:17
41:3

**loss**
41:15
112:21,22
141:14
142:19

**lost**
137:23
138:5

**lot**
36:8 37:5
57:24
122:25
130:4
137:23

**low**
147:20

**lower**
24:24

**LP**
84:12

—————————
       M
—————————

**machine**
34:9

136:16

**Macris**
5:22
15:16
16:3,22
18:5
25:19
42:25
43:10,12
44:6
60:2,11,
12 61:2
65:24,25
67:2
68:17
77:4,15,
24 78:2
80:1
83:3,12
85:12
88:7
89:13,14
93:13
95:7 96:1
98:7
100:14
101:20
106:7
110:21
111:16
129:8,22
130:5
131:7
146:5

**made**
21:9,11,
18,21
22:7,11,
13,17
38:9 43:9
54:19
55:3,9,
12,18
64:14
90:23

**mail**
103:12

**mailed**
87:18,20

**mailing**
42:13

**maintain**
38:15

**major**
35:24

**make**
6:6 21:6
23:7,13
24:3
25:20
26:8
39:22
40:18,24
46:20,22
49:19,20
54:23
55:7,14
62:5,10,
19,20
65:5 69:7
71:19
106:23
136:23
138:12,24

**making**
10:15
21:25
22:19,22
23:1,3
24:14,17
25:5,6
37:24
38:5
39:3,6,
16,19
40:1,5,16
41:14
42:5
54:18

81:24

**Manhattan**
139:9

**manufacturing**
136:16
137:3

**March**
90:18
128:10,14

**marital**
45:11,21
46:3

**mark**
25:19
42:25
43:11
65:25
67:2
68:17
78:2
89:13
95:7 98:7
101:19
110:21
125:1,15,
16 126:12
127:8,17,
24 131:6
139:12

**marked**
5:1 16:4
19:3
42:19
61:9 65:7
82:21
88:8
105:24
106:1
125:7
130:24
131:1

**marks**
144:25

**marriage**
41:23

**married**
12:8,11,
13 126:23

**Mary**
89:14

**material**
104:6

**materials**
88:11
138:12,17
139:7

**math**
28:1

**matriculate**
36:12,18,
22

**matrimonial**
42:23

**matter**
94:4 95:2
96:2
131:17
133:3

**matters**
131:15,20

**Mcgrath**
5:21,24
15:2,7,
12,15
56:4
59:22
60:1
72:18
73:25
74:15
75:17,22
76:3,10,
13,16,20,
24 77:3,
23 90:24



129:13,21
135:1
147:9,18

**means**
7:7 9:18
33:9,14
90:3,4
94:5
112:22
114:11
119:25
121:22,25
124:19
129:4
133:10

**medically**
142:13

**medication**
141:11,19
142:3
143:7

**medications**
142:15

**meet**
13:18,21
137:6

**meeting**
13:24
137:24

**members**
131:16,23

**memories**
43:6

**memory**
83:22

**mental**
141:23

**mentally**
7:15

**mentioned**
143:9

**met**
13:17,20

**midway**
98:6

**Miller**
5:16 8:14
111:20
112:17
113:8
145:24

**mind**
82:10
90:3

**mine**
81:21
132:7

**minute**
26:22
72:6

**minutes**
18:13
85:15
129:15

**missed**
119:8

**misstated**
56:5

**mitigation**
112:21,22

**Mm-hmm**
44:2 66:9
91:4
98:10
102:24
112:19,25
113:6
114:4
124:12
125:5,21

**modificatio
n**
64:21

66:7,11
70:12
75:7
83:13,14,
16,21,25
84:2
106:3
113:17

**modificatio
ns**
86:15

**modify**
65:23
84:20
85:10

**mom**
87:6

**monetary**
135:7

**money**
63:14,17
87:3,10
101:23,24
103:17
105:8
109:13,15
111:5
112:9
121:25
122:3
140:20

**monies**
87:3

**month**
124:14

**months**
45:17
90:20
132:21

**morning**
5:22,23
94:18

**mortgage**
11:20,22
17:16,25
18:14
19:5
21:5,12
24:25
25:18
37:19
38:14,25
39:10,16
40:1,5,
16,18,23
41:14
42:5,12
45:20
46:10,13,
25 47:4,
9,12,18,
25 48:9,
13,15,20,
22,25
49:17,20,
21,25
50:4,5,
10,11,14,
19,24
51:12
52:20,25
53:16,18,
20,24
54:2,6
55:3,18
56:11,15,
18,19,20
57:7,9,13
58:20
59:2,6,
11,15
61:7
63:2,5,9,
12,13,14,
23 64:3,
14 65:23
84:20
85:11
86:24

87:2,10,
13,19,20
88:5
91:16
94:12
96:20,22
97:20
98:18,24
99:5,13,
16,20,24
100:3,10,
12,18,25
101:6
102:3,15
103:17
105:5,6,
11 106:16
107:5,12,
18,24
108:13
109:1,9,
23 110:5,
20,22
111:6,10,
11 113:10
114:17
115:14
116:6,16
119:17
125:24
129:11
144:20

**mother**
131:25
132:1,19,
20 133:5

**Motor**
119:11
126:3

**move**
10:12
72:19
76:14
78:13,14
102:10



110:24

**moved**
8:18 9:5,
18 11:6
12:7

**moving**
9:8
105:25
112:14

**multiple**
33:3,8
75:15

─────────────

**N**

─────────────

**NA**
125:3
128:17

**named**
89:24
100:15
104:16

**names**
67:6
131:23
140:16

**narrow**
22:6
131:22

**National**
89:11

**needed**
103:11
113:12

**needing**
147:19

**negative**
125:13
127:22

**negligently**
134:16

**neighbors**
130:13,
14,16
131:12,
19,20

**NFL**
130:2

**Niagara**
67:12

**night**
137:16
139:16

**nod**
6:18

**notarize**
45:1

**notarized**
44:12,25
71:2,23
78:4

**notary**
44:14,15,
20 45:1
66:20,23
67:1,10,
12,13,14,
24,25
68:10,12,
13 69:7,
12,17
73:4
74:21
86:16

**notary's**
69:13

**note**
17:24
19:5
20:14,16
21:4
22:1,8
24:11
40:23

46:9
49:24
50:3,4,
15,20
55:7 61:6
62:23
63:9 64:2
65:12
78:18
79:6
91:16
96:6 97:2
98:15
100:18,25
101:6
102:2
109:22
110:5,20,
22 111:6,
10,11
114:17
125:24
128:24
129:11

**noted**
77:1

**notes**
88:17
128:9
139:4

**notice**
17:8
88:15,20,
25 89:2,9

**notified**
17:13,14

**notify**
42:8

**November**
12:25
13:1 43:9
57:1,2
98:6
99:14

**number**
61:5,17,
25 64:5,
19 67:13
70:10,11,
21,23
71:12
72:2
73:24
74:7,18
75:5
77:6,9,
17,24
78:7,11,
16 79:5,
14,20
80:12
81:3
94:22
104:19

**numbers**
104:20

**numerous**
75:12

**NYWCIRB**
27:23
28:5

**NYWCRB**
27:22

─────────────

**O**

─────────────

**O'DONNELL**
95:6

**oath**
5:9 7:4
87:17
107:11

**object**
20:11
47:19
72:14
73:23

76:10

**objection**
20:22
60:17
72:18
74:13

**objections**
5:11
61:20
64:10,25
76:11

**obligated**
20:12
40:24
49:24
50:3
59:18
62:9,15
96:6

**obligation**
17:16
45:20
46:13
47:4,18,
25 49:17
56:7
57:8,11
90:6
94:21
96:22
99:5
100:24
106:16
107:24
110:4

**obligations**
47:9
50:20
51:17,22
56:2
59:20
61:18
62:1,22
88:5



MARK MACRIS
MACRIS vs EXPERIAN INFORMATION SOLUTIONS

April 25, 2018
Index: obtain..past

93:3,10
97:2
98:15
101:5
104:25
118:15
125:25
135:4

**obtain**
37:2,3
95:1

**occupation**
26:25

**occurred**
22:3

**October**
10:14
64:7,15
85:7

**Odenbach**
93:25
94:18
95:23
96:16,17,
25 97:8
99:21
106:14
107:6,9
108:8,18,
20,22
110:3,9

**Odenbach's**
97:13
101:2

**offer**
34:10,19
35:4
131:5
144:16

**office**
18:22
27:16
34:21

52:18
54:1
58:4,6
88:21
93:17
95:3
102:4

**officially**
11:13

**oldest**
93:23

**online**
112:11

**open**
104:7
123:18

**opened**
125:6

**operation**
138:10,14
139:13

**operations**
34:17
136:1
137:7
138:3
139:6

**opposed**
6:17
33:1,7

**options**
112:21,23

**order**
88:4
98:4,12,
20 99:13,
15,25
102:1
106:13,24
107:10
108:5,6,
7,14

109:2,3,
16,17
110:23

**ordered**
98:7
106:15
107:23
108:13
109:1,18

**ordering**
108:9

**orders**
98:23

**organizatio
n**
137:11

**original**
86:19

**outcome**
132:25

**outright**
71:25

**overtook**
138:7

**owe**
101:24
103:13
105:3,5,
21
109:12,15
121:25
122:3
140:8,20

**owed**
20:15
90:6
96:7,21
101:23
103:16
112:9
114:16
127:2

145:11

**owing**
111:5

**owned**
146:3

_____

**P**

_____

**p.m.**
147:22

**package**
35:11
42:20

**pages**
43:3,16
48:8
53:15
57:15,22
59:1
88:18
89:3,4
98:21,22
99:25
113:5
120:25

**paid**
38:1
39:15
118:21
119:7,11
123:20
126:17
127:20

**painful**
6:7

**Panera**
110:7

**paperwork**
84:25
85:11,12,
18 86:1,8
95:2,21

110:8
113:17

**paragraph**
17:2,3
20:5,10,
13 21:14,
16 22:1
24:9
26:14,15,
16,18
45:15
47:20
52:15,16
53:12
54:5,12,
22 55:9,
21 58:23
84:23
85:6
86:24
99:11,12
100:2
134:15

**parcel**
58:2

**part**
34:16
56:25
57:5
58:24
65:2 72:1
101:12
118:1
127:15
138:25

**parties**
5:8

**party**
48:9,13,
20,22
57:17
98:3

**past**
7:19



118:14
123:20
125:18
126:4,7,
11

**patience**
25:3

**pay**
20:12,15,
24 39:11
63:15,18
87:2,19
90:5
110:2
124:14
127:6
136:14

**paying**
38:18,20,
23 47:12

**payment**
21:10,11,
15,19,21
22:8
24:25
55:3,19
64:15
121:19
122:13,
15,19
123:19
124:16
125:7,19
126:16

**payments**
21:7,25
22:12,13,
17,20,22
23:1,4,8,
10,11,14
24:4,14,
17 25:5,
7,20 26:9
37:24

38:5,10
39:3,7,
16,19,22,
23 40:2,
5,16,18,
24 41:14
42:4,6
46:20,22
49:19,21
54:18,19,
23 55:7,
10,12,14
62:6,10,
19,21
87:10
119:8,13
124:22

**people**
122:25
132:12
134:7,11
137:7,10,
12,13,25
138:8
139:24
140:18
147:4

**percent**
122:13,18

**percentage**
122:15

**period**
25:2 30:7
46:14
49:10
83:17
105:19

**person**
13:18,20,
21 20:14
44:18
56:19
67:5
68:19

133:1

**personal**
30:22
145:6

**personally**
67:1
68:16

**persons**
67:6

**phone**
13:19
17:14
75:16
96:15,17,
18
102:21,
23,25
104:12
126:22
133:2
138:25
143:9

**physically**
7:10
33:25

**piece**
66:4
144:16

**plaintiff**
16:22
52:19
54:13
55:13,17,
22,24
56:14
61:5,17,
21 64:6,
20 65:1
71:1 72:3
73:10
78:17
79:6,9,16
89:11
109:21

134:18

**plaintiff's**
60:21,24
107:3

**planner**
36:21,23
37:8

**planning**
36:10
91:18

**plans**
92:14

**platinum**
115:25

**pleading**
85:13
94:7

**pleasant**
25:2 87:8

**point**
22:25
24:16
32:21
34:21
53:14,19
58:18
98:21
100:1
116:24

**pointing**
100:6

**points**
120:6,8
122:22

**policies**
30:25
31:3,5
33:17,18

**policy**
31:7,16,
17 33:15,

16 34:11
35:4,14
38:25

**pop**
105:22

**portion**
83:13

**posed**
75:19

**position**
29:7
114:15
125:22
145:21

**positive**
132:25

**possession**
50:18
56:10
140:8

**possessions**
144:4

**possibility**
41:13
147:10

**post**
36:5
37:9,12

**Post-it**
88:17

**potential**
35:3,11

**potentially**
16:1
127:21

**precipitate
d**
13:4

**precise**
86:2



MARK MACRIS
MACRIS vs EXPERIAN INFORMATION SOLUTIONS

April 25, 2018
Index: Precisely..puzzle

**Precisely**
121:18

**premarked**
15:17
17:17,20
82:18
84:10
93:12,14
120:17

**premises**
45:21
46:4

**premiums**
136:14

**preparation**
16:19

**prepare**
13:12,15

**preparing**
16:14

**prescribed**
141:11,19
142:3,15
143:7

**present**
38:11,19
118:14

**presently**
45:20

**pressure**
137:17,
20,22
139:17
142:6,12,
16,20

**Prestige·**
94:2

**presume**
45:17

**pretty**
90:8

105:23
120:2

**prevent**
7:12

**previous**
145:20

**price**
11:10
46:15

**principal**
100:17
109:22

**prior**
8:21 9:8,
23 12:20
28:4,7,
21,22,23
29:17
32:4
41:25

**privilege**
75:19
76:6

**problems**
135:20
138:23
139:17
143:1

**proceedings**
12:20
13:2
125:20

**process**
87:13,18
89:21
96:19,23
97:22
100:25
106:3
108:24
113:12
138:11

**procure**
11:12

**produce**
147:17

**produced**
104:6

**product**
30:18

**products**
139:7

**program**
34:11,18
36:13,19,
20,23,25
37:1,13

**programs**
37:10,12

**prompted**
103:5

**property**
10:16
31:9
34:5,12
37:20,21,
25 38:1,
5,6,9,15,
18,20
39:4,7,
11,12,14,
15,19,20,
23 40:2,6
41:7
42:10
45:7,12,
13 46:15
48:25
49:12,15
50:5
52:17,20
57:12
58:2
63:16,24
87:23

91:12
93:4
102:15
114:10
144:17
145:6

**proved**
67:4
68:17

**provide**
16:17
34:15
35:11
42:13
96:8,25
113:24
130:11
131:7
135:19
139:22
146:19

**provided**
14:14,25
15:8
16:23
42:22
72:15
73:18
75:20
77:25
80:12,21,
23,24
88:11
93:17
114:25
121:5
130:10
146:11
147:12

**provision**
62:15

**provisions**
31:4
134:17

**public**
67:1
119:22

**punitive**
134:19

**purchase**
11:10,15
144:16

**purchased**
11:8,9,
13,21

**purpose**
47:15
69:13
137:5,14
138:21

**purposes**
32:10

**pursuant**
37:19
38:13
39:9,25
49:15
108:14

**pursue**
36:5 37:6

**pursuing**
122:2

**pursuit**
96:10

**put**
87:11
88:17
108:20
137:15

**puts**
22:21
93:23

**puzzle**
66:5



**Q**

**qualified**
67:12

**question**
7:1 8:8
10:16
14:16
16:16
29:12
40:13,14
47:5
48:16,17
50:22
51:19
53:22
55:8
56:21
58:22
59:12
64:19,23
67:20,21
68:8 69:2
70:1
72:19,20,
22,24
73:13,17,
19,20,21
74:2,4,16
75:12,14,
18,24
76:2,3,5,
8 77:4,8,
11,17,24
78:10,24
79:5,11,
13,20
80:16,18
81:10
82:2,3,9
86:19
99:22,24
101:14
102:20
103:9

105:1
107:21
111:19
113:16
115:17
116:3,13
117:20
122:24

**questioning**
87:25
137:10

**questions**
5:12
6:17,24
7:23 25:3
35:6 61:4
64:17
80:4 88:2
104:8,25
129:16
130:6
138:2,9
139:10
141:4
146:6,9
147:19,20

**quick**
46:5,24
59:22
137:13
138:4,8

**quicker**
128:3

**quiz**
105:22

**quote**
34:16

**R**

**R-E-M-I-C**
89:12

**raised**
103:10

**raising**
96:5
147:6

**ramificatio
ns**
137:21

**ran**
130:2

**rapport**
137:13
138:4,8

**Rating**
27:7

**raw**
138:12,17
139:7

**re-ask**
50:22

**reached**
26:3

**read**
20:5
26:13
32:1 45:8
60:23
62:15
68:13
72:10,22
74:4 78:2
85:5 95:8
96:11
99:7

**reading**
20:7
26:15
31:20
88:24
109:24

**real**
45:7,12

52:17
144:17
145:6

**reason**
8:3 19:18
69:6
115:12
139:14

**Rebecca**
67:11

**recall**
8:25 9:21
11:10,15,
20 12:1,
17,23
13:9
19:16,21,
23 21:4,
9,21,24
22:3,11,
17,19,22,
24,25
23:3
24:15,16,
19 30:7
38:3,17,
24 39:1,
14,17
41:16
42:15
44:8
62:17
67:19
69:22,24
70:4,5,7
71:2,7,8,
18,20
72:5,7,
11,25
73:3,7,12
74:8,11,
17,23,25
75:1,24
77:7,11,
12 78:4,

9,12
79:17
81:6,9,
12,14,20,
21,23
82:4,11,
12 83:14,
16 84:8
85:19
86:1,3,6
87:15,16,
18,24
90:16
91:1,6,21
92:23
102:18
103:1,5,
8,9,20
104:14
105:16
123:23
145:10,14

**recalled**
22:19

**receipt**
94:1

**receive**
42:3
141:5

**received**
55:22
85:11
90:11
103:15,
20,25
112:4
113:10,21
115:1
130:17
131:13

**receiving**
17:8 90:9
104:11

**recently**



85:1,19

**recess**
59:25
129:19

**recognize**
17:20,23
18:17,20

**recollection**
13:24
14:8,10,
13,19
38:4
39:18
119:15

**record**
15:21,24
52:6,9
77:19,21
85:6
90:21
95:10
119:22
128:10

**recording**
18:21,22

**recourse**
143:19

**refer**
15:19
88:18
120:5,8

**referee**
5:9
100:15
109:20

**reference**
94:5
98:4,21
100:1
102:2
106:13,
24,25

107:10
108:5,6,
7,15
109:3,16
110:23
115:19

**referenced**
94:6

**referred**
43:10,12
58:25
109:19

**referring**
15:19
16:9 51:6
53:11
57:14
61:8
70:14
72:1
74:20
98:11
99:23
108:2,4,
11 109:2
112:7
118:11,
17,19
119:25
121:16
126:4
130:19
131:14
133:19
134:8
135:15

**refinance**
11:24
18:25
24:20,24
45:25
46:2
47:23
48:3
49:7,22

**refinanced**
12:1
17:25
18:13
48:24
49:4,8,15

**refinances**
46:8
48:1,2

**refinancing**
19:21,23

**reflect**
144:25

**reflected**
126:9

**reflects**
118:4,14
126:7

**refresh**
14:7

**refreshed**
13:24
14:9,13,
19

**refuse**
83:24

**refused**
83:12,21
85:13

**reinvestigation**
15:6

**reiterate**
146:25

**relate**
61:3

**related**
39:2
134:21

**relative**

130:13,14
131:12

**relatives**
130:16
139:23

**relayed**
133:2

**release**
45:19
46:12
47:17
48:4
50:11
53:2

**released**
26:21

**releases**
59:19

**releasing**
50:14,19,
24 51:9
59:15

**relevant**
17:7 25:4
133:12
134:3,12

**relieve**
53:2

**relieved**
53:16,17,
24 88:4
93:9
98:14
102:2
107:5
109:25
110:12,
19,21
125:24
135:4

**relieves**
47:3,9,12

**relieving**
51:16,21
101:5

**remainder**
19:2

**remark**
123:6
124:7
127:12
128:13

**remember**
68:6
69:21
81:4,5
85:25
86:9,10,
13,15,22,
23 105:4
110:6
119:8,10

**Remic**
89:12

**remove**
58:2
99:19
106:19

**removed**
52:25
53:20
54:2,6
56:15,17
57:6,10,
11 58:24
59:3,11
93:3
98:17,23
99:12,15,
23 100:3,
9,12,19
106:15
107:12,
17,24
108:10,13
109:1,9



**removes**
  58:19

**removing**
  51:12
  52:19

**render**
  7:15

**rent**
  146:2

**renting**
  11:8
  146:4

**reopen**
  147:11

**rep**
  29:9

**repay**
  96:7

**repeat**
  51:3,19
  55:16
  61:24
  72:20
  74:2
  138:24

**report**
  14:4,12,
  18 15:4,6
  34:20
  52:17
  53:8
  103:11
  114:21,22
  117:7
  118:4,14,
  20,23
  119:19,21
  120:23,25
  121:5,11,
  12 123:3,
  7,9 124:4
  125:1,15
  126:13,15

127:8,10,
13,16,17,
19,21,23,
25 128:2,
15,19
134:25
135:2
139:3,5
144:23,24

**reported**
  103:6
  106:21
  124:6,24
  127:3,23

**reporter**
  6:9,21
  7:4

**reporting**
  102:14
  114:15,
  16,20
  115:13
  116:6,15,
  22 117:11
  119:17,19
  121:13
  124:3
  125:10,23
  128:7
  134:22
  135:2,6

**reports**
  14:9
  106:20
  139:11

**repossessed**
  119:12

**repossessio
n**
  116:19
  117:1

**representat
ives**
  104:15

**representin
g**
  33:8

**represents**
  33:3

**request**
  60:22
  61:1,5,
  17,25
  64:5,19
  70:10,11,
  20,23
  71:12
  72:2
  73:23
  74:7,18
  75:5
  77:6,9
  78:7,11,
  16 79:5,
  14 80:12
  81:2

**requested**
  115:7

**requesting**
  42:4
  55:23

**requests**
  61:2
  104:9

**required**
  20:15,24
  21:25
  42:13
  46:5,21
  136:12

**requires**
  135:22

**reserved**
  5:13 16:1

**resolve**
  112:24

**respect**
  134:24

**respective**
  5:8

**respond**
  94:17
  104:24

**responded**
  105:20

**responds**
  95:23

**response**
  6:20
  60:21,25
  61:19
  65:3
  72:3,15,
  16 73:9,
  22 74:12
  76:9
  79:3,15
  80:17
  94:17
  111:4
  113:21

**responses**
  27:10

**responsibil
ity**
  129:1

**responsible**
  24:10
  25:18,20
  94:11
  97:20
  105:7,10
  111:11

**responsive**
  104:9

**rest**
  141:3

**restated**
  65:12
  78:18
  79:6

**restaurant**
  136:16

**restroom**
  8:4

**result**
  41:15
  49:17
  115:8
  121:7
  144:9

**resulted**
  135:5

**retaining**
  92:10,12

**retirement**
  144:2

**returned**
  18:23
  84:25
  85:18
  86:9
  139:14

**revealing**
  60:7

**revelation**
  75:25
  76:5

**review**
  13:23
  17:7,19
  112:20
  146:18

**reviewed**
  14:4,13,
  17 32:1
  94:4

**rewards**



115:25

**rid**
126:25

**rights**
16:1

**risk**
33:22
34:20,22
35:3,9
136:1
138:9

**Road**
5:16 8:14
111:20
112:17
113:8

**rule**
6:8

**rules**
6:6

———————

**S**

**S-E-N-T-R-Y**
32:19

**S-I-M-I-N-S-K-I**
132:9

**sake**
105:25

**sale**
46:14

**sales**
29:9,10

**satisfactory**
67:5
68:18

**Schaefer**
84:13,16

86:7

**Schaefer's**
86:20

**scheduled**
128:9

**school**
36:14,16

**science**
35:23

**score**
115:15
122:8,12,
13,17,18,
21,23
123:10
144:11

**search**
147:16

**secondary**
36:9

**section**
45:9
88:19

**secure**
45:18
46:12
47:16
48:4

**secured**
50:4
114:9

**securing**
63:23

**sell**
29:11
46:21

**selling**
48:5
49:11

**send**

35:10
139:12
147:17

**sending**
140:19

**sense**
65:5

**sentence**
20:13,20
45:23
46:1,7,
11,17,19,
23 47:14,
15 48:4
56:13,25
57:5 86:4
98:14,16,
17 100:1,
8 117:3,
20,25
118:13

**sentences**
47:7

**Sentry**
32:17
33:6,19
34:4,10
35:10

**separate**
38:24
63:7 86:5
97:14,17
106:5

**separated**
12:15
13:9
23:24

**separately**
49:25

**separation**
13:5,8
23:23
42:1 55:1

**September**
9:22
13:11
23:25
95:24
101:3
112:15
140:22

**series**
66:6

**served**
61:20
104:10

**service**
31:18
126:22,25

**servicer**
42:4,14
51:16,21
52:4
105:6

**services**
34:8 37:7

**Servicing**
5:25
15:20
17:13,15
60:18,22
61:1
84:12
103:14,16
119:6,14
125:17
128:22

**set**
83:9
114:13
120:16
129:15

**Seth**
13:17
60:6
130:1

**sets**
80:3

**Setting**
87:7

**settle**
127:7

**settlement**
15:25
42:24
43:21
91:2,5

**severely**
122:21

**sharing**
133:24

**Sheridan**
9:1,8

**shop**
34:9
136:17

**shoulder**
132:22

**show**
17:17
42:19
95:4,20
107:9,16
114:23

**showed**
54:1
95:19

**showing**
38:9
120:16
121:4

**shows**
56:17
119:21

**sic**
22:21



**sign**
20:24
68:3
69:21
70:8
71:10,13
73:16
81:14
83:13,21,
24 84:1,7
85:13

**signature**
18:1,3,4
19:12,14,
19,24,25
21:2
43:25
44:3,6,
21,22
58:9,15
65:15,16,
17,25
66:1,17
67:18,22,
23,25
68:7,9
69:3,17
71:1,14,
15,18,19,
22 72:4
73:1,3,5,
6,14,15
74:22
75:2
78:3,23,
25 79:2,
16 81:8,
15 86:17,
18

**signatures**
58:7,12

**signed**
21:4
44:17,23
45:1,2

53:1
56:11,22
64:20
66:15
67:10,25
68:5,25
69:23
70:2,12,
17,25
71:9
72:7,8
73:10
75:6
77:16
78:17,21
79:6,23
81:5,8,13
83:3
84:13,25
85:18
86:8
91:12
96:5
109:3
129:10

**signing**
5:10
19:16
20:14
44:8,19
67:19
68:6
69:14,21,
22,24
70:4,6
71:3,7,8,
20 72:5,
11,25
73:3,7
74:10,23
75:1
77:7,12,
13 78:4,
9,12
79:1,17
81:4,7,18

82:12
86:15

**similar**
112:7

**Siminski**
132:9

**simply**
84:5

**single**
87:6
135:20
139:21
147:6

**sir**
137:8
140:10

**sister**
131:25
132:1
133:4,15
146:3

**sit**
7:10,16
31:11
76:9
87:17
113:20
137:9

**sitting**
7:12 47:2
50:17
64:13
73:8
74:11,17
110:7
137:24

**situation**
110:11

**six-month**
49:10

**sleep**
41:13

135:18
136:7
137:16
139:16
141:14
142:19

**slowly**
6:16

**SLS**
17:5
55:22,24
56:6
57:8,18
58:12
59:14
61:4
104:1,12,
16 105:6,
13 106:3,
8,12
111:1,15
112:9,15
114:25
115:13,19
116:5,15,
22 118:7,
23 119:17
129:7
130:7
131:15
132:18
134:16,22
135:2
143:9

**SLS's**
111:4
114:14

**SLS007**
19:7

**SLS010**
26:13

**SLS012**
19:11

**SLS024**
83:2

**SLS025**
66:8

**SLS026**
66:10

**SLS028**
66:14

**SLS035**
65:24

**SLS038**
65:14
78:19,21

**SLS039**
84:11

**small**
119:10

**SOB**
140:2

**sold**
29:14

**Solutions**
15:22
16:11

**son**
41:5,7
92:2
132:23,24
139:20

**sore**
141:2

**Sound**
8:11

**speak**
6:16

**speaking**
76:11

**speaks**
47:20



**Specialized**
5:25
15:20
17:13,14
60:18,22,
25
103:13,16
119:6,14
125:17
128:21

**specific**
8:24 9:11
10:1 14:7
22:4
30:18
32:13
38:4
83:17
110:19
138:2

**specifically**
37:18
71:9,13
81:13,18
100:2
110:12
116:14
117:15

**specifics**
39:1

**speculation**
144:6,8

**spelled**
32:19
98:19

**spoke**
60:6
104:15,22
133:1

**spring**
26:1,3,8
55:2

**SROF-2013-SE**
89:12

**stacking**
82:19

**staff**
35:1,8

**stamp**
107:3

**stamped**
88:21

**stand**
73:8,18,
22 74:12,
18 75:8
77:5,8
80:13

**standard**
34:24

**start**
25:6 34:4
42:16
45:6
67:17
82:19
102:22
106:6
132:19
133:5
140:1
141:6

**started**
6:5 12:20
28:1
58:17
125:20

**starting**
28:4
62:21
88:13
93:20
115:5
137:25

**starts**
45:7
112:14

**state**
8:9 30:21
34:7,13
35:20
36:3,8
59:13
64:10
65:1
66:23
67:1
68:16
70:15
71:21
72:8,18
79:15
94:14,23
95:6
99:11,18
106:15,19
107:5,22
108:6,7
110:12,
19,22
114:19
115:11
116:4,8,
14,18,21,
25 123:12
130:11
134:15
135:23
136:4,9,
18

**stated**
24:8
25:24
48:19
56:14
62:5,9,20
83:11,20
92:5 97:9
107:11
123:12

131:24
140:15

**statement**
17:12
54:4,8
56:8
58:23
68:4,11
69:4,8
74:24
85:24
86:12,20
97:7
105:4
118:11
120:2,9
127:14
130:9

**states**
17:5
21:14
45:15
53:15
54:13
56:13
61:21
65:11
66:23
67:11
68:14
84:24
85:17
86:24
100:2
101:20
107:17
124:16
125:18
131:4
136:9

**stating**
58:17
59:10
69:2
85:22

86:8 88:2
89:5
103:16
108:25
113:9
115:15

**status**
64:11
121:19
123:18,19
124:16
125:8,19
126:16,17

**stay**
128:14

**stays**
123:3

**step**
25:6

**Stevens**
32:21
34:21

**stipulated**
5:7

**stipulations**
5:4

**stole**
87:2

**Stone**
132:5,6
134:5

**stop**
6:13 8:6,
10 10:15
54:18

**stopped**
21:25
23:1,3,
10,11
24:14,17
25:5



37:24
39:15
40:5,15
42:5

**stopping**
41:14

**strain**
41:23

**Stratton**
36:11,13,
17 37:13

**strike**
16:15,16
92:24
93:1

**strikes**
92:25

**struggled**
85:8

**struggles**
41:22,25

**studies**
36:6

**subject**
54:14,16,
24 55:7,
15,25
56:2,7
61:7,19
62:2,23
64:7
141:2
147:9,18

**submit**
113:16

**subscribed**
67:6
68:19

**substance**
60:4,9
129:24

**successfull
y**
49:3,7,8

**suffered**
135:9
140:14

**suffering**
147:2

**suggesting**
55:9

**summarize**
45:8

**summons**
88:15,20,
25 89:2,8

**supplemente
d**
15:5
72:15

**support**
85:9
124:10,
14,21
128:19
129:1
146:15

**suppose**
29:15

**supposed**
23:7,13
100:16
130:15

**Supreme**
95:7

**swearing**
140:1

**swore**
7:4

**sworn**
5:17

**Synergy**
29:3,8,
11,17

**system**
94:24
136:11,21

———————————

**T**

———————————

**tab**
98:2

**tabulate**
122:16

**takes**
9:4 22:14
35:5

**taking**
6:9
115:20
143:12

**talk**
6:11,14
12:6
31:11
122:17
130:2

**talked**
130:1

**talking**
6:12
79:25
80:1
102:21
147:2

**talks**
47:16

**tax**
39:19,23
40:2

**taxes**
39:11,14

**Teakwood**
10:2,13,
17,24
11:6 12:7
18:14
37:21
38:6,10
39:12
40:6
45:13
49:1 50:5
52:20
87:24
94:12
99:6
102:15
103:18
106:16
126:23

**telephone**
130:15,16
131:12

**telling**
133:20

**ten**
19:17
137:19,24

**ten-year-
old**
139:19

**tense**
138:6

**tentative**
15:24

**term**
35:13

**terminated**
124:18

**termination**
116:20
117:2

**terms**

20:9
33:25
46:16
47:1
125:14

**Terrace**
10:2,13,
17 18:14
37:21
38:6,10
39:12
40:6
45:13
49:1 50:6
52:21
87:24
94:13
99:6
102:16
103:18
106:17
126:23

**testified**
5:18 21:1
40:21
54:25
74:14
99:9
102:6

**testify**
7:8

**testimony**
18:12
60:5,9
61:15
69:20
72:9 80:8
85:14
86:20
95:11,16
101:1
119:16
121:16
129:25
130:11



131:7

**theory**
81:17

**thing**
7:25 8:1,
7 29:10
118:23
128:24
137:15
139:15

**things**
85:8 86:5
97:14,18
133:6,11
143:10
144:24

**thought**
9:12
33:12

**thoughts**
8:4

**threaten**
143:13,
15,18

**threatened**
143:21,22

**time**
5:13 8:10
10:21
12:7
17:19,25
18:7,24
21:22,24
23:7,9
24:2
25:16
30:2,7
31:23
35:5 37:5
40:4
41:8,17
46:13
55:4

67:13
83:12,17,
19 90:5
91:14,23,
25 92:2,
11 102:13
104:4
105:19
118:22
119:1,3
130:3
144:21
145:2,9
146:12,
13,21
147:14

**timeframe**
103:21

**times**
43:5
75:12,15
133:1
137:23
138:6

**titled**
65:22
66:11

**today**
6:1,2,24
7:8,11,
13,16,23
13:13
15:23,25
47:2
50:17
60:13
62:20
64:13
69:20
73:8
74:11,17
80:8,14
86:20
87:17,21
107:11

113:20
129:25
146:6,9,
11

**told**
24:21
25:19
26:7
49:19
92:24
93:1
95:20
99:17
100:22
101:13,17
109:14
110:4,9
133:6,11
146:6,8,
14

**Tonawanda**
29:1,2

**Tony**
104:16
139:25

**top**
66:15
82:25
88:13
98:5
121:12

**topic**
42:17

**topics**
102:10

**total**
131:16

**tough**
147:5

**Town**
10:9

**Toyota**

119:11
126:3

**track**
6:21

**trade**
118:20

**trained**
137:18

**transaction**
12:6

**transcript**
5:11 89:5

**transfer**
46:5
52:17
53:8

**treated**
141:17
142:1,12
143:5

**treatment**
141:5

**Triad**
29:3,7,
11,17

**trial**
5:13 16:8

**triggered**
112:8

**true**
69:8
85:24
86:3,4

**trust**
89:13

**trustee**
89:12

**truthful**
68:10

**truthfully**
7:8

**turn**
15:16
20:3
26:12
53:4
60:11
65:5
70:20
79:13
98:2
104:2

**turning**
19:11
21:13
43:24
45:5,14
66:14
116:9
121:11
124:10
125:3
126:2
128:2,16
134:14

**two-page**
53:7

**Tyler**
28:8,12,
21

**type**
27:2
29:13
30:15
135:10
136:15

**typed**
65:15
66:16,17

**types**
138:13

**typo**



130:14

---

**U**

uh-uh
 6:18

ultimately
 61:20
 97:24

unable
 49:10

unaware
 63:21

undated
 106:7

underneath
 33:19,21

undersigned
 66:25

understand
 6:24,25
 7:1,3,7,
 21 14:16
 20:9,20
 23:9 25:1
 26:16,19
 29:12
 33:13
 37:17,18
 39:9,25
 42:12
 43:15,18
 44:14
 45:23,24
 46:6,19
 47:5,7
 58:25
 60:15
 63:11,12
 68:21
 69:6
 80:3,6
 89:19

94:9
96:14
110:10
112:22
121:3,24
122:7,11,
 25 135:8
146:5

understanda
ble
 22:7

understandi
ng
 31:20
 33:23
 48:12
 49:16
 59:17
 63:16
 69:12
 90:2
 97:13
 119:16
 126:11
 127:5
 128:13
 129:10
 137:6

understood
 24:8
 38:13
 40:22
 94:10
 99:2,9
 101:2
 102:6
 108:25
 146:9

undertook
 51:22

underwritin
g
 33:25
 35:1,7

unfit
 7:15

unified
 94:23

uphold
 61:18
 62:1,22

upper
 88:14

utilities
 145:25
 146:1,2

---

**V**

vantage
 122:16,17

verbal
 6:17,20
 25:17,22,
 25 26:2
 55:1
 104:24

verbatim
 95:15

verbiage
 110:16,17

verificatio
n
 138:3,16

verified
 44:22
 89:1,3,9

verifies
 44:15

verify
 34:17
 44:17,18
 69:14
 135:25
 138:10

Verizon
 126:15,25
 127:3

versus
 89:13

view
 135:3

village
 10:8,9

violated
 17:5
 134:17

Visa
 115:25

vision
 41:10

visit
 136:23
 137:5,14

visits
 138:25

---

**W**

wages
 140:6
 143:16

wait
 110:8

waive
 96:10
 97:2

waived
 5:9,11

walk
 137:2

walked
 85:7

walkthrough
 138:16

Wallace
 106:15
 107:2,4,
 7,16,23
 108:9

wanted
 24:20,24
 49:21
 130:2

wanting
 137:25

warranty
 53:6,21
 57:24
 58:1,8

ways
 28:15
 112:23

weather
 130:1

week
 81:5

Western
 136:22

whatsoever
 145:7

wife
 10:21
 17:24
 18:7 21:6
 23:7,13,
 17 24:2,
 13,17
 25:5,16
 26:2
 37:20,23
 38:2,14
 39:6,15
 40:1,15
 42:1,5
 43:11
 45:15
 46:4,11



47:16
48:24
49:9,14
54:15
55:1,9
62:12,20
83:20
84:5
85:21
126:23
139:23

**willfully**
134:17

**Williamsburg**
10:3

**Williamsville**
8:23 9:25
10:4,7,9

**Wisconsin**
32:21,22
34:21

**wishes**
132:24

**wondered**
143:11

**word**
33:24

**wording**
100:11

**words**
22:18
60:16,17
69:18
72:2
107:12
109:8
110:19

**work**
27:4,13
28:5,7,

10,18,22
29:2,22
32:10,22,
24 93:22
135:21
136:15,
18,21
138:14
140:6,10
143:1
144:2,4

**worked**
27:21,24
28:8,20
29:1,4,
24,25
137:18

**Workers'**
27:7
31:1,10
34:13,23
135:24
136:5,10

**working**
28:21
30:2 34:9
96:2,24
97:15
140:12
147:7

**works**
33:4

**worried**
41:2

**worries**
143:10

**write**
33:17,18,
19,20,21,
24 35:12,
13 104:21

**writer**
33:6,7

**writes**
16:17
31:15
92:25

**writing**
24:6
33:10,25
34:1
105:14
127:18

**written**
23:19
31:3,5
33:15
50:13
53:17
59:14
97:1,5,6,
7 102:21,
23 106:9
139:4

**wrong**
65:8

**wrote**
30:23,24,
25 31:13,
14,15
32:2
33:6,12
35:13,14
94:1
122:2

―――――――――

**Y**

―――――――――

**year**
12:17
22:18,23
27:20
36:3
80:22
145:3,20

**years**
8:17 9:3,

7,17
19:17
27:25
32:8 70:5
85:8
86:11
91:20
123:4
137:19

**yesterday**
13:22
14:14,18
80:24
93:17

**York**
5:16
27:7,11,
17 28:14
29:1
30:21
34:7,13
52:21
66:24
68:14
95:6
135:23,25
136:4,9,
19,22

**youngest**
132:24

