# EXHIBIT 18

Atkinson-Baker Court Reporters
www.depo.com

```
 1              UNITED STATES DISTRICT COURT
              WESTERN DISTRICT OF NEW YORK
 2

 3   MARK MACRIS,                  )
                                   )
 4        Plaintiff,               )      CERTIFIED COPY
                                   )
 5   v.                            )   Civil Action No.
                                   )   17-CV-361
 6   EXPERIAN INFORMATION          )
     SOLUTIONS, INC. and           )
 7   SPECIALIZED LOAN SERVICING,   )
     LLC,                          )
 8                                 )
          Defendants.              )
 9                                 )
     _____)
10

11

12   _____

13           RULE 30(b)(6) DEPOSITION OF

14      EXPERIAN INFORMATION SOLUTIONS, INC. and
            SPECIALIZED LOAN SERVICING, LLC,
15

16         BY AND THROUGH LORETTA POCH

17              LITTLETON, COLORADO

18               AUGUST 14, 2018

19   _____

20

21   ATKINSON-BAKER, INC.
     COURT REPORTERS
22   (800) 288-3376
     www.depo.com
23

24   REPORTED BY:  TERRY H. EDWARDS,
     Registered Professional Reporter
25   FILE NO.:  AC03E10
```

```
 1                UNITED STATES DISTRICT COURT
                 WESTERN DISTRICT OF NEW YORK
 2

 3   MARK MACRIS,                    )
                                     )
 4        Plaintiff,                 )
                                     )
 5   v.                              ) Civil Action No.
                                     ) 17-CV-361
 6   EXPERIAN INFORMATION            )
     SOLUTIONS, INC. and             )
 7   SPECIALIZED LOAN SERVICING,     )
     LLC,                            )
 8                                   )
          Defendants.                )
 9                                   )
     _____)
10

11

12

13

14

15           RULE 30(b)(6) DEPOSITION OF LORETTA POCH,

16   taken on behalf of Plaintiff, at Regus-Kellogg

17   Center, 26 West Dry Creek Circle, Suite 600,

18   Littleton, Colorado 80120, before Terry H. Edwards,

19   Registered Professional Reporter and Notary Public

20   within and for the State of Colorado.

21

22

23

24

25
```

```
 1                    A P P E A R A N C E S

 2    FOR PLAINTIFF:

 3    LAW OFFICES OF KENNETH HILLER, PLLC
      BY:  SETH J. ANDREWS, Esq.
 4    6000 North Bailey Avenue, Suite 1A
      Amherst, New York  14226
 5    (716) 564-3288
      sandrew@kennethhiller.com
 6
      FOR DEFENDANTS:
 7
      LAW OFFICES OF MCGLINCHEY STAFFORD
 8    BY:  BRIAN S. MCGRATH, Esq.
      112 West 34th Street, Suite 1515
 9    New York, New York  10120
      (646) 362-4000
10    bmcgrath@mcglinchey.com

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    I N D E X

 2

 3   WITNESS:   LORETTA POCH

 4   EXAMINATION                              PAGE

 5        By Mr. Andrews                        6
          By Mr. McGrath                       --
 6

 7                 E X H I B I T S

 8                                           INITIAL
     NUMBER            DESCRIPTION          REFERENCE
 9
       1    Letter to To Whom It May Concern  24, 30
10          from Macris, SLS 322;
            Defendant SLS's Amended
11          Objections to Plaintiff's Notice
            of Taking Deposition of
12          Defendant's Designated Corporate
            Representative Pursuant to
13          Fed.R.Civ.P.30(b)(6),
            SLS 051 through 370
14
       2    SLS 371 documents through 857;       36
15          SLS 323 stamped DRAFT every page

16     2B   Screen shot                          65

17     2c   Screen shot                          79

18     3    Letter to Macris from Teller,        68
            May 23, 2016
19
       4    CAPRESPA Loan Form, 6-28-2017,       88
20          (Confidential)

21     5    Complaint and Demand for Jury Trial  93
            Preliminary Statement, 7 pages
22
       6    Preliminary Statement               94
23

24

25
```

Atkinson-Baker Court Reporters
www.depo.com

```
 1      I N D E X   (Continued)

 2

 3   INSTRUCTIONS  NOT  TO  ANSWER:
      PAGE                    LINE
 4
              (None)
 5

 6

 7      INFORMATION  REQUESTED:

 8              (None)

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Atkinson-Baker Court Reporters
www.depo.com

```
 1        LITTLETON, COLORADO; TUESDAY, AUGUST 14, 2018;

 2                        10:14 A.M.

 3

 4                     LORETTA POCH,

 5            having first been duly sworn, was

 6            examined and testified as follows:

 7                      EXAMINATION

 8   BY MR. ANDREWS:

 9        Q   How are you doing?  My name is Seth

10   Andrews.  I'm the attorney for the plaintiff Mark

11   Macris.  We're here today pursuant to an action you

12   filed in the Western District of New York, naming

13   Specialized Loan Servicing, LLC as a defendant,

14   alleging violations of the FCRA and FDCPA.

15            We're here today to take the deposition

16   of -- I'll refer from now on SLS as Specialized

17   Loan Servicing.  So we're here to take SLS's

18   30(b)(6) deposition relative to that lawsuit.

19            That means you'll be providing testimony

20   on behalf of the company, not as an individual.  Do

21   you understand that?  You'll be testifying in that

22   capacity today?

23        A   I do.

24        Q   Okay.  Just a couple of ground rules for

25   you again.  We can only talk one person at a time;
```

Atkinson-Baker Court Reporters
www.depo.com

1    otherwise, we won't have a clear record.  I tend to

2    speak very fast.  I guarantee that won't be the

3    first time she asks me to stop and repeat the

4    question, so I'll try to really slow down.

5         But in the event that I speak too quickly,

6    or you don't understand, let me know and I'll slow

7    down and rephrase.  If you think that you know

8    where I'm going with the question, you might jump

9    in -- which I oftentimes do.  Let me finish so you

10   can then respond and we can have a clear record.

11        Okay?

12   A   Okay.

13   Q   You need to give verbal responses.  Can't

14   be any head nods or gestures.  In order to have a

15   complete record, we need a verbal response; is that

16   understood?

17   A   Yes.

18   Q   Okay.  If you don't understand a

19   question and you answer it, I'm going to assume you

20   understood it; is that understood?

21   A   Yes.

22   Q   You understand you're under oath and you

23   have an obligation to tell the truth just as if you

24   were in court?

25   A   I do.

Atkinson-Baker Court Reporters
www.depo.com

1      Q   If at any time you need a break, let me

2   know.  I just ask that if there's a question I've

3   asked you, answer the question before break.  Okay?

4      A   Yes.

5      Q   Any reason you can't provide truthful and

6   accurate testimony today?

7      A   No.

8      Q   Not on any medication to alter your

9   ability to recall or provide truthful responses?

10      A   No.

11      Q   Would you please state your full name for

12   the record.

13      A   Loretta Poch, P-O-C-H.

14      Q   What's the -- the -- SLS's corporate

15   address?

16      A   8742 Lucent Boulevard, Highlands Ranch,

17   Colorado.

18      Q   In preparation for today's deposition, did

19   you discuss -- outside of your attorney.  I don't

20   want to know what you discussed with your attorney,

21   but with anyone else?

22      A   Our in-house corporate counsel.

23      Q   Who is that?

24      A   Patrick McBride.

25      Q   Was it Patrick that, prior to starting the

1    deposition, counsel was saying made off with the

2    good copies of the docs?

3        A   Yes.

4        Q   Okay.  So other than -- I don't want to

5    know what you discussed with Patrick.  Other than

6    house counsel and counsel here, did you discuss the

7    matter with anyone else?

8        A   I did discuss the responses to the credit

9    bureau dispute, to the e-Oscar dispute, to make

10   sure I thoroughly understood the response and the

11   form.

12       Q   When you say you did discuss the e-Oscar

13   response, did you discuss it with someone outside

14   of counsel or in-house counsel?

15       A   Yes.

16       Q   Who is that?

17       A   A gentleman in our office named Fred Korb.

18       Q   Can you spell the last name?

19       A   K-O-R-B.

20       Q   What's Mr. Korb's position at SLS?

21       A   I do not know his title.

22       Q   What made you feel confident to discuss

23   the e-Oscar response with Mr. Korb?

24       A   He has worked at SLS for quite some time,

25   and this is one of his areas of specialty

1    knowledge.

2        Q    And how do you know that?  Just by word of

3    mouth working at the company?  You didn't give me

4    his title.  I'm trying to understand how you go to

5    him.

6        A    Just from working with him.

7        Q    When you say you work with him, in your

8    normal capacity as an employee for SLS, do you work

9    in his department or --

10       A    No.  I speak to him on occasion when I'm

11   looking for clarification.

12       Q    Okay.  So he's kind of like maybe a guru

13   at SLS for legal matters, but he's not an attorney?

14   Is that fair to classify him as that?

15       MR. MCGRATH:  Objection to form.

16       A    He has a lot of policy knowledge and

17   procedures.

18       Q    (BY MR. ANDREWS)  I know you don't know

19   his exact title, but is he high up on the hierarchy

20   at SLS, like, is he a vice president or president?

21       MR. MCGRATH:  Objection to form.

22       A    I don't know.

23       Q    (BY MR. ANDREWS)  Okay.  Other than

24   in-house counsel, present counsel, and Mr. Korb,

25   did you discuss the matter in preparation for

```
 1    today's deposition with anyone else at SLS?
 2         A    No.
 3         Q    What's the highest level of education you
 4    obtained?
 5         A    Two years post high school.
 6         Q    Do you have your associate's?
 7         A    It's a paralegal certification.
 8         Q    Okay.  Where did you get that
 9    certification from?
10         A    El Paso Community College.
11         Q    Is that in Colorado?
12         A    Yes, Colorado Springs.
13         Q    Okay.  When did you get that
14    certification?
15         A    1978.  You're in trouble.
16         Q    It's not that long ago.  Prior to today's
17    deposition testimony, have you ever testified
18    before in deposition?
19         A    I have.
20         Q    When?
21         A    Oh, over the last 5 years, I've probably
22    testified between 30 and 40 depositions.
23         Q    Are what is your current position at SLS?
24         A    High risk analyst.
25         Q    Can you explain what that means in
```

Atkinson-Baker Court Reporters
www.depo.com

```
 1    layman's terms?
 2         A   Yes.  I work on contested foreclosures
 3    with local foreclosure counsel providing
 4    information from our systems of record and
 5    documents, reviewing affidavits, responses to
 6    discovery, and then I testify at depositions and
 7    trials.
 8         Q   After you got your certification, do you
 9    recall where you first worked?
10         A   My first law firm?  Yes.
11         (Interruption at the door.)
12         MR. ANDREWS:  Off the record.
13         (Delay in the proceedings.)
14         MR. ANDREWS:  Back on the record.
15         Q   (BY MR. ANDREWS)  Do you remember the
16    question?
17         A   The first law firm that I worked for, my
18    first job.
19         Q   What was the name of that firm?  Do you
20    remember?
21         A   La Croix Achziger Multz & Croker.
22         Q   What capacity did you work at that firm?
23         A   I worked as a paralegal for one of the
24    managing attorneys.
25         Q   How long did you do that for?
```

Atkinson-Baker Court Reporters
www.depo.com

```
 1        A    A long time ago.  Year and a half, 2
 2    years.
 3        Q    What type of practice?  What area of law
 4    did you assist that attorney in?
 5        A    Debtor bankruptcy.
 6        Q    And after that, do you recall where you
 7    worked?
 8        A    Then I worked for Kline Smith &
 9    Associates.
10        Q    And that's another law firm?
11        A    Yes.
12        Q    What area of law do they handle?
13        A    Residential mortgage foreclosure.
14        Q    And you worked as a paralegal for that
15    firm?
16        A    I did.
17        Q    How long, approximately?
18        A    Twelve years.
19        Q    And after them, do you recall where you
20    worked?
21        A    I worked for the law firm of Shapiro &
22    Meinhold.
23        Q    What kind of law did they practice?
24        A    Residential mortgage foreclosure.
25        Q    How long did you work for them for.
```

Atkinson-Baker Court Reporters
www.depo.com

1        A    Eleven years.

2        Q    And after them?

3        A    Specialized Loan Servicing.

4        Q    So you've worked for SLS since 2012; is

5    that right?

6        A    No, no.  I've worked for SLS since 2007.

7        Q    My math is not that good.  Okay.  When you

8    first started with SLS, do you recall what position

9    you worked in?

10       A    Yes.  I worked in the office of corporate

11   counsel.

12       Q    How long did you do that for?

13       A    Two years.

14       Q    And then after that, did you move to a

15   different position?

16       A    My current position, high risk analyst.

17       Q    You previously testified you also

18   testified in trials; is that correct?

19       A    Yes.

20       Q    How many trials have you testified?

21       A    I have not counted recently, but I can

22   tell you that it's over 300.

23       Q    Can you tell me what type of business SLS

24   is engaged in?

25       A    We're a third-party mortgage loan

1   servicer.

2        Q   Can you tell me the kind of work that SLS

3   typically does?

4        A   Yes.  We service mortgage loans for

5   investors, meaning we are the face to the borrower.

6   We collect their monthly mortgage payments,

7   disburse taxes and insurance, foreclose if it

8   becomes necessary, conduct loss mitigation, try to

9   resolve delinquencies, and if we are unable to and

10  we wind up foreclosing and going through a

11  foreclosure sale, then we sell the property for

12  many of the investors after the foreclosure is

13  complete.

14       Q   You say loss mitigation.  Does SLS collect

15  debts on behalf of its clients?

16       MR. MCGRATH:  Objection as to form.

17       A   We attempt to resolve a delinquency with

18  borrowers, get a loan performing.  We do not

19  collect deficiencies.

20       Q   (BY MR. ANDREWS)  With respect to default

21  accounts, does SLS attempt to collect moneys on

22  those accounts for its clients?

23       MR. MCGRATH:  Object as to form.

24       A   We attempt to get the monthly mortgage

25  payments brought current.

```
 1        Q    (BY MR. ANDREWS)   Okay.  So is it fair to
 2   say a regular part of SLS's practice is to collect
 3   defaulted debts for its clients?
 4        MR. MCGRATH:  Objection as to form.
 5        A    That is a small part of our business.
 6        Q    (BY MR. ANDREWS)   Is it something that SLS
 7   does regularly?
 8        A    Yes.
 9        MR. MCGRATH:  Objection as to form.
10        A    Yes.  We work defaulted loans regularly.
11        Q    (BY MR. ANDREWS)   Does SLS provide
12   training in FDCPA compliance?
13        A    Yes.
14        Q    Are you familiar with that training?
15        A    I am.
16        Q    Can you describe the training to me?
17        A    When you're a new hire at SLS, you go
18   through initial training, and it's a 2-week
19   intensive training, and one of the modules is
20   FDCPA.  And then annually every employee is
21   recertified by going to a training module and
22   passing a test.
23        Q    A written test?
24        A    It's electronic.
25        Q    Well, you said there's a 2-week training
```

1    period.  Who does that training, provide the

2    training?

3        A   We have a department, learning and

4    development that specifically provides that

5    training.

6        Q   Is there one person in that department or

7    is there many people in that department?

8        A   There are many people in that department.

9        Q   So it's not just one person that's in

10   charge of doing the training?

11       MR. MCGRATH:  Objection as to form.

12       A   That's correct.

13       Q   (BY MR. ANDREWS)  During that 2-week

14   period, are there any materials provided to the new

15   employees for that system and the training?

16       A   I don't know because it has been so many

17   years since I went through the training that I

18   don't know if they do or not.

19       Q   When you went through the training, do you

20   recall if there was any materials provided to you

21   to help you train?

22       MR. MCGRATH:  Objection as to form.

23       A   My training was electronic.

24       Q   (BY MR. ANDREWS)  So when you say

25   electronic, you weren't -- there was no interaction

```
 1   with an individual?  It was all learned from some
 2   software?
 3        MR. MCGRATH:  Objection as to form.
 4        A    No.  We were literally sitting in a
 5   classroom, each of us with a computer and an
 6   instructor.
 7        Q    (BY MR. ANDREWS)  So there was a live
 8   person there instructing you?
 9        A    Correct.
10        Q    Okay.  Do you recall if you ever reviewed
11   any manuals in that training?
12        A    I don't recall.
13        Q    Do you know if presently the training
14   consists of reviewing any manuals regarding FDCPA
15   compliance?
16        A    I don't know, in the initial 2-week
17   period, what's included.
18        Q    After that 2-week period, you said there's
19   annual reviews; is that correct?  Did I hear you
20   right?
21        A    Recertification.
22        Q    What did that recertification consist of
23   in addition to that electronic test, I believe you
24   said.
25        A    Right.  So it's an electronic presentation
```

1    in the form of slides on FDCPA, and SLS's need and

2    requirement to comply with FDCPA.  And then once

3    you go through those slides, the very end of the

4    presentation is the test.

5         Q    Do you know who creates the slides?

6         A    Learning and development.

7         Q    That in-house department within SLS?

8         A    Correct.

9         Q    Do you know if there's an attorney in that

10   department?

11        A    All the training has oversight by a

12   compliance attorney.

13        Q    Is that the same attorney you met with --

14   not present counsel -- you previously testified you

15   met with earlier today?

16        A    No.

17        Q    Do you know that attorney's name?

18        A    It has changed.

19        Q    The attorney or the new attorney's name?

20        A    I guess that's a fair question.  The

21   attorney.  It was a male and now it's a female, and

22   I cannot think of her name.

23        Q    Do you know how long she's been working in

24   that capacity for SLS?

25        A    Several years.

```
 1         Q    The training that you've described, that
 2   procedure, was that in place back in 2016?
 3         A    Yes.
 4         Q    Does SLS also train on how to handle
 5   e-Oscar?
 6         A    Yes.
 7         Q    Are you familiar with that training?
 8         A    I have not taken the e-Oscar training
 9   other than a global overview of how an e-Oscar
10   dispute is handled, so I'm aware of it on a high
11   level.
12         Q    Okay.  As much as you're aware of the
13   FDCPA training or not as much?
14         MR. MCGRATH:  Objection as to form.
15         A    I would say as much as the FDCPA.
16         Q    (BY MR. ANDREWS)  Like in the FDCPA, are
17   initial employees provided a 2-week training period
18   with respect to e-Oscar disputes?
19         A    I don't know if they are or not.
20         Q    Do you know -- is there a particular
21   department in SLS that handles that, like there is
22   for the FDCPA compliance?
23         A    FDCPA compliance is throughout the company
24   in every department.
25         Q    I don't want to mischaracterize your
```

1    testimony.  I thought you previously testified that

2    there's a separate internal department that handles

3    the training and compliance for FDCPA at SLS; is

4    that right?

5        A    For the training, yes.

6        Q    With respect to training for an e-Oscar

7    dispute, is there a similar department that handles

8    protocol procedures for e-Oscar disputes within

9    SLS?

10       A    Yes.

11       MR. MCGRATH:  Objection as to form.

12       A    Sorry.  Yes.

13       Q    (BY MR. ANDREWS)  Like how you previously

14   testified in the in-house department that handles

15   the training compliance for FDCPA, that there was

16   multiple people within that department, are there

17   multiple folks within the department handling the

18   e-Oscar dispute training?

19       A    I don't know the answer to that question.

20       Q    Do you know if there's a head of that

21   department?

22       A    Of the learning and development training

23   team?

24       Q    The head of the department who handled the

25   learning or training in how to handle an e-Oscar

1    dispute at SLS?

2        A    I don't know the specifics of that

3    training.

4        Q    Do you know if there's specific documents

5    that set forth SLS's routine practice of handling

6    disputes, e-Oscar disputes at SLS?

7        A    In our annual recertifications under the

8    Fair Credit Reporting Act, there is a section on

9    e-Oscar disputes, so similar to the FDCPA training

10   with slides and a test, the Fair Credit Reporting

11   Act has a similar module.

12       Q    Not to be too specific, are you aware if

13   SLS has an in-house department that handles

14   training compliance for FCRA -- let me get my

15   question -- is there a department that handles just

16   FCRA compliance?

17       A    Yes.

18       Q    All right.  Are you familiar with that

19   training process for the FCRA?

20       A    Other than the annual recertification, I

21   am not.

22       Q    So you're not sure if -- like the FDCPA --

23   that 2-week track where new employees are taught

24   compliance?

25       MR. MCGRATH:  Objection as to form.

```
 1        A    I don't know.

 2        Q    (BY MR. ANDREWS)   Okay.  Do you know if

 3   that procedure, as it exists today, was the same as

 4   it was back in 2016 with respect to FCRA training

 5   and compliance?

 6        MR. MCGRATH:   Objection as to form.

 7        A    As to annual recertification, it is the

 8   same.

 9        Q    (BY MR. ANDREWS)   But outside of the

10   annual, you're not sure?

11        A    Correct.

12        Q    Let's talk about the current matter.   At

13   some point, did SLS attempt to collect debt from

14   the plaintiff -- in this Western District of New

15   York case, Mark Macris?

16        MR. MCGRATH:   Objection as to form.

17        A    There were communications between SLS and

18   both Mr. and Ms. Macris, both verbal and in

19   writing.   Monthly billing statements were sent,

20   solicitations for loss mitigation were sent, and

21   Mr. Macris called in several times to discuss

22   making monthly payments.

23             Sometimes he would ask about loan

24   modification, and sometimes he would say he wasn't

25   interested in loan modification.   Ms. Macris
```

Atkinson-Baker Court Reporters
www.depo.com

```
 1   communicated sometimes with SLS as well.
 2        Q   (BY MR. ANDREWS)  So what -- who was SLS's
 3   client for that account, if you know?
 4        MR. MCGRATH:  Objection as to form.
 5        A   It's a trust and I don't recall the
 6   trust's name.
 7        Q   (BY MR. ANDREWS)  If I give you a copy --
 8   it's all bound together.  It's SLS's production
 9   with objections affixed and the Bates range is 051
10   through 370.  I have it for you.
11        A   Oh, yay.
12        Q   Let me find a sticky.  I'm sorry.  Did it
13   fall apart?
14        A   Yes.
15        MR. MCGRATH:  See why I wanted to do
16   electronic.
17        Q   (BY MR. ANDREWS)  Let's turn to -- got it?
18        A   Uh-huh.
19        Q   Let's turn to SLS 180.  I'm just picking
20   out kind of a random pleading that has the caption.
21        MR. MCGRATH:  Are we going to mark this as an
22   exhibit?
23        MR. ANDREWS:  Yeah.
24        Q   (BY MR. ANDREWS)  Are you with me?
25        A   I am.
```

1      Q   So we see that this is an Order of
2  Reference, and then if we look at the caption there
3  is a plaintiff, U.S. Bank National Association as
4  Trustee for the SROF-2013-S3 Remic Trust 1?
5      A   Yes.
6      Q   Does that refresh your recollection as to
7  who SLS's client may be?
8      A   Yes.
9      Q   Is that still SLS's client with respect to
10  this account?
11     MR. MCGRATH:  Objection as to form.
12     A   I don't know if this property has been
13  liquidated or not, meaning at REO sale.
14     Q   (BY MR. ANDREWS)  Are you aware if at any
15  time prior to the sale of the property if the
16  account changed hands?
17     MR. MCGRATH:  Objection as to form.
18     A   I'm not aware of a change.
19     Q   (BY MR. ANDREWS)  As far as you know, that
20  would've been SLS's client throughout this process?
21     MR. MCGRATH:  Objection as to form.
22     A   Yes.
23     THE WITNESS:  I'll put Humpty Dumpty back
24  together here real quick.
25     Q   (BY MR. ANDREWS)  Kind of flimsy.  So is

```
 1   there someone at SLS that's in charge, or a
 2   supervisor, of handling e-Oscar disputes?
 3        MR. MCGRATH:  Objection as to form.  Asked and
 4   answered.
 5        A    The handling of e-Oscar disputes?
 6   Customer support.
 7        Q    (BY MR. ANDREWS)  You're not aware if it's
 8   one person?
 9        MR. MCGRATH:  Objection as to form.
10        A    There is not one person.  It's a group.
11        Q    (BY MR. ANDREWS)  If a person in that
12   department that you just identified in customer
13   support has a question, is there someone that they
14   can go to in the hierarchy of SLS to have that
15   question answered, regarding a dispute filed by a
16   consumer?
17        MR. MCGRATH:  Objection as to form.
18        A    There are supervisors and managers and
19   officers above the managers that are available.
20        Q    (BY MR. ANDREWS)  Okay.  So let's do this:
21   Can you describe to me kind of the hierarchy for
22   that customer support department?
23        A    Yes.  There is the analysts, regular level
24   department employees, and then they report to a
25   supervisor, supervisors report to managers,
```

```
 1   managers report to officers, junior officers, and
 2   then junior officers report to senior officers.
 3       Q   Are you aware of how far up that hierarchy
 4   you just identified, an analyst, a supervisor, a
 5   manager, a junior officer, and a senior officer,
 6   how far up that hierarchy a dispute could be
 7   handled?  In other words, would a senior officer
 8   ever handle a dispute?
 9       MR. MCGRATH:  Objection as to form.
10       A   I don't know.
11       Q   (BY MR. ANDREWS)  What about a junior
12   officer?  Do you know if a junior officer would
13   ever handle a dispute?
14       A   I don't know.
15       Q   What about a manager?  Do you know if a
16   manager would ever handle a dispute?
17       A   I don't know.
18       Q   What about supervisor?  Do you know if a
19   supervisor would ever handle a dispute?
20       A   I don't know.
21       Q   Analyst?  Do you know if --
22       A   Yes, they do.
23       Q   An analyst handles disputes?
24       A   Yes.  And then it would be up to them to
25   escalate if they needed assistance, or if there
```

1    were further questions.

2         Q    Is that what the process would be

3    described as, escalating?  Is that written in the

4    manual anywhere?

5         A    I don't know.

6         Q    How do you know that the analyst has the

7    ability to escalate it up to the chain above them?

8         A    That's our entire corporate structure in

9    every business unit that's specialized.

10        Q    But you're not sure if that's codified in

11   some type of manual or written protocol?

12        MR. MCGRATH:  Objection.  Asked and answered.

13        A    I've never seen...

14        Q    (BY MR. ANDREWS)  Okay.  What do analysts

15   -- can you describe what their role is at SLS?

16        A    It depends on their business unit.

17        Q    So an analyst assigned to the current

18   account -- what would their job duties be?

19        A    So we're broken into business units that

20   handle portions of the loan servicing.  For

21   example, we have cashiering that those analysts

22   deal with payments received on the loan, and we

23   have customer support that deals with borrower

24   questions on the loan, and we have timeline

25   management that deals with foreclosures.

1     Q   So that different breakout you just

2   described, who would be the analyst that would

3   handle a dispute if it came across?

4     A   What kind of dispute?

5     Q   The e-Oscar dispute.

6     A   Customer support.

7     Q   What if it was just a dispute from the

8   consumer that sells directly?

9     A   It would depend on the dispute.  If it's a

10   dispute saying, I made this payment but it wasn't

11   applied to my loan, then cashiering would research.

12        If it's a dispute saying, my ZIP Code is

13   wrong, customer support would handle it.

14        So it would depend on the kind of dispute

15   that came in.

16     Q   In this particular instance, what was it

17   -- apart from the analyst's division -- that

18   handled Mr. Macris's dispute?

19     MR. MCGRATH:  Objection as to form.

20     A   Are you referring to his --

21     Q   (BY MR. ANDREWS)  His personal dispute,

22   not e-Oscar.

23     MR. MCGRATH:  Objection as to form.

24     Q   (BY MR. ANDREWS)  Strike that.  Let's

25   first establish -- make it easier for you.

1        MR. ANDREWS:  Let's mark --

2        THE WITNESS:  Do you need this --

3        MR. ANDREWS:  Yeah, let's mark the whole

4    thing.  It's really one letter.

5            Let's go off the record.

6        (Exhibit 1 marked for identification.)

7        Q    (BY MR. ANDREWS)  You've been provided a

8    document that's plaintiff's Exhibit 1.  Have you

9    seen that document prior to today?

10       A    I have.

11       Q    Can you identify that document for me?

12       A    This is a letter that Specialized Loan

13   Servicing received from Mark Macris, and what he's

14   asking us to look at is the order of reference

15   signed by James H. Dillon, the State of New York

16   Supreme Court.

17           Do you want me to read it?

18       Q    No, that's fine.  I previously asked you

19   about the different departments within the

20   analyst's position that would handle a dispute

21   directly from the consumer.

22           And I asked you without first establishing

23   that Mr. Macris had indeed sent the dispute.  Here

24   is the dispute.  The question now is, is there a

25   particular department within the analyst's position

1    that would handle disputes like this directly from

2    the consumer?

3        A    Yes, customer support would.

4        Q    So customer support handles both disputes

5    coming from the consumer as well as the e-Oscar

6    disputes?

7        MR. MCGRATH:   Objection as to form.

8        A    No.   It depends on the kind of dispute

9    coming in which department would handle it.   In

10   this case, with regard to this dispute, customer

11   support handled.

12       Q    (BY MR. ANDREWS)   Okay.   Help me

13   understand why this particular dispute got

14   allocated towards customer support as opposed to a

15   different area within the analytic department?

16       A    Because it dealt with a request regarding

17   credit reporting.

18       Q    Okay.   So any dispute with respect to an

19   issue of credit reporting from a consumer, would

20   that be allocated towards the customer support part

21   of the analyst position?

22       A    Correct.

23       Q    Okay.   Do you know approximately how many

24   analysts are employed by SLS in that capacity?

25       A    I don't have any idea.

1        Q    Okay.   Do you know how much of their time
2    at work is allocated for dealing with the e-Oscar
3    and/or disputes from the consumer?
4        MR. MCGRATH:   Objection as to form.
5        A    I don't know.
6        Q    (BY MR. ANDREWS)   What are the other job
7    responsibilities for the customer support
8    subdivision of that analyst position?
9        A    Assisting borrowers with general requests,
10   disputes, assisting other business units.
11       Q    Is the majority of their day spent
12   handling disputes?
13       A    No.   The majority of their day is spent
14   assisting customers regardless of disputes or any
15   other request.
16       Q    Do you have any idea of how many disputes
17   the average customer service analyst at SLS would
18   respond to in a given workday?
19       MR. MCGRATH:   Objection as to form.
20       A    I don't.
21       Q    (BY MR. ANDREWS)   Do you know who would
22   know that information?
23       MR. MCGRATH:   Objection as to form.
24       A    The management group of the customer
25   service group.

1        Q    (BY MR. ANDREWS)   Does SLS have protocol
2   with respect to how much time it takes to process
3   the dispute?
4        MR. MCGRATH:   Objection as to form.
5        A    Not that I'm aware of.
6        Q    (BY MR. ANDREWS)   So there's no protocol
7   in terms of how long it's going to take them to
8   investigate a dispute?
9        MR. MCGRATH:   Objection as to form.
10  Misstates.
11       A    Not that I'm aware of.
12       Q    (BY MR. ANDREWS)   Back in 2016, was there
13  any protocol in place for how complete SLS would
14  process a dispute?
15       A    Not that I'm aware of.
16       Q    With respect to any e-Oscar dispute, were
17  you aware of any guidelines from SLS's client or
18  in-house on how long it should take for SLS to
19  respond to a dispute?
20       MR. MCGRATH:   Objection as to form.
21       A    Not that I'm aware of.
22       Q    (BY MR. ANDREWS)   Is it SLS's position
23  that it has a responsibility to respond to disputes
24  that come directly from the consumer?
25       MR. MCGRATH:   Objection as to form.

```
 1        A    I'm sorry, can you say that again.
 2        Q    (BY MR. ANDREWS)   Does SLS have a policy
 3   or a procedure that they take responsibility to
 4   respond to disputes that comes from a consumer?
 5        A    Yes.
 6        Q    What's that policy?
 7        A    That all communications from borrowers
 8   must be responded to.
 9        Q    Is there a time frame in which that's to
10   occur?
11        MR. MCGRATH:  Objection as to form.
12        A    We treat communications from borrowers,
13   whether they qualify or not, as qualified for
14   written requests, and respond in those required
15   time forms [sic].  I don't think CFPB calls them
16   QWRs anymore.  They call 'em -- I forget what
17   they're called now.
18        Q    (BY MR. ANDREWS)   So is it your testimony
19   that regardless of whether it's a written
20   correspondence from a consumer, SLS is going to
21   treat it as such and respond with a written reply?
22        MR. MCGRATH:  Objection as to form.
23        A    I'm sorry.  Say that again.
24        MR. ANDREWS:  Can you repeat that.
25        Q    (BY MR. ANDREWS)   Is it your testimony
```

```
 1    that SLS treats all communication as if it was a
 2    written communication?
 3         A    No.
 4         Q    Does SLS have a policy that calls for
 5    distinction on how to treat written communication
 6    versus oral communication coming from the consumer?
 7         A    We have a policy with regard to all
 8    written communications how they're handled and the
 9    timeliness of the response, and we have a policy
10    regarding verbal communications and the response.
11         Q    Are those response times different if it's
12    verbal versus written communication from the
13    consumer?
14         A    All communications must be in compliance
15    with FDCPA.  With regard to written responses, they
16    must be in accordance with RESPA guidelines.
17         Q    Okay.  Let's talk a little bit about SLS's
18    procedure responding to disputes.  Are you familiar
19    with that procedure?
20         MR. MCGRATH:  Objection as to form.
21         A    Are you talking about written disputes?
22         Q    (BY MR. ANDREWS)  I'm talking about an
23    e-Oscar dispute.
24         A    Yes.
25         Q    Let's go through it step by step.  Okay?
```

1        A    Okay.

2        Q    So let's look at --

3        MR. ANDREWS:  We'll mark -- let's mark the

4   whole thing.

5        (Exhibit 2 marked for identification.)

6        Q    (BY MR. ANDREWS)  I'm showing you a

7   document marked as plaintiff's Exhibit 2.  It's a

8   series of documents Bates stamped SLS 371 through

9   SLS 857.

10         Have you seen this stack of documents

11   prior to today?

12        A    Yes.

13        MR. MCGRATH:  Take a look at it.

14        A    Yes.

15        Q    (BY MR. ANDREWS)  Okay.  Can you identify

16   for me SLS 371 through 374?

17        A    These are SLS responses to an e-Oscar

18   dispute filed by Mr. Macris.

19        Q    Okay.  You testified that you're familiar

20   with that process, the ACDV, you're familiar with

21   that term?

22        A    Yes.

23        Q    That comes from -- the CRA in this case,

24   looking at SLS 371 Experian.  Are you familiar with

25   that?

```
 1        A    Yes.

 2        Q    How does the analyst get this?

 3        A    It comes electronically through the

 4   e-Oscar dispute system.

 5        Q    Okay.  You testified that there's multiple

 6   analysts, correct?

 7        A    Yes.

 8        Q    How does it get to analyst Seth, for

 9   example, with Brian?

10        A    I don't know.

11        Q    After it makes its way to the analyst, and

12   your testimony is you're not sure how that

13   particular analyst gets assigned it; is that

14   correct?

15        A    That's correct.

16        Q    Does that analyst look up the account

17   that's in dispute?

18        A    Yes, they do.

19        Q    How do they do that?

20        A    They look in our servicing platform.

21        Q    What's that?

22        A    It's called FISERV.

23        Q    Can you spell it?

24        A    F-I-S-E-R-V.

25        Q    What do you mean by "servicing platform"?
```

1   Explain it to me like I'm in third grade, if you

2   can.

3       A   Okay.  It houses all of the loan

4   information, borrower, borrower's mailing address,

5   property address, financial information regarding

6   the loan, all servicing notes regarding the loan,

7   and the mortgage loan payment history.

8       Q   So is it an account management system?  Is

9   that fair to say?

10      MR. MCGRATH:  Objection as to form.

11      Q   (BY MR. ANDREWS)  As you understand that

12  term?

13      A   Yes.

14      Q   When you say there's notes, if we look at

15  the remainder of plaintiff's Exhibit 2, starting at

16  381 [sic] through 857, are those the notes that

17  you've referenced that would be housed in the

18  FISERV --

19      MR. MCGRATH:  I want you to take a look.  You

20  said through [587]?

21      MR. ANDREWS:  Yeah, 381 through -- 857.  I'm

22  sorry.

23      MR. MCGRATH:  857.

24      A   Yes.

25      Q   (BY MR. ANDREWS)  Okay.  Would there be

1    any other place where account notes would be

2    stored?

3        A    No.

4        Q    No procedure to have written notes or a

5    hard copy of a file that would contain notes?

6        MR. MCGRATH:   Objection as to form.

7        A    No.

8        Q    (BY MR. ANDREWS)  So after the employee

9    looks the account up on the FISERV, the servicing

10   platform -- strike that.

11            What does it look like when an employee

12   looks up the account on that FISERV?

13       MR. MCGRATH:   Objection as to form.

14       A    So the first screen?

15       Q    (BY MR. ANDREWS)  Yes.

16       A    The first screen that comes up is general

17   loan information, borrowers' names, property

18   address, mailing address, security numbers, phone

19   numbers, basic loan information, original UPB,

20   current UPB, loan terms.

21       Q    Do you know if what is described, is that

22   able to be produced or was that produced, if you

23   know?

24       A    I didn't see it in any of the document

25   production.

1        Q    Do you know if it's something -- that

2   first screen you just described, is that possible

3   that analyst could print off that information

4   onto --

5        A    Yes.

6        Q    Okay.  So after that first screen, what

7   then -- what would the analysts do next after

8   locating the account and looking at the first

9   screen on the FISERV?

10       A    They would look at the loan payment

11  history, these servicing notes.  They would look at

12  the imaging system, which is separate from FISERV,

13  but that houses the note, the mortgage, the

14  assignments, correspondence regarding the loan, any

15  images related to the loan.

16       Q    Is that imaging separate from FISERV?

17  What is that imaging connected to?

18       A    It's called Global Viewpoint.

19       Q    Is Kimberly separate software?

20       A    It is.

21       Q    Is the analyst able to open up a PDF of

22  the imaging?

23       A    Yes, they are.

24       Q    Okay.  Is there kind of like a punch list

25  that the analyst is instructed to go through to

1   identify that the account is the same account?

2        A    Always when working alone.  Everyone is

3   trained to look at a loan by the loan number.  So,

4   for example, don't look up John Smith and expect it

5   to be the same loan by using that single

6   identifier, and this is true throughout the company

7   no matter what you're looking at.

8        Q    Other than the loan number, are there any

9   other identifiers that the analyst is supposed to

10  use to match the account with this view?

11       A    Property addresses, loan balances.  So,

12  for example, if we're servicing both first and

13  second loan, the dispute with regard to the second

14  mortgage, make sure you're looking at the second

15  mortgage, not the first.

16       Q    What about birth dates, Social Security

17  numbers?

18       A    That information is identified initially

19  -- not birth dates, but Social Security numbers.

20  There are three pieces of nonpublic information

21  that should be used to verify that you're looking

22  at the proper loan.

23       Q    And what are those three?

24       A    The loan number, the Social Security

25  number, and like the last four of a Social.

```
1          Q    I think you said one twice.  You said loan
2    number, Social Security, last four of the Social.
3          A    Oh, sorry.  The last four of a phone
4    number.
5          Q    What about full name?
6          A    Absolutely full name.
7          Q    So if we look at SLS 371, and we look at
8    the box, there's a Request Data column and then a
9    Response Data -- are you with me?
10         A    Where are you looking?
11         Q    371.  In black, it says Request Data --
12         A    Gotcha.
13         Q    And then Response Data and Account
14   underneath?
15         A    Right.
16         Q    And then Account in between that says
17   V-E-R-I-F, I-N-D --
18         A    Correct.
19         Q    -- which I think stands for verified
20   indicator, maybe, or identifier?
21         A    I see where you're referring to.
22         Q    Above that is an S that indicates the
23   response element is the same as the request, D
24   indicates different, and U indicates unknown.
25              Do you see where I read that from?
```

```
 1        A    Yes.
 2        Q    So if we look at the middle name column,
 3   it says Kenneth --
 4        A    Correct.
 5        Q    And that's under Request.  And then the
 6   Response, we just have a K.
 7        A    Correct.
 8        Q    And so D is different?
 9        A    That's right.
10        Q    Where would the analyst have looked to see
11   that K, that match with Kenneth?
12        A    In the main screen of FISERV.
13        Q    That first screen --
14        A    The system will reflect K as opposed to
15   the full middle name.
16        Q    Okay.
17        MR. MCGRATH:  Off the record for one second.
18        MR. ANDREWS:  Yeah.
19        (Discussion off the record.)
20        MR. ANDREWS:  Back on the record.
21        Q    (BY MR. ANDREWS)  So if we look down at
22   the Request Data column, we see an address of 270
23   Miller Road, Getzville, New York, 14068, and the
24   Response Data is 270 Miller Road, Amherst, New York
25   14068, and again that Verif column we have Ind,
```

1   right?

2        A    Correct.

3        Q    Would the analyst also look to that first

4   page on the FISERV to get that information for that

5   Response Data?

6        A    They would look to the first page.  They

7   would also look to the loan documents.  They want

8   to ensure that we're talking about the same

9   property even though the towns are denoted

10  differently.

11       Q    Okay.  So is it ever the analyst's

12  practice to look beyond that screen to be able to

13  respond to a dispute in e-Oscar's view as a part of

14  the routine practice of SLS?

15       MR. MCGRATH:  Objection as to form.

16       A    They would look at the loan documents, the

17  image documents.

18       Q    (BY MR. ANDREWS)  Okay.  When an analyst

19  does that, would that be -- would that view pop up

20  in the system?  In other words, if the assessing

21  analyst at SLS assessed dealing with a dispute, and

22  goes to look at an imaged document on the thing,

23  the Global Viewpoint, let's say Seth looks at the

24  note, would that viewing show up as a system

25  generating note, or maybe Seth inputs it as a note

1    on the notes contained on the FISERV?

2        MR. MCGRATH:  Object as to form.

3        A   I've never seen a note indicating the

4    depth.  So what image documents did they look at to

5    verify they were talking about the same property, I

6    have not seen the detail and I don't believe that

7    it exists.

8        Q   (BY MR. ANDREWS)  What I'm trying to get

9    at is, is there any way to view within the system

10   when an image is being viewed by an analyst?

11           Does the system automatically know every

12   time an image is being viewed, or does the analyst

13   have a protocol they're supposed to follow to note

14   I viewed this image?

15       MR. MCGRATH:  Objection as to form.

16       Q   (BY MR. ANDREWS)  If that's too

17   complicated, I can break --

18       A   It is.  It's an IT thing.  No, I don't

19   know if there is a record, a footprint so to speak.

20       Q   Perfect.  If there's an electronic

21   footprint, you're not aware if that's the case.

22       A   No.

23       Q   Okay.

24       MR. MCGRATH:  I need a break in the next

25   5 minutes.

1      MR. ANDREWS:  Okay.

2      (Recess taken from 11:15 a.m. to 11:25 a.m.)

3      Q   (BY MR. ANDREWS)  Those documents that are

4  housed in that Global Viewpoint software, are those

5  obtained from SLS's client?

6      MR. MCGRATH:  Objection as to form.

7      A   Those are obtained from the prior

8  servicing company that transferred the servicing to

9  Specialized.

10     Q   (BY MR. ANDREWS)  Does SLS ever request

11 documents from the clients?

12     MR. MCGRATH:  Objection as to form.

13     A   The clients don't do loan-level work.

14     Q   (BY MR. ANDREWS)  Just so I understand

15 then, anytime SLS receives e-Oscar's review, their

16 protocol is they're never going to contact a client

17 relative to that dispute?

18     MR. MCGRATH:  Objection as to form.

19 Misstates.

20     A   When you say client, you mean in this case

21 the plaintiff in the foreclosure action?

22     Q   (BY MR. ANDREWS)  Correct.

23     A   That is correct, we would not.

24     Q   Okay.  And that's just not for this

25 particular case.  That's for any foreclosure

1  action?

2      MR. MCGRATH:  Objection as to form.

3      A    That's correct.

4      Q    (BY MR. ANDREWS)  Okay.  You just

5  testified that the client isn't involved in that

6  level of activity on the account; is that right?

7      MR. MCGRATH:  Objection as to form.

8      A    That's right.

9      Q    (BY MR. ANDREWS)  Okay.  Is there anything

10  that would prevent SLS from reaching out to the

11  client to request certain documents that might be

12  beneficial with respect to a response to this view?

13      MR. MCGRATH:  Objection as to form.

14      A    Because we know on these trusts that they

15  do not involve themselves loan level on any of the

16  loans.  We would not reach out to them for document

17  specific -- or loan-specific documents.

18      Q    (BY MR. ANDREWS)  When SLS receives any

19  e-Oscar dispute, do they ever contact the consumer

20  or the individual making the dispute?

21      A    I don't know.

22      Q    Do you know if there's a written procedure

23  policy with respect to whether they contact the

24  consumer when they make a dispute?

25      A    I'm not aware of one.

1      Q    So going back to the analyst then who has

2   reviewed the screens on the FISERV software, what

3   do they do next with respect to that procedure

4   responding to the e-Oscar dispute?

5      A    Once they verified the information is

6   correct, an electronic response is sent to the

7   dispute.

8      Q    So if we look at plaintiff's Exhibit 2,

9   SLS 371, the electronic response, would that be --

10  if we look at the top right, there's a column that

11  says Response Code, and that's got 01.  Is that

12  account information accurate as of the date

13  reported?  Is that what would be transmitted

14  electronically?

15     A    This entire form is, but that's our

16  specific response.

17     Q    Is that response manually typed in by the

18  analyst, or is it already kind of keyed in?  So if

19  you hit 01, that statement is what shows up?

20     MR. MCGRATH:  Objection as to form.

21     A    I've never done it, so I don't know the

22  answer.

23     Q    (BY MR. ANDREWS)  Do you know if there's

24  other response codes other than that 01?

25     A    I was looking at the Credit Bureau Codes

1   and -- you know just on Google, their master list,
2   but as I sit here I can't recall.
3       Q   Can you walk me through what entries would
4   also be made on what you're electronically sending
5   back to the Credit Bureau?
6       A   In the rest of the form, other than the
7   upper right-hand Response Code, anything in gray is
8   our response.  Anything not in gray was pulled from
9   the Credit Bureau.  The Credit Bureau pulled it at
10  the time they sent the dispute to us.
11      Q   So looking down -- 371, there's a
12  Compliance Condition Code, and there's a blank
13  underneath it towards the bottom -- are you with
14  me?
15      A   Yes.
16      Q   And then next there's an SCC, and then
17  below that there's BO.  Do you see that?
18      A   Correct.
19      Q   Do you know what BO stands for?
20      A   I do not.
21      Q   That was information that was provided
22  from the Credit Bureau when they sent over the ACDV
23  initially?
24      A   Yes.
25      Q   Do you know if that BO designation was at

1    one point initially provided by the furnisher, in

2    this case SLS, to the Credit Bureau?

3         A    I don't know.

4         Q    So once you fill out the information

5    that's in gray, and you electronically send it, you

6    press a button and it goes?  I may be

7    oversimplifying it, but that's the gist?

8         A    That is the gist.

9         Q    Okay.  Do you print out or scan that ACDV

10   response and attach to your system?

11        A    It is saved in Global Viewpoint.

12        Q    Okay.  This says draft.  Is there a

13   finalized version that went out?

14        A    The issue is this is an e-Oscar form, and

15   they have never gotten rid of their watermark.

16   It's on every one of their forms.

17        Q    Even though it says draft, this is what it

18   looks like when the analysts updated the

19   investigation and punched that button and it went

20   back?

21        A    That's correct.

22        Q    Okay.  Do you know what the Compliance

23   Condition Code is?

24        A    I do not.

25        Q    Do you know if you have to provide, as a

1    furnisher, compliance condition codes to adhere to

2    the FCRA?

3        A    I do not know.

4        Q    So any information SLS would have about

5    Mr. Macris's dispute that was provided through

6    Experian, it looks like July 26, 2016 as stated on

7    SLS 371, which is plaintiff's Exhibit 2, that would

8    all be derived from either/or the FISERV screen

9    documents and Account Summary notes; is that right?

10       A    And if needed, the review of the actual

11   loan documents.

12       Q    Which would be imaged in the Global

13   Viewpoint?

14       A    That's correct.

15       Q    Okay.  Other than plaintiff's Exhibit 2,

16   which is the ACDV form from Experian, and those

17   Account Summary notes which you recently provided,

18   as well as you provided some documents or initial

19   disclosures, and the prior document production,

20   which I think we probably put on the record as --

21   I'll just say it again, Bates 051 through 370 --

22       A    Do you want me to look at a few pages?

23       Q    No, no.  Other than those documents I just

24   named, are there any other documents that SLS would

25   have in their possession that would relate to

1    Mr. Macris's dispute on the account?

2         (Background noise.)

3         Q   (BY MR. ANDREWS)  I know that's a lot of

4    verbiage.  I think Brian is showing --

5         MR. MCGRATH:  I'm showing the witness the

6    initial production, supplemental production, and

7    then the production from 2 days ago.

8         Q   (BY MR. ANDREWS)  Perfect.  Take a few

9    minutes.  There's a lot.

10        A   That's it.  370.

11        MR. MCGRATH:  These are going in reverse Bates

12   number.  To be clear, our copy set of our second

13   production starts out at the end and is bound to

14   the earliest document at the end, which explains

15   why I was struggling to find the missing range of

16   documents.  Yeah, that was it.  It was upside down.

17        THE WITNESS:  Okay.  Operator error.  Stuck

18   together.  Dry air.  Bates 1 through 50, 051

19   through 370 and 371 through the end.

20             I'm sorry, Seth, can you ask your

21   question.

22        Q   (BY MR. ANDREWS)  You just reviewed all

23   the production.

24        A   Yes.

25        Q   Are there any other documents that you're

1   aware of that SLS has, that relate to Mr. Macris's

2   dispute on the account, that have not been

3   produced?

4        A   I'm not.

5        Q   Okay.  Looking at plaintiff's Exhibit 2,

6   are you aware if there's any notation memorializing

7   the analyst who conducted this dispute

8   investigation relative to SLS 371, the e-Oscar

9   dispute from Experian dated 7-26-2016?

10       A   There is a note in the servicing notes,

11  but I don't think I can find it rapidly because the

12  dates are redacted.

13       Q   Okay.  Let's see.  So if we look at SLS

14  676 --

15       A   Sorry, what number?

16       Q   676.

17       A   Yes.

18       Q   Okay.  Do you see the note that reflects

19  the analyst that conducted the investigation?

20       A   Yes.

21       Q   Can you first start off with -- if we look

22  at the top, there's an Account Number, Date of

23  Message, Teller ID, Trans Type Code, Transaction

24  Message.  Do you see that, the headings for the

25  columns?

1        A    Yes.

2        Q    Can you start off with what date the note

3    is in?

4        A    7-21-2016.

5        Q    Okay.  The Teller ID?

6        A    20075.

7        Q    And the Trans Type Code?

8        A    NT.

9        Q    And what's the Transaction Message?

10       A    A very long number.  Do you want me to

11   read it?

12       Q    No.  Is that all the notes in 7-21?  Is

13   that the response to it?

14       A    Yes.

15       Q    Is that analyst's notation of conducting

16   an investigation?

17       A    Yes.

18       Q    Okay.  Let's do this.  Let's go through

19   the account notes.  Not all of them, just certain

20   ones I want to ask you certain questions about.

21            Before I begin that, any reason to believe

22   that the account notes misrepresent how SLS

23   would've handled the dispute?

24       A    No.

25       Q    Okay.  I don't see it on here, so I'm

1    going to ask you -- and you may not know from

2    memory.

3          Do you recall when SLS first received this

4    account?

5        MR. MCGRATH:  Objection as to form.

6        A   I believe it was April 1, 2014.

7        Q   (BY MR. ANDREWS)  Okay.  That date,

8    April 1, 2014, what's your basis for believing that

9    that's the date that they acquired it?

10       A   In the FISERV system, there's a date of

11   servicing transfer.

12       Q   Okay.  Would that be on that first screen

13   page?

14       A   It is not.  It's on a page called Cust

15   User, but the date is on the Cust User screen.

16       Q   Do know that from reviewing for today's

17   deposition?  That's pretty good that you just

18   remembered that date.

19       A   No, I know it specifically in reviewing

20   for today's deposition.

21       Q   Was there a printout of that?  You said

22   Cust Serve was the --

23       A   The name of the screen, yes.  I reviewed

24   it.  I did not print it out.  I reviewed it

25   electronically.

1      Q    Do you know if the table can be printed?

2      A    It can be printed.

3      MR. MCGRATH:  And same note.  We have no

4  problem producing that document.

5      Q    (BY MR. ANDREWS)  It's C-U-S-T --

6      A    User.

7      Q    They don't want to spell the whole thing?

8  They want to save electronic data?

9      A    You know how electronic guys are.

10     Q    Okay.  At the time SLS received this, what

11  was the status of the account?  Was it current or

12  in default?

13     MR. MCGRATH:  Objection as to form.

14     A    I need to look at the loan payment history

15  which is in here.  When the loan boarded, like

16  loaded only boarded.

17     Q    (BY MR. ANDREWS)  By that, you mean when

18  you received it, when SLS received it?

19     A    That's correct.  The loan was paid through

20  September 1, 2009.

21     Q    So it was delinquent since September 1,

22  2009?

23     A    The next payment due was October 1, 2009,

24  and interest was due since September 1, 2009.

25     Q    Where do you see that on --

1      A   So I'm on Bates SLS 377, the bottom line

2   item, the first entry on the payment history dated

3   4-9-2014.  And if you scroll over you will see

4   under the column Paid Through Date, September 1,

5   2009.

6      Q   Okay.  Okay.  Let's go to Bates 540.

7      A   Okay.

8      Q   I think it carries on through 542, 541 is

9   redacted out.  Take a minute to look through the

10  transaction messages and let me know when you've

11  reviewed those.

12      MR. MCGRATH:  Just to be clear, it looks like

13  that continues through the first line of 543.

14      MR. ANDREWS:  Yes.

15      A   This is not necessarily in order.  I can't

16  tell the way this is printed out, what's the

17  beginning and the end of the comment.

18      Q   (BY MR. ANDREWS)  Reviewing it -- have you

19  reviewed it?

20      A   Yes.

21      Q   Okay.  Do you know if this is the first

22  time SLS received notice from Mr. Macris that he

23  was disputing -- he was responsible on the

24  mortgage, or he was relieved from obligations --

25  the August 24th, 2015 is the date of all those

1    notes.

2         MR. MCGRATH:   Object.   Just to clarify that

3    the scope is from when SLS was servicing the loan,

4    which the witness testified was in April 2014.   So

5    her testimony will be limited to SLS's information

6    from April of 2014 through August of 2016 as per

7    our response to 30(b)(6) topics.

8         MR. ANDREWS:   It's '15, right?

9         MR. MCGRATH:   Yes.   I'm just clarifying that

10   to the extent there's information prior to that,

11   the witness is not here to testify on behalf of

12   that.

13        A    I'm sorry, Seth, I have to go through

14   these.

15        Q    (BY MR. ANDREWS)   That's okay.

16        A    Can you tell me your question again?

17        Q    Sure.   The question is, on August 24,

18   2015, was that date the first time Mr. Macris

19   contacted SLS to state he wasn't obligated on the

20   account any longer?

21        A    No.

22        Q    So there was a date prior to August 24,

23   2015 when he contacted SLS --

24        A    Or his agent.

25        Q    Do you see that in the summary notes?

```
1        A   I do.  I lost the page.  I'll take you
2   back to it in just a minute.
3        MR. MCGRATH:  You need a sticky.
4        THE WITNESS:  Terry gracefully provided it.
5   She gave it to me when I got this.
6        A   It's much easier when it's electronic and
7   you're word searching.  Your question was
8   specifically when Mr. Macris contacted us?
9        Q   (BY MR. ANDREWS)  Correct.
10       MR. MCGRATH:  Off the record.
11       (Discussion off the record.)
12       MR. ANDREWS:  Back on the record.
13       Q   (BY MR. ANDREWS)  The question was, was
14  August 24, 2015 the date Mr. Macris first contacted
15  SLS disputing that he was responsible or obligated
16  on the mortgage?
17       A   Yes.
18       Q   It was also the first time that he
19  requested that he be dropped from the foreclosure
20  action?
21       A   Yes.
22       Q   Let's look at 6-26.  Are you with me?
23       A   I am.
24       Q   Can you -- can you explain the notation,
25  the first one, on March 26, 2016?  It starts with
```

1    ES and CCI.

2         A    ES stands for executive services, which is

3    an escalating group within customer support.  The

4    customer called in, talked to one borrower.

5    Borrower advised he will be sending a court order

6    that he should be removed from account and not

7    report him negative to credit.

8         Q    Okay.  So ES, that a subset of an analyst

9    position?

10        A    It is a subset of the customer support.

11        Q    Okay.  And then we're -- it says contact

12   with customer changed hour.  What does that mean?

13        A    Just the type of contact, meaning we

14   contacted him as opposed to, no, we didn't contact

15   him.

16        Q    I don't understand.  R means it's okay for

17   SLS to contact or SLS to initiate contact?

18        A    That we had contact with the borrower.

19        Q    Oh, that there was contact?

20        A    Correct.

21        Q    Okay.  And then that last notation where

22   it says assistance, victorious, is that the --

23   Victor --

24        A    Victorious.

25        Q    Let's go to 6-31.

1      A    You have to do all the evens together and
2  all the odds together.  Okay.
3      Q    Same thing, can you break out what those
4  messages say from 3:29 to 3:30 on 6-31?
5      A    Yes.  The first group is teller ID 11328,
6  outbound call Catherine M. Macris verified
7  information advise customer cust file abandoned.
8  Will send RMA reactive.  Tony K.
9      Q    What is RMA?
10     A    Request for modification assistance.
11 Request for mortgage assistance.
12     Q    What's reactive?
13     A    Started up again.
14     Q    Okay.  That's not a specific division
15 within SLS?
16     A    No.
17     Q    Okay.  If we look on March 30th, 2016,
18 starting at ES, can you explain what that notation
19 states?
20     A    Are you looking at teller ID 4904?
21     Q    Correct.
22     A    ES inbound call.  Verified information.
23 Talked to Mark Macris.  Calling stating he has doc
24 showing he needs to be removed from the note per
25 court orders these docs.  SLS attorney handling the

1   foreclosure//borrower is insisting for an email

2   address for he to submit the docs.  Advise only

3   have fax or mailing address.  And then the teller's

4   name.

5        Q   When the notation that states these docs

6   SLS attorney handling, do they mean in-house, or do

7   they mean Davidson & Fink?

8        A   They mean Davidson & Fink.

9        Q   Let's look at 649.

10       A   Go the other way.  It works better.  Okay.

11       Q   That's going to spill over onto 650.

12       A   This begins with the last line.

13       Q   It looks like it begins on April 27 of

14   '16.

15       A   Okay.

16       Q   There's a line that says contact with

17   consumer [sic].  Changed to P?

18       A   Right.

19       Q   What's P?

20       A   Just indicating that we had contact with

21   the borrower.

22       Q   Before it was an R, I believe, right?

23       A   That's true.

24       Q   What's the difference between P and R?

25       A   I don't know.

1     Q    If we look at the bottom of the last

2   notation on May 3rd, 2016 --

3     A    Uh-huh.

4     Q    -- there's an 025, we have received a

5   court order in regards to -- if you look on the

6   next page at SLS 650, removing one of the borrowers

7   from the loan, if we look at plaintiff's Exhibit 1,

8   is that letter what's being referenced in that

9   notation?

10    A    Yes.

11    Q    Okay.  And then there's the message that

12  states UF 63 updated to P, VC, updated to P.  What

13  does that mean?

14    A    Those are codes in FISERV that just

15  indicate a change in the status of the loan.  I

16  don't have these codes with me.  I don't know...

17    Q    When you say status of the loan --

18    A    So we have contact from Mr. Macris and the

19  request.

20    Q    The message below says this letter is in

21  gv as of 5-2-16 imaged as.  gv is the Global

22  Viewpoint?

23    A    That's correct.

24    Q    And then there's a note that says, please

25  review docs and advise if borrower one will be

1    reviewed.

2         A    Yes.

3         Q    Do you know if at that point SLS did an

4    investigation with respect to Mr. Macris's request?

5         A    Yes.

6         Q    Was an investigation performed at that

7    time?

8         A    Yes.

9         Q    Who performed it?

10        A    I don't know who.

11        Q    Is there a note in here that indicates

12   than an investigation was done?

13        A    Yes.

14        Q    Can you point me to where that would be,

15   what note?

16        MR. ANDREWS:  We can go off the record.

17        (Discussion off the record.)

18        MR. ANDREWS:  Back on the record.

19        Q    (BY MR. ANDREWS)  Back on the record.

20        A    Okay.  So the entry we're talking about

21   begins 025.  We have received a court order in

22   regards to removing one of the borrowers from the

23   loan.  This letter has been GV as of 5-2-16 imaged

24   as divorce decree.  Please review docs and advise

25   if borrower one will be removed.  TY.

1          The next entry is 025 done 5-10-16 by

2    teller 04247 test type 002 loan data correction.

3          Next section still on 5-10.  025, unable

4    to assist.  Please open correct CIT for the right

5    department.  Closing CIT.

6          Next section begins a new CIT 026.  Please

7    send correspondence issued on 5-2-2016 (QWR) to

8    email markmacris@yahoo.com.  Still on 5-10-2016.

9          CIT 026 done.  5-10-2016 by teller

10   19345 test type 108 resend docs.  Then CIT 026,

11   invalid request for 108.  Please send

12   correspondence issued on 5-2-2016 (QWR) to email

13   markmacris@yahoo.com.

14        MR. MCGRATH:  Just for clarification of the

15   record, the witness is reading from the unredacted

16   version of Exhibit 2.  Defendant has agreed to

17   unredact that section and provide it, and we will

18   make that Exhibit 2B, the section she just read

19   from.

20        Q   (BY MR. ANDREWS)  What does CIT stand for?

21        A   It's a work item, like a tickler.

22        Q   Okay.  Did I hear you read it right, there

23   was two different tellers involved in that

24   investigation process, two different analysts?

25        A   Yes.  CIT 25, teller 4247, and CIT 26 were

1    tellers 14128 and 19345.

2         MR. MCGRATH:  Mr. Andrews, if you want to look

3    at this, that's fine, what she's reading.

4         MR. ANDREWS:  That would be helpful.

5         MR. MCGRATH:  As long as you don't scroll.

6         MR. ANDREWS:  Perfect.

7         Q    (BY MR. ANDREWS)  With respect to

8    May 10th, 2016, the message that says 085, unable

9    to assist, please open correct CIT for the next

10   line right department closing CIT -- did I read

11   that right?

12        A    Yes.

13        Q    What's 025?

14        A    That is the number of the work item.

15        Q    Okay.  What do you mean by work item?

16        A    CIT is the tickler.

17        Q    Okay.

18        A    And this is the tickler number, 025.

19   There are two place code requests from one person

20   to another person to do something.

21        Q    025 is not referencing a particular

22   document?

23        A    Correct.

24        Q    It's a task?

25        A    That's correct.

1        Q    Okay.   So the line unable -- or the phrase

2    "unable to assist," that's one analyst telling

3    another analyst that they can't help them?

4        A    Right.   They're saying you asked the wrong

5    group to perform a task.   Send your task to the

6    correct group.

7        Q    Okay.   If we go to the next line, 026,

8    that's another task?

9        A    Correct.

10       Q    Please send correspondence issue on -- I

11   think you skipped a few lines down to this 58-10-26

12   that says correspondence issued on 5-2-16?

13       A    Right here?

14       Q    Okay.

15       A    Yes.

16       Q    To email markmacris@yahoo.com?

17       A    Correct.

18       Q    That note or those series of notes are

19   stating for a response to be emailed to Mark Macris

20   at that email address?

21       A    That's correct.

22       Q    Okay.   Sit tight.   I'm trying to come back

23   to that.

24       A    All right.   I have literally 321.   We're

25   two off -- oh, right here, perfect.

1      Q    Can you mark this 3?

2      (Exhibit 3 marked for identification.)

3      Q    (BY MR. ANDREWS)   I'm showing you a

4   document marked plaintiff's Exhibit 3.   Have you

5   seen that document prior to today?

6      A    I have.

7      Q    Is that the document that's referenced in

8   those lines that we just previously read that said

9   for correspondence to be issued to Mark Macris at

10  markmacris@yahoo.com?

11     A    No.

12     Q    Okay.   So that line states that on 5-2-16,

13  correspondence to be sent to Mark Macris at

14  markmacris@yahoo.com?

15     A    Yes.

16     Q    With respect to his dispute that he called

17  in -- not called in -- with respect to that dispute

18  letter, plaintiff's Exhibit 1 -- I'm showing you

19  plaintiff's Exhibit 1 again.

20         Is that correspondence that is identified

21  as being sent to markmacris@yahoo.com, is that in

22  response to plaintiff's Exhibit 1, SLS 322?

23     A    No.

24     Q    What is that correspondence in reference

25  to?

```
 1        A    He called in.  This was a call saying --
 2        Q    Okay.  So the next line, 027, receive QCD.
 3   What's QCD?
 4        A    Quitclaim deed.
 5        Q    Okay.  Next line says done May 31st, 2016
 6   by TLR.  What's that?
 7        A    So the quitclaim deed was forwarded to the
 8   imaging group, and it was scanned and saved, and
 9   they're saying, I completed your request.  So this
10   person is saying here is the QCD, scan it and save
11   it.  And this person is saying, okay, I did.
12        Q    The next line, TSK.  What's TSK?
13        A    TSK TYP, T-Y-P, 436, due on sale.
14        Q    What does that translate to?
15        A    I would have to look at more of the notes.
16        Q    Okay.  And then we have another task at
17   027, quitclaim deed received.  No further action?
18        A    Right.
19        Q    And then the next note is required.
20   What's the report?
21        A    It's all one comment.  It's word wrapping.
22   No further action required.
23        Q    Okay.  Then we have another TSK TYP 108,
24   resend docs?
25        A    Right.
```

1      Q   So that's a task for an analyst to resend

2   docs to who?

3      A   TSK TYP 108 resend docs.  And then the

4   next line is 028.  Docs need to be specified,

5   closing CIT.

6      MR. MCGRATH:  Off the record just one second.

7      (Discussion off the record.)

8      MR. ANDREWS:  Back on the record.

9      Q   (BY MR. ANDREWS)  We just went through,

10   pursuant to SLS 650, where it states -- SLS

11   received plaintiff's Exhibit 1, which is this

12   dispute letter, right?

13      MR. MCGRATH:  Objection.  Form.  I believe it

14   misstates what she said.

15      Q   (BY MR. ANDREWS)  Let's start beginning at

16   SLS 649, last entry, which is May 3rd, 2016 for the

17   Trans Type Code.  It says CIT, and then the

18   transaction message says 025.  We received a court

19   order in regards to -- and then it wraps to 650 and

20   says removing one of the borrowers from the loan.

21      This letter is in GV as of 5-2-16 imaged

22   as divorce decree, please review docs and advise

23   the borrower when will be removed.

24      Is that referencing plaintiff's Exhibit 1,

25   that SLS received it as of that date?

1        A    I believe it is.

2        Q    The next question was what, if any,

3   investigation did SLS do at that time?  And you

4   just read into the record a series of transaction

5   messages between two analysts where one analyst

6   requested another analyst to do something and was

7   told you have the wrong department or party; is

8   that right?

9        A    Correct.

10       Q    Okay.  What, if anything else, did SLS do

11  with respect to investigating the claims brought by

12  Mr. Macris on plaintiff's Exhibit 1?

13       A    Okay.  If you go to SLS 654 --

14       Q    Okay.  I'm with you.

15       A    This is 5-17-2016.

16       Q    Okay.

17       A    It's a phone call as indicated by

18  transaction type code DM, teller number 1833,

19  verified info contact, and the rest of that seems

20  to be redacted.

21            But then from teller number 1985 asked the

22  borrower for needed item multiple times to

23  underwrite loan to remove name on loan.  We need

24  document decision package sent on 5-17 by Mark.

25  Refused.  States he's no longer liable.

1    Refinanced.  Mark stated that he has no interest

2    in -- and then skip that NT comment.

3            Explained loan will need to be refinanced

4    or providing info to resolve by alternate means.

5    Now go to 655.  Alternate means resolving to remove

6    name to resolve our refi on Catherine's behalf the

7    -- from this loan.  Advice, if needed.  Items.

8    Divorce decree is noted on file.

9        Q   So when that 5-17-2016, teller 1985,

10   message says asked borrower for needed items, what

11   are those needed items?

12       A   I would have to listen to the phone call,

13   but the concept would be items that would qualify

14   Catherine to be the only borrower on this loan,

15   meaning ability to pay, proof of income, pay stubs,

16   tax returns.

17       Q   So you would have to listen to the call.

18   Does SLS record the conversations between its

19   analyst and consumers, customers?

20       A   Yes.

21       Q   Are conversations between SLS and

22   Mr. Macris recorded?

23       A   I did not listen to the recorded calls.  I

24   expect that they should be there, be in the

25   recorded call log.

```
 1        Q   So is it SLS's policy and procedure to
 2   record all communications telephonically it has
 3   with customers or consumers?
 4        MR. MCGRATH:  Objection as to form.
 5        A   If the borrower requests that the call not
 6   be recorded, then -- so initially, they can ask
 7   that the call not be recorded, and then a
 8   supervisor call them back on an unrecorded line.
 9   But if the caller does not request that the call
10   not be recorded, it should be recorded.
11        Q   (BY MR. ANDREWS)  Okay.  Assuming there's
12   no request not to record, is it recorded regardless
13   of whether it's an inbound or an outbound call?
14        A   Yes.
15        MR. MCGRATH:  I'm going to need to take a
16   break.
17        MR. ANDREWS:  Okay.
18        (Recess taken from 12:40 p.m. to 12:47 p.m.)
19        MR. ANDREWS)  Back on the record.
20        Q   (BY MR. ANDREWS)  You previously testified
21   that the policy is that it is okay to have these
22   recordings, but you didn't listen to the recordings
23   in preparation for today's deposition testimony; is
24   that right?
25        A   That's right.
```

1        Q    Do you recall if you ever listened to the

2    recordings at any time relative to this account?

3        A    No, I did not listen to them ever.

4        Q    As you sit here today, do you have

5    definitive knowledge that there are recordings

6    regarding the conversations between Mr. Macris and

7    SLS?

8        A    There are recordings of phone calls.

9    Since I didn't listen to them, I didn't know who

10   the parties are on the calls.

11       Q    When you testified that there are

12   recordings, there are recordings on this account?

13       A    Yes.

14       Q    But you're not sure.  It could be

15   Ms. Macris, for example?

16       A    That's correct.

17       Q    To your knowledge, are these recordings

18   able to be taken off -- strike that.  How are these

19   recordings housed?

20       MR. MCGRATH:  Objection as to form.

21       A    They are audio files.

22       Q    (BY MR. ANDREWS)  Okay.  Are those audio

23   files able to be downloaded and put on a disk?

24       A    Yes.

25       Q    Going back to SLS 654, which you

1   identified those series of statements on that Bates

2   page as SLS's actions taken in response to

3   Mr. Macris's dispute letter, which is plaintiff's

4   Exhibit 1, correct?

5        MR. MCGRATH:  Objection to form.

6        A   His -- I believe it was his call regarding

7   his dispute letter.

8        Q   (BY MR. ANDREWS)  Okay.  At any time, did

9   SLS reach out to in-house counsel to seek advice on

10  how to handle his dispute?

11       MR. MCGRATH:  Objection.  I'm going to caution

12  the witness not to reveal the substance of any

13  communications between SLS and its attorneys.  To

14  the extent SLS had conversations with its

15  attorneys, you're allowed to answer whether they

16  had conversations.

17       Q   (BY MR. ANDREWS)  I don't want to know

18  about substance.  I want to know if they reached

19  out to them.  That's all.

20       A   No.

21       Q   Based on that SLS 654, it appears that an

22  analyst was -- it looks like just one analyst --

23  I'm sorry.  There's two analysts that were

24  responsible for the actions that are listed in that

25  Bates --

1        A    It's really just analyst 1985, teller ID

2    1985.

3        Q    Okay.  Do you know if that analyst -- do

4    you know if that analyst consulted with anyone --

5    above him in the hierarchy with respect to that

6    response?

7        A    I don't know.

8        Q    Do you know what the general background of

9    analyst 1985 was around May 17, 2016?

10       A    I do --

11       (Cross-talking.)

12       MR. MCGRATH:  Objection.  Beyond the scope.

13       A    Sorry.  And I do not.

14       Q    (BY MR. ANDREWS)  Let's look at 658.  Are

15    you with me?

16       A    I am.

17       Q    Okay.  Can you explain what those notes

18    state?

19       A    Yes.  With regard to teller number 1833,

20    customer called in Mark Macris verified

21    information.  Customer called in about being

22    removed from loan.  Received court order to remove

23    him from the loan.  Sent email to supervisor to

24    assist in removing him from the loan.  Tony K.

25    Contact with customer changed to P.

1       Q    So did Tony K email the supervisor?

2       A    Yes.

3       Q    Okay.  Who was that supervisor?  Do you

4   know who that supervisor is?

5       A    I don't know.

6       Q    Do we know what the email from Tony K to

7   the supervisor said?

8       A    I don't know.

9       Q    When an analyst emails a supervisor or

10  anyone higher up in that hierarchy, do those emails

11  get attached to the account notes at all?

12      MR. MCGRATH:  Objection as to form.

13      A    I did not look at the documents other than

14  what's been produced, and so if it wasn't produced,

15  I don't know.

16      Q    (BY MR. ANDREWS)  Okay.  Is it SLS's

17  policy that an analyst is to attach emails to the

18  account notes when they're emailing someone higher

19  up in the hierarchy?

20      A    I don't know.

21      Q    Do you know if SLS has the ability within

22  their FISERV to even attach those emails?

23      A    They wouldn't be attached in FISERV, but

24  they could have been saved in Global Viewpoint.

25      Q    So assuming that Tony K did send an email

1    to the supervisor, what would be the protocol for

2    the supervisor to do in response of that email?

3        A    To review the request and advise Tony K of

4    the handling.

5        Q    Is there anywhere in the account notes

6    that demonstrates the supervisor got back to Tony K

7    with the decision?

8        A    It could be redacted.

9        MR. MCGRATH:  Off the record.

10       (Discussion off the record.)

11       MR. ANDREWS:  Back on the record.

12       (Record read.)

13       A    I do not see it.

14       Q    (BY MR. ANDREWS)  Just so we're clear, you

15   do not see any notation in the account summary

16   notes that the supervisor got back to Tony K

17   relative to Tony K e-mailing him for a decision?

18       A    That's correct.

19       Q    Okay.  I'm showing you plaintiff's

20   Exhibit 3.  That letter is in response to

21   plaintiff's Exhibit 1, correct?

22       A    Yes.

23       Q    Can you show me where in the system notes

24   that that letter was sent out?  Do you want to go

25   back off the record?

1      A    Yeah.

2          MR. ANDREWS:  Off the record.

3          (Discussion off the record.)

4          MR. MCGRATH:  Back on the record.

5              Again, defendant has shown the witness the

6    unredacted portion of Exhibit 2.  We will make what

7    the witness is looking at in unredacted form

8    available to plaintiff as part of the record as

9    Exhibit 2c.

10         MR. ANDREWS:  Can you read the last question.

11         (Record read.)

12     A    Okay.  On 5-23-2016, teller 1985, type NT,

13   dispute resolved, see PPV for details.

14     Q    (BY MR. ANDREWS)  What does PPV stand for?

15     A    PPV was the name of the predecessor to

16   Global Viewpoint, so it was Pay Per Vision.  And

17   then we upgraded and it was then called Global

18   Viewpoint.

19     Q    Okay.  That letter -- this is a form

20   letter, plaintiff's Exhibit 3 a form letter?

21     A    No.  That's a custom letter.

22     Q    This teller Patricia, ID 30614, she

23   drafted this from scratch?

24     A    Yes.

25     Q    Okay.  How do you know she drafted that?

1   What line shows you?  Do you need me to move?

2       A   Maybe.  I'm not.  I'm sorry, Seth.  What's

3   her teller ID?

4       MR. ANDREWS:  30614.

5           Off the record again.

6       (Discussion off the record.)

7       MR. ANDREWS:  Back on the record.

8       Q   (BY MR. ANDREWS)  Can you point to a part

9   in the Account Summary notes that evidences that

10  teller Patricia ID ending 30614 drafted the

11  plaintiff's Exhibit 3.

12      A   There is not a note.

13      Q   How did Patricia know to draft that

14  letter?

15      A   Going back to when this dispute was

16  received, Patricia obviously did the research and

17  the response, but I don't know how this got to her

18  to respond.

19      Q   "This" meaning Exhibit 1?

20      A   Yes.  I do not know how Exhibit 1 got to

21  Patricia, teller ID number 30614, to do the

22  research and response.

23      Q   So it was a different analyst that

24  received plaintiff's Exhibit 1, which was the

25  Macris dispute letter, right?

1        MR. MCGRATH:  Object as to form.

2        A   Yes.

3        Q   (BY MR. ANDREWS)  Is there a procedure in

4    which SLS allocates what analyst is going to handle

5    what dispute?

6        A   I have not seen the procedure.

7        Q   Is it routine for one analyst to receive a

8    written dispute and for another analyst to provide

9    a written response to that dispute?

10       MR. MCGRATH:  Objection as to form.

11       A   Yes.

12       Q   (BY MR. ANDREWS)  That's a common

13   occurrence, to have two different analysts work two

14   different parts of the dispute.

15       MR. MCGRATH:  Objection as to form and

16   misstates.

17       A   The correspondence comes in and is scanned

18   and assigned to the customer support group.  That's

19   one analyst, the receipt.  Then it gets to that

20   group and the analyst in that group handles it from

21   there.

22       Q   (BY MR. ANDREWS)  Is there any indication

23   in the Account Summary notes of the investigation

24   that Patricia, that that analyst teller with ID

25   30614 did to fashion that response?

1        MR. MCGRATH:  Objection as to form.

2        A   I saw no notes in the system from this

3    teller ID.

4        Q   (BY MR. ANDREWS)  Okay.  Okay.  Was that

5    -- we're talking plaintiff's Exhibit 3.  That

6    wasn't sent to Mark K. Macris and Catherine M.

7    Macris at 403 Teakwood Terrace, Amherst, New York

8    14221, that wasn't sent in error?

9        MR. MCGRATH:  Objection as to form.

10       A   I don't have any indication in the notes

11   or otherwise that it was sent in error.

12       Q   (BY MR. ANDREWS)  What I'm getting at is,

13   this letter was meant to be drafted and meant to be

14   sent to those two, Mark and Catherine Macris.  So

15   it was intended to have that letter drafted and be

16   sent to them.  It wasn't a mistake.  It wasn't

17   somebody hit the wrong button.  Someone drafted the

18   letter that shouldn't have went to them.

19           This was intended to go to them is my

20   question.

21       MR. MCGRATH:  Objection as to form.

22       A   Yes.

23       Q   (BY MR. ANDREWS)  Okay.  Let's look at

24   676.

25       A   You really took me at my word when I said

1   even or odd.

2        Q    Yes.

3        A    All right.

4        Q    Starting at the top on 7-19-2016, can you

5   explain what those messages state?

6        A    This is 7-19-2016, teller ID 30923,

7   transaction type code DM, customer called in,

8   verified information, borrower one, property

9   vacant.  Borrower returning phone call.  Educated

10  status of account.  Update mailing and request all

11  docs be resent to new mailing.  Borrower was not

12  willing to give reason for default, but stated he

13  has not lived at the property for over 8 years and

14  will reach out to ex-wife to seek intentions of

15  property.  Advise foreclosure status and...

16       Q    If we look down at the bottom on 7-26, can

17  you state those transaction messages?

18       A    Yes.  Teller number 10489, transaction

19  type DM, CR, outbound call cell.  Talked to Mark K.

20  Macris.  Verified information.  Wanted account info

21  mailed to him so that he would know what is going

22  on with account.  I advised if interested in short

23  sale but didn't get answer.  Requested payoff.  J

24  Hernandez.

25       Q    That last one requested payoff?

1        A    Correct.

2        Q    Then if we look at 7-21.

3        A    Oh, 7-21, date, gotcha.  Teller number

4   20075, transaction type code NT, a long number,

5   received e-Oscar dispute.  Customer claims not

6   liable for account (i.e. ex-spouse's business).

7   Verified still liable for account and information,

8   verified ID SSN matches reporting correctly.

9        Q    And that teller is different than -- or an

10  analyst -- than the analyst that sent out the

11  letter identified as plaintiff's Exhibit 3; is that

12  right?

13       A    That's right.

14       Q    677, can you explain what that says?

15       A    This is dated 7-27-2016, teller 30788.

16  DM.  Customer called in.  Mark K. Macris requesting

17  all docs we have mailed to him to be faxed to (716)

18  730-5168, stated he hasn't received any mail from

19  us.  Advised mailing address was just updated 7-22.

20  Didn't answer what intentions with home were.  SADV

21  of sale date.  Reason for default didn't want to

22  provide.  Diana.

23       Q    What is SADV?

24       A    I don't know.

25       Q    All right.  I'm done with these.  Can we

1    look at 683.

2         A    Okay.

3         Q    And the same thing, what does that state?

4         A    The date is 9-6-2016.  Teller ID 1985.

5    Transaction Type Code DM.  Mark K. Macris checking

6    status of the loan.  Advised foreclosure sale date

7    9-27-16.  Advised spoc verified removed home number

8    (716) 632-1564.  It's his parents' phone number.

9    He said not working on loss mit.  He asked if he is

10   still on the loan.  Advised yes, Linda C.

11        Q    What is spoc?

12        A    Single point of contact.

13        Q    Can we look at 684?  Can you explain those

14   notes?

15        A    Yes.  Dated 9-14-2016.  Teller ID 1833.

16   Transaction Type Code NT.  Deal status change.

17   Status changed to denied of 9-14-2016 comment.

18   Comments:  RMA needs to be completed by both

19   borrowers.  Divorce decree doesn't forgive

20   ownership to either borrower, proof of income for

21   each borrower for last 30 days.

22        Q    When it says deal status change, what does

23   that mean?

24        A    Meaning to change who was liable on the

25   note, to remove Mr. Macris was denied.

1        Q    What does RMA stand for?

2        A    Request for modification -- mortgage

3    assistance.

4        Q    And SLS is requesting proof of income for

5    both Mr. and Ms. Macris?

6        A    Yes.

7        Q    Why are they requesting proof of income?

8        A    To see that Ms. Macris had the ability to

9    pay the loan on her own.

10        Q    Wasn't it each borrower?  It doesn't just

11    say Ms. Macris.

12        A    It does say each borrower.

13        Q    Do you know why they're requesting

14    Mr. Macris's income?

15        A    I don't know.

16        Q    So prior to receiving the e-Oscar dispute,

17    did SLS have any involvement in reporting

18    Mr. Macris's credit data to any credit reporting

19    agency --

20        MR. MCGRATH:  Objection as to form.

21        Q    (BY MR. ANDREWS)  -- regarding the

22    account?

23        A    We began reporting to all four Credit

24    Bureau's in June of 2014, and that was reporting

25    the status of the loan with regard to both Mr. and

1    Ms. Macris.

2         Q    Prior to reporting Mr. Macris's credit

3    data for this account -- and again this is pre-

4    dispute, did SLS ever contact its client to verify

5    the accuracy of what it was reporting?

6         MR. MCGRATH:  Object as to form.

7         A    The client would not have been contacted

8    because they would not have had loan-level data.

9         Q    (BY MR. ANDREWS)  Was SLS aware at the

10   time it reported Mr. Macris's credit data on the

11   account in May of 2016 that Mr. Macris was removed

12   from the foreclosure action that was filed in New

13   York Supreme Court, Erie County area.

14        MR. MCGRATH:  Objection as to form.

15        A    I don't know.

16        Q    (BY MR. ANDREWS)  Did SLS ever contact its

17   client or its client's attorney Davidson & Fink to

18   clear Mr. Macris as judgement debtor prior to

19   reporting Mr. Macris's credit data in May of 2016?

20        MR. MCGRATH:  Objection as to form.

21        A    Whether Mr. Macris was a judgment debtor

22   in the foreclosure would not impact how we reported

23   credit.

24        Q    (BY MR. ANDREWS)  That wasn't my question.

25             My question was, did SLS ever contact

1    either its client or its client's attorneys to

2    inquire if you had a judgment debtor prior to

3    reporting his credit data in May of 2016?

4          MR. MCGRATH:  Objection as to form.

5          A    I don't know.

6          Q    (BY MR. ANDREWS)  Other than plaintiff's

7    Exhibit 3, did SLS send any letters to Mr. Macris

8    regarding the results of the e-Oscar dispute?

9          A    I don't recall seeing another letter as a

10   result of the e-Oscar dispute.

11         (Exhibit 4 marked for identification.)

12         Q    (BY MR. ANDREWS)  I'm showing a document

13   marked as plaintiff's Exhibit 4.  This is

14   Experian's ACDV Response based on the information

15   that was provided to SLS.

16              If we look at the top box -- do you see

17   where it says documents viewed and it's got a Y?

18         A    Yes.

19         Q    Okay.  So I'll represent to you that that

20   indicates that SLS indicated to Experian the

21   documents reviewed, and then they provided their

22   response to Experian.

23         MR. MCGRATH:  Objection to form.  I don't know

24   that we established any foundation on this

25   document.  You can answer the question.

Atkinson-Baker Court Reporters
www.depo.com

1        Q    (BY MR. ANDREWS)   Yeah.

2        A    I don't know.

3        Q    Okay.  Do you know what documents SLS

4    reviewed prior to providing the ACDV response?

5        MR. MCGRATH:  Objection as to form.  Asked and

6    answered.

7        A    I don't know.

8        Q    (BY MR. ANDREWS)  Did SLS get a copy of

9    the correspondence from Experian, the e-Oscar

10   dispute?

11       A    Yes, we did receive e-Oscar dispute.

12       Q    What I'm asking is, did you get a copy of

13   the dispute from Mr. Macris that he sent to

14   Experian?  Did Experian provide you a copy of that

15   actual dispute?

16       MR. MCGRATH:  Objection as to form.  Vague as

17   to time.

18       A    I don't know.

19       Q    (BY MR. ANDREWS)  If we look over at the

20   far right column, there's a Date Sent and then

21   there's 7-26-2016.

22       A    Correct.

23       Q    That's the date that Experian sent ACDV to

24   SLS?

25       A    I don't know.  This isn't an SLS form.

1      Q   Okay.  Where you see the authorized

2   verifier, Kirsten Palumbo, and then below it (720)

3   241-7200, do you know if that phone number is an

4   SLS number?

5      A   It is an SLS number.

6      Q   Do you know if Kirsten Palumbo is an SLS

7   employee?

8      A   I don't.

9      Q   Do you have any reason to not believe that

10   Kirsten Palumbo is an SLS employee?

11      MR. MCGRATH:  Objection as to form.

12      A   I don't have any reason to believe that

13   she's not.

14      Q   (BY MR. ANDREWS)  Do you know how Experian

15   would've gotten that name if not for being provided

16   by SLS?

17      A   I don't know.

18      Q   Okay.  So you have no idea who that person

19   is?

20      MR. MCGRATH:  Objection as to form.

21      A   Correct.

22      Q   (BY MR. ANDREWS)  Okay.  Again, looking at

23   the top it has Date Sent, Date Due, Response Date,

24   and it has a response date July 27, 2016.

25          Do you see that?

```
1          A    Yes.

2          Q    Okay.  So did SLS perform this

3     investigation within a day of receiving ACDV from

4     Experian?

5          MR. MCGRATH:  Objection as to form.

6          A    I don't know.  Since this isn't our form,

7     I don't know what those dates refer to.

8          Q    (BY MR. ANDREWS)  Okay.  Have you seen

9     this type of form before?

10         A    No.

11         Q    You testified that you previously provided

12    deposition testimony and trial testimony for SLS,

13    correct?

14         A    Yes.

15         Q    During those different times, those

16    different matters, did you ever have occasion to

17    see an Experian ACDV response form?

18         MR. MCGRATH:  Objection.  Asked and answered.

19         A    No.

20         Q    (BY MR. ANDREWS)  Do you consider yourself

21    a competent person to interpret ACDV?

22         MR. MCGRATH:  Objection as to form.  Beyond

23    the scope.

24         Q    (BY MR. ANDREWS)  Answer, if you can.

25         A    SLS's form.
```

1    Q   Okay.  Looking back at plaintiff's

2  Exhibit 2, SLS 371, you previously testified that

3  you didn't know the Response Code, is that correct?

4  Was 01 account information accurate as of date

5  reported, if that was manually input or if that was

6  just a key entry?

7    MR. MCGRATH:  Objection as to form.  Asked and

8  answered.

9    A   That's correct.

10    Q   (BY MR. ANDREWS)  Okay.  But you just told

11  me that you were competent to interpret an ACDV

12  form for SLS; is that right?

13    A   Right.

14    Q   Okay.  So which is it?  Are you competent

15  to do it, or are you not sure of the Response Code?

16    MR. MCGRATH:  Objection as to form.

17    A   I'm competent to do it.  It says account

18  information accurate as of date reported.  What I

19  don't know is if that was manually typed in, or if

20  it's a standard comment that is entered when you

21  choose 01.

22    Q   (BY MR. ANDREWS)  Do you know what SLS

23  employee provided this ACDV?

24    MR. MCGRATH:  Objection as to form.

25    A   I do not.

1      Q   (BY MR. ANDREWS)   Is it SLS's position

2   that on July 27, 2016, Mark Macris was a judgment

3   debtor relative to the foreclosure proceeding filed

4   in the New York Supreme Court, Erie County, 803473/

5   2015?

6      MR. MCGRATH:   Objection as to form.   Calls for

7   legal conclusion.   Beyond the scope.   You can

8   answer to the extent you know.

9      A   No.

10      Q   (BY MR. ANDREWS)   Is it SLS's position

11   that Mark Macris on July 27, 2016 was a named

12   defendant in a pending foreclosure proceeding filed

13   in New York Supreme Court, County of Erie, 803473/

14   2015?

15      MR. MCGRATH:   Objection as to form.   Beyond

16   the scope.

17      A   No.

18      MR. ANDREWS:   Off the record.

19      (Recess taken from 1:39 p.m. to 1:45 p.m.)

20      MR. ANDREWS:   Back on the record.

21      (Exhibit 5 marked for identification.)

22      MR. ANDREWS:   Back on the record.

23      Q   (BY MR. ANDREWS)   I'm showing you a

24   document marked as plaintiff's Exhibit 5.   Have you

25   seen this document prior to today?

Atkinson-Baker Court Reporters
www.depo.com

```
 1        MR. MCGRATH:  Take a look through it.

 2        THE WITNESS:  All right.

 3        A    I have.

 4        Q    (BY MR. ANDREWS)  When was the first time

 5   you think you saw this document?

 6        A    When I was preparing for this deposition.

 7        Q    Okay.

 8        (Exhibit 6 marked for identification.)

 9        Q    (BY MR. ANDREWS)  Exhibit 6, have you seen

10   this document prior to today?

11        MR. MCGRATH:  Take a moment to look at it.

12        THE WITNESS:  Okay.

13        A    Yes.

14        Q    (BY MR. ANDREWS)  Okay.  Turn to page 10,

15   paragraph 74.  So SLS has raised a bona fide error

16   defense.  My question is, with respect to any of

17   the acts taken by SLS towards Mr. Macris, were any

18   of those errors?

19        MR. MCGRATH:  Objection as to form.

20        A    No.

21        Q    (BY MR. ANDREWS)  Okay.  All the

22   correspondence that was sent to Mr. Macris that

23   weren't sent in error, they were sent intentionally

24   to him?

25        A    Yes.
```

1        Q    All the conversations that SLS had with

2   Mr. Macris, there was nothing that was communicated

3   to him that was in error?  It was all communicated

4   to him with that purpose, whatever that content was

5   on that given day?

6        MR. MCGRATH:  Objection as to form.

7        A    Yes.

8        Q    (BY MR. ANDREWS)  And whatever credit data

9   was reported to the credit bureaus regarding

10  Mr. Macris, that was all done intentionally and

11  none of that was in error?

12       A    That's correct.

13       Q    Okay.

14       MR. ANDREWS:  I'm all good.

15       MR. MCGRATH:  Okay.  Great.  No questions.

16  I'll handle reading and signing.

17       (The proceedings were concluded at 1:49 p.m.

18  on August 14, 2018.)

19

20

21

22

23

24

25

1          I, LORETTA POCH, the witness in the above

2    deposition, do hereby acknowledge that I have read

3    the foregoing transcript of my testimony, and state

4    under oath that it, together with any attached

5    Amendment to Deposition pages, constitutes my sworn

6    testimony.

7

8    _____   I have made changes to my deposition.

9    _____   I have NOT made any changes to my

10             deposition.

11

12   _____

13                     LORETTA POCH

14

15       Subscribed and sworn to before me this.

16   _____ day of _____ , 20_____.

17

18       My commission expires:

19       _____

20

21       _____

22                     Notary Public

23       Address:
     _____

24   _____

25   _____

```
 1                    REPORTER'S CERTIFICATE
 2        I, TERRY H. EDWARDS, Registered Professional
 3   Reporter and Notary Public for the State of
 4   Colorado, certify:
 5        That the foregoing proceedings were taken
 6   before me at the time and place therein set forth,
 7   at which time the witness was put under oath by me;
 8        That the testimony of the witness, the
 9   questions propounded, and all objections and
10   statements made at the time of the examination were
11   recorded stenographically by me and were thereafter
12   transcribed;
13        That the foregoing is a true and correct
14   transcript of my shorthand notes so taken.
15        I further certify that I am not a relative or
16   employee of any attorney of the parties, nor
17   financially interested in the action.
18        I declare under penalty of perjury under the
19   laws of Colorado that the foregoing is true and
20   correct.
21        Dated this _28th_ day of _August_____,
22   2018.
23                _____
24                TERRY H. EDWARDS, Notary Public
                  Commission expires January 31, 2019
25                Registered Professional Reporter
```

TERRY H. EDWARDS
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID 19954001700
MY COMMISSION EXPIRES JANUARY 31, 2019

97

**Exhibits**

**30(b)(6)**
**Loretta Poch August 14,**
**2018 - Exhibit-01**  4:9 30:6,8 63:7
68:18,19,22 70:11,24 71:12 75:4
78:21 80:19,20,24

**30(b)(6)**
**Loretta Poch August 14,**
**2018 - Exhibit-02**  4:14 36:5,7
38:15 48:8 51:7,15 53:5 65:16 79:6
92:2

**30(b)(6)**
**Loretta Poch August 14,**
**2018 - Exhibit-2B**  4:16 65:18

**30(b)(6)**
**Loretta Poch August 14,**
**2018 - Exhibit-2C**  4:17 79:9

**30(b)(6)**
**Loretta Poch August 14,**
**2018 - Exhibit-03**  4:18 68:2,4
78:20 79:20 80:11 82:5 84:11 88:7

**30(b)(6)**
**Loretta Poch August 14,**
**2018 - Exhibit-04**  4:19 88:11,13

**30(b)(6)**
**Loretta Poch August 14,**
**2018 - Exhibit-05**  4:21 93:21,24

**30(b)(6)**
**Loretta Poch August 14,**
**2018 - Exhibit-06**  4:22 94:8,9

**(**

**(716)**  84:17

**(720)**  90:2

**0**

**002**  65:2

**01**  48:11,19,24 92:4,21

**025**  63:4 64:21 65:1,3 66:13,18,21
70:18

**026**  65:6,9,10 67:7

**027**  69:2,17

**028**  70:4

**04247**  65:2

**051**  24:9 51:21 52:18

**085**  66:8

**1**

**1**  25:4 30:6,8 52:18 55:6,8 56:20,21,
23,24 57:4 63:7 68:18,19,22 70:11,
24 71:12 75:4 78:21 80:19,20,24

**10**  94:14

**10489**  83:18

**108**  65:10,11 69:23 70:3

**10:14**  6:2

**10th**  66:8

**11328**  61:5

**11:15 a.m**  46:2

**11:25 a.m**  46:2

**12:40 p.m**  73:18

**12:47**  73:18

**14**  6:1 95:18

**14068**  43:23,25

**14128**  66:1

**14221**  82:8

**15**  58:8

**16**  62:14

**17**  76:9

**180**  24:19

**1833**  71:18 76:19 85:15

**19345**  65:10 66:1

**1978**  11:15

**1985**  71:21 72:9 76:1,2,9 79:12
85:4

**1:39**  93:19

**1:45 p.m**  93:19

**1:49**  95:17

**2**

**2**  13:1 36:5,7 38:15 48:8 51:7,15
52:7 53:5 65:16 79:6 92:2

**2-week**  16:18,25 17:13 18:16,18
20:17 22:23

**2007**  14:6

**20075**  54:6 84:4

**2009**  56:20,22,23,24 57:5

**2012**  14:4

**2014**  55:6,8 58:4,6 86:24

**2015**  57:25 58:18,23 59:14 93:5,14

**2016**  20:2 23:4 33:12 51:6 58:6
59:25 61:17 63:2 66:8 69:5 70:16
76:9 87:11,19 88:3 90:24 93:2,11

**2018**  6:1 95:18

**24**  58:17,22 59:14

**241-7200**  90:3

**24th**  57:25

**25**  65:25

**26**  51:6 59:25 65:25

**27**  62:13 90:24 93:2,11

**270**  43:22,24

**2B**  65:18

**2c**  79:9

**3**

**3**  68:1,2,4 78:20 79:20 80:11 82:5
84:11 88:7

**30**  11:22 85:21

**30(b)(6)**  6:18 58:7

**300**  14:22

**30614**  79:22 80:4,10,21 81:25

**30788**  84:15

**30923**  83:6

**30th**  61:17

**31st**  69:5

Atkinson-Baker Court Reporters
www.depo.com

**321**  67:24

**322**  68:22

**370**  24:10 51:21 52:10,19

**371**  36:8,16,24 42:7,11 48:9 49:11
51:7 52:19 53:8 92:2

**374**  36:16

**377**  57:1

**381**  38:16,21

**3:29**  61:4

**3:30**  61:4

**3rd**  63:2 70:16

---

**4**

**4**  88:11,13

**4-9-2014**  57:3

**40**  11:22

**403**  82:7

**4247**  65:25

**436**  69:13

**4904**  61:20

---

**5**

**5**  11:21 45:25 93:21,24

**5-10**  65:3

**5-10-16**  65:1

**5-10-2016**  65:8,9

**5-17**  71:24

**5-17-2016**  71:15 72:9

**5-2-16**  63:21 64:23 67:12 68:12
70:21

**5-2-2016**  65:7,12

**5-23-2016**  79:12

**50**  52:18

**540**  57:6

**541**  57:8

**542**  57:8

**543**  57:13

**58-10-26**  67:11

**587**  38:20

---

**6**

**6**  94:8,9

**6-26**  59:22

**6-31**  60:25 61:4

**63**  63:12

**649**  62:9 70:16

**650**  62:11 63:6 70:10,19

**654**  71:13 74:25 75:21

**655**  72:5

**658**  76:14

**676**  53:14,16 82:24

**677**  84:14

**683**  85:1

**684**  85:13

---

**7**

**7-19-2016**  83:4,6

**7-21**  54:12 84:2,3

**7-21-2016**  54:4

**7-22**  84:19

**7-26**  83:16

**7-26-2016**  53:9 89:21

**7-27-2016**  84:15

**716 632-1564**  85:8

**730-5168**  84:18

**74**  94:15

---

**8**

**8**  83:13

**803473**  93:4,13

**857**  36:9 38:16,21,23

**8742**  8:16

---

**9**

**9-14-2016**  85:15,17

**9-27-16**  85:7

**9-6-2016**  85:4

---

**A**

**A.M.**  6:2

**abandoned**  61:7

**ability**  8:9 28:7 72:15 77:21 86:8

**Absolutely**  42:6

**accordance**  35:16

**account**  24:3 25:10,16 28:18 37:16
38:8 39:1,9,12 40:8 41:1,10 42:13,
16 47:6 48:12 51:9,17 52:1 53:2,22
54:19,22 55:4 56:11 58:20 60:6
74:2,12 77:11,18 78:5,15 80:9
81:23 83:10,20,22 84:6,7 86:22
87:3,11 92:4,17

**accounts**  15:21,22

**accuracy**  87:5

**accurate**  8:6 48:12 92:4,18

**ACDV**  36:20 49:22 50:9 51:16
88:14 89:4,23 91:3,17,21 92:11,23

**Achziger**  12:21

**acquired**  55:9

**Act**  22:8,11

**action**  6:11 46:21 47:1 59:20
69:17,22 87:12

**actions**  75:2,24

**activity**  47:6

**acts**  94:17

**actual**  51:10 89:15

**addition**  18:23

**address**  8:15 38:4,5 39:18 43:22
62:2,3 67:20 84:19

**addresses**  41:11

**adhere** 51:1

**advice** 72:7 75:9

**advise** 61:7 62:2 63:25 64:24 70:22 78:3 83:15

**advised** 60:5 83:22 84:19 85:6,7, 10

**affidavits** 12:5

**affixed** 24:9

**agency** 86:19

**agent** 58:24

**agreed** 65:16

**air** 52:18

**alleging** 6:14

**allocated** 31:14,20 32:2

**allocates** 81:4

**allowed** 75:15

**alter** 8:8

**alternate** 72:4,5

**Amherst** 43:24 82:7

**analyst** 11:24 14:16 27:4,21,23 28:6,17 29:2 31:21 32:8,17 37:2,8, 11,13,16 40:3,21,25 41:9 43:10 44:3,18,21 45:10,12 48:1,18 53:7, 19 60:8 67:2,3 70:1 71:5,6 72:19 75:22 76:1,3,4,9 77:9,17 80:23 81:4,7,8,19,20,24 84:10

**analyst's** 29:17 30:20,25 44:11 54:15

**analysts** 26:23 28:14,21 31:24 37:6 40:7 50:18 65:24 71:5 75:23 81:13

**analytic** 31:15

**and/or** 32:3

**Andrews** 6:8,10 10:18,23 12:12, 14,15 15:20 16:1,6,11 17:13,24 18:7 20:16 21:13 23:2,9 24:2,7,17, 23,24 25:14,19,25 26:7,11,20 27:11 28:14 29:21,24 30:1,3,7 31:12 32:6, 21 33:1,6,12,22 34:2,18,24,25 35:22 36:3,6,15 38:11,21,25 39:8, 15 43:18,20,21 44:18 45:8,16 46:1, 3,10,14,22 47:4,9,18 48:23 52:3,8, 22 55:7 56:5,17 57:14,18 58:8,15

**annual** 18:19 22:7,20 23:7,10

**annually** 16:20

**anymore** 34:16

**anytime** 46:15

**appears** 75:21

**applied** 29:11

**approximately** 13:17 31:23

**April** 55:6,8 58:4,6 62:13

**area** 13:3,12 31:15 87:13

**areas** 9:25

**asks** 7:3

**assessed** 44:21

**assessing** 44:20

**assigned** 28:17 37:13 81:18

**assignments** 40:14

**assist** 13:4 65:4 66:9 67:2 76:24

**assistance** 27:25 60:22 61:10,11 86:3

**assisting** 32:9,10,14

**associate's** 11:6

**Associates** 13:9

**Association** 25:3

**assume** 7:19

**assuming** 73:11 77:25

**attach** 50:10 77:17,22

**attached** 77:11,23

**attempt** 15:17,21,24 23:13

**attorney** 6:10 8:19,20 10:13 13:4 19:9,12,13,19,21 61:25 62:6 87:17

**attorney's** 19:17,19

**attorneys** 12:24 75:13,15 88:1

59:9,12,13 64:16,18,19 65:20 66:2, 4,6,7 68:3 70:8,9,15 73:11,17,19,20 74:22 75:8,17 76:14 77:16 78:11,14 79:2,10,14 80:4,7,8 81:3,12,22 82:4,12,23 86:21 87:9,16,24 88:6, 12 89:1,8,19 90:14,22 91:8,20,24 92:10,22 93:1,10,18,20,22,23 94:4, 9,14,21 95:8,14

**audio** 74:21,22

**August** 6:1 57:25 58:6,17,22 59:14 95:18

**authorized** 90:1

**automatically** 45:11

**average** 32:17

**aware** 20:10,12 22:12 25:14,18 26:7 27:3 33:5,11,15,17,21 45:21 47:25 53:1,6 87:9

**B**

**back** 12:14 20:2 23:4 25:23 33:12 43:20 48:1 49:5 50:20 59:2,12 64:18,19 67:22 70:8 73:8,19 74:25 78:6,11,16,25 79:4 80:7,15 92:1 93:20,22

**background** 52:2 76:8

**balances** 41:11

**Bank** 25:3

**bankruptcy** 13:5

**based** 75:21 88:14

**basic** 39:19

**basis** 55:8

**Bates** 24:9 36:8 51:21 52:11,18 57:1,6 75:1,25

**began** 86:23

**begin** 54:21

**beginning** 57:17 70:15

**begins** 62:12,13 64:21 65:6

**behalf** 6:20 15:15 58:11 72:6

**believing** 55:8

**beneficial** 47:12

**billing** 23:19

**birth** 41:16,19

**bit** 35:17

**black** 42:11

**blank** 49:12

**BO** 49:17,19,25

Atkinson-Baker Court Reporters
www.depo.com

**boarded** 56:15,16

**bona** 94:15

**borrower** 15:5 28:23 38:4 60:4,5, 18 62:21 63:25 64:25 70:23 71:22 72:10,14 73:5 83:8,9,11 85:20,21 86:10,12

**borrower's** 38:4

**borrowers** 15:18 32:9 34:7,12 63:6 64:22 70:20 85:19

**borrowers'** 39:17

**bottom** 49:13 57:1 63:1 83:16

**Boulevard** 8:16

**bound** 24:8 52:13

**box** 42:8 88:16

**break** 8:1,3 45:17,24 61:3 73:16

**breakout** 29:1

**Brian** 37:9 52:4

**broken** 28:19

**brought** 15:25 71:11

**bureau** 9:9 48:25 49:5,9,22 50:2

**Bureau's** 86:24

**bureaus** 95:9

**business** 14:23 16:5 28:9,16,19 32:10 84:6

**button** 50:6,19 82:17

---

**C**

**C-U-S-T** 56:5

**call** 34:16 61:6,22 69:1 71:17 72:12,17,25 73:5,7,8,9,13 75:6 83:9,19

**called** 23:21 34:17 37:22 40:18 55:14 60:4 68:16,17 69:1 76:20,21 79:17 83:7 84:16

**caller** 73:9

**Calling** 61:23

**calls** 34:15 35:4 72:23 74:8,10 93:6

**capacity** 6:22 10:8 12:22 19:24 31:24

**caption** 24:20 25:2

**carries** 57:8

**case** 23:15 31:10 36:23 45:21 46:20,25 50:2

**cashiering** 28:21 29:11

**Catherine** 61:6 72:14 82:6,14

**Catherine's** 72:6

**caution** 75:11

**CCI** 60:1

**cell** 83:19

**certification** 11:7,9,14 12:8

**CFPB** 34:15

**chain** 28:7

**change** 25:18 63:15 85:16,22,24

**changed** 19:18 25:16 60:12 62:17 76:25 85:17

**charge** 17:10 26:1

**checking** 85:5

**choose** 92:21

**CIT** 65:4,5,6,9,10,20,25 66:9,10,16 70:5,17

**claims** 71:11 84:5

**clarification** 10:11 65:14

**clarify** 58:2

**clarifying** 58:9

**classify** 10:14

**classroom** 18:5

**clear** 7:1,10 52:12 57:12 78:14 87:18

**client** 24:3 25:7,9,20 33:17 46:5, 16,20 47:5,11 87:4,7,17 88:1

**client's** 87:17 88:1

**clients** 15:15,22 16:3 46:11,13

**closing** 65:5 66:10 70:5

**code** 29:12 48:11 49:7,12 50:23 53:23 54:7 66:19 70:17 71:18 83:7 84:4 85:5,16 92:3,15

**codes** 48:24,25 51:1 63:14,16

**codified** 28:10

**collect** 15:6,14,19,21 16:2 23:13

**College** 11:10

**Colorado** 6:1 8:17 11:11,12

**column** 42:8 43:2,22,25 48:10 57:4 89:20

**columns** 53:25

**comment** 57:17 69:21 72:2 85:17 92:20

**Comments** 85:18

**common** 81:12

**communicated** 24:1 95:2,3

**communication** 35:1,2,5,6,12

**communications** 23:17 34:7,12 35:8,10,14 73:2 75:13

**Community** 11:10

**company** 6:20 10:3 20:23 41:6 46:8

**competent** 91:21 92:11,14,17

**complete** 7:15 15:13 33:13

**completed** 69:9 85:18

**compliance** 16:12 18:15 19:12 20:22,23 21:3,15 22:14,16,24 23:5 35:14 49:12 50:22 51:1

**complicated** 45:17

**comply** 19:2

**computer** 18:5

**concept** 72:13

**concluded** 95:17

**conclusion** 93:7

**condition** 49:12 50:23 51:1

**conduct** 15:8

**conducted** 53:7,19

**conducting** 54:15

**confident** 9:22

**connected** 40:17

**consist** 18:22

**consists** 18:14

**consulted** 76:4

**consumer** 26:16 29:8 30:21 31:2, 5,19 32:3 33:24 34:4,20 35:6,13 47:19,24 62:17

**consumers** 72:19 73:3

**contact** 46:16 47:19,23 60:11,13, 14,17,18,19 62:16,20 63:18 71:19 76:25 85:12 87:4,16,25

**contacted** 58:19,23 59:8,14 60:14 87:7

**contained** 45:1

**content** 95:4

**contested** 12:2

**continues** 57:13

**conversations** 72:18,21 74:6 75:14,16 95:1

**copies** 9:2

**copy** 24:7 39:5 52:12 89:8,12,14

**corporate** 8:14,22 14:10 28:8

**correct** 14:18 17:12 18:9,19 19:8 23:11 31:22 37:6,14,15 42:18 43:4, 7 44:2 46:22,23 47:3 48:6 49:18 50:21 51:14 56:19 59:9 60:20 61:21 63:23 65:4 66:9,23,25 67:6,9,17,21 71:9 74:16 75:4 78:18,21 84:1 89:22 90:21 91:13 92:3,9 95:12

**correction** 65:2

**correctly** 84:8

**correspondence** 34:20 40:14 65:7,12 67:10,12 68:9,13,20,24 81:17 89:9 94:22

**counsel** 8:22 9:1,6,14 10:24 12:3 14:11 19:14 75:9

**counted** 14:21

**County** 87:13 93:4,13

**couple** 6:24

**court** 7:24 30:16 60:5 61:25 63:5 64:21 70:18 76:22 87:13 93:4,13

**CR** 83:19

**CRA** 36:23

**creates** 19:5

**credit** 9:8 22:8,10 31:17,19 48:25 49:5,9,22 50:2 60:7 86:18,23 87:2, 10,19,23 88:3 95:8,9

**Croix** 12:21

**Croker** 12:21

**Cross-talking** 76:11

**current** 11:23 14:16 15:25 23:12 28:17 39:20 56:11

**cust** 55:14,15,22 61:7

**custom** 79:21

**customer** 26:6,12,22 28:23 29:6, 13 31:3,4,10,14,20 32:7,17,24 60:3, 4,10,12 61:7 76:20,21,25 81:18 83:7 84:5,16

**customers** 32:14 72:19 73:3

---

### D

**data** 42:8,9,11,13 43:22,24 44:5 56:8 65:2 86:18 87:3,8,10,19 88:3 95:8

**date** 48:12 53:22 54:2 55:7,9,10,15, 18 57:4,25 58:18,22 59:14 70:25 84:3,21 85:4,6 89:20,23 90:23,24 92:4,18

**dated** 53:9 57:2 84:15 85:15

**dates** 41:16,19 53:12 91:7

**Davidson** 62:7,8 87:17

**day** 32:11,13 91:3 95:5

**days** 52:7 85:21

**deal** 28:22 85:16,22

**dealing** 32:2 44:21

**deals** 28:23,25

**dealt** 31:16

**debt** 23:13

**debtor** 13:5 87:18,21 88:2 93:3

**debts** 15:15 16:3

**decision** 71:24 78:7,17

**decree** 64:24 70:22 72:8 85:19

**deed** 69:4,7,17

**default** 15:20 56:12 83:12 84:21

**defaulted** 16:3,10

**defendant** 6:13 65:16 79:5 93:12

**defense** 94:16

**deficiencies** 15:19

**definitive** 74:5

**delay** 12:13

**delinquencies** 15:9

**delinquency** 15:17

**delinquent** 56:21

**demonstrates** 78:6

**denied** 85:17,25

**denoted** 44:9

**department** 10:9 17:3,6,7,8 19:7, 10 20:21,24 21:2,7,14,16,17,21,24 22:13,15 26:12,22,24 30:25 31:9,15 65:5 66:10 71:7

**departments** 30:19

**depend** 29:9,14

**depends** 28:16 31:8

**deposition** 6:15,18 8:18 9:1 11:1, 17,18 55:17,20 73:23 91:12 94:6

**depositions** 11:22 12:6

**depth** 45:4

**derived** 51:8

**describe** 16:16 26:21 28:15

**designation** 49:25

**detail** 45:6

**details** 79:13

**development** 17:4 19:6 21:22

**Diana** 84:22

**difference** 62:24

**differently** 44:10

**Dillon** 30:15

**directly** 29:8 30:21 31:1 33:24

**disburse** 15:7

**disclosures** 51:19

Atkinson-Baker Court Reporters
www.depo.com

**discovery** 12:6

**discuss** 8:19 9:6,8,12,13,22 10:25 23:21

**discussed** 8:20 9:5

**discussion** 43:19 59:11 64:17 70:7 78:10 79:3 80:6

**disk** 74:23

**dispute** 9:9 20:10 21:7,18 22:1 26:15 27:6,8,13,16,19 29:3,4,5,7,9, 10,12,14,18,21 30:20,23,24 31:8, 10,13,18 33:3,8,14,16,19 35:23 36:18 37:4,17 41:13 44:13,21 46:17 47:19,20,24 48:4,7 49:10 51:5 52:1 53:2,7,9 54:23 68:16,17 70:12 75:3, 7,10 79:13 80:15,25 81:5,8,9,14 84:5 86:16 87:4 88:8,10 89:10,11, 13,15

**disputes** 20:18 21:8 22:6,9 26:2,5 27:23 31:1,4,6 32:3,10,12,14,16 33:23 34:4 35:18,21

**disputing** 57:23 59:15

**distinction** 35:5

**District** 6:12 23:14

**division** 29:17 61:14

**divorce** 64:24 70:22 72:8 85:19

**DM** 71:18 83:7,19 84:16 85:5

**doc** 61:23

**docs** 9:2 61:25 62:2,5 63:25 64:24 65:10 69:24 70:2,3,4,22 83:11 84:17

**document** 30:8,9,11 36:7 39:24 44:22 47:16 51:19 52:14 56:4 66:22 68:4,5,7 71:24 88:12,25 93:24,25 94:5,10

**documents** 12:5 22:4 36:8,10 44:7,16,17 45:4 46:3,11 47:11,17 51:9,11,18,23,24 52:16,25 77:13 88:17,21 89:3

**door** 12:11

**downloaded** 74:23

**draft** 50:12,17 80:13

**drafted** 79:23,25 80:10 82:13,15, 17

**dropped** 59:19

**Dry** 52:18

**due** 56:23,24 69:13 90:23

**duly** 6:5

**Dumpty** 25:23

**duties** 28:18

---

**E**

**e-mailing** 78:17

**e-oscar** 9:9,12,23 20:5,8,9,18 21:6, 8,18,25 22:6,9 26:2,5 29:5,22 31:5 32:2 33:16 35:23 36:17 37:4 47:19 48:4 50:14 53:8 84:5 86:16 88:8,10 89:9,11

**e-oscar's** 44:13 46:15

**earlier** 19:15

**earliest** 52:14

**easier** 29:25 59:6

**Educated** 83:9

**education** 11:3

**either/or** 51:8

**EI** 11:10

**electronic** 16:24 17:23,25 18:23, 25 24:16 45:20 48:6,9 56:8,9 59:6

**electronically** 37:3 48:14 49:4 50:5 55:25

**element** 42:23

**Eleven** 14:1

**em** 34:16

**email** 62:1 65:8,12 67:16,20 76:23 77:1,6,25 78:2

**emailed** 67:19

**emailing** 77:18

**emails** 77:9,10,17,22

**employed** 31:24

**employee** 10:8 16:20 39:8,11 90:7,10 92:23

**employees** 17:15 20:17 22:23 26:24

**end** 19:3 52:13,14,19 57:17

**ending** 80:10

**engaged** 14:24

**ensure** 44:8

**entered** 92:20

**entire** 28:8 48:15

**entries** 49:3

**entry** 57:2 64:20 65:1 70:16 92:6

**Erie** 87:13 93:4,13

**error** 52:17 82:8,11 94:15,23 95:3, 11

**errors** 94:18

**ES** 60:1,2,8 61:18,22

**escalate** 27:25 28:7

**escalating** 28:3 60:3

**establish** 29:25

**established** 88:24

**establishing** 30:22

**evens** 61:1

**event** 7:5

**evidences** 80:9

**ex-spouse's** 84:6

**ex-wife** 83:14

**exact** 10:19

**EXAMINATION** 6:7

**examined** 6:6

**executive** 60:2

**exhibit** 24:22 30:6,8 36:5,7 38:15 48:8 51:7,15 53:5 63:7 65:16,18 68:2,4,18,19,22 70:11,24 71:12 75:4 78:20,21 79:6,9,20 80:11,19, 20,24 82:5 84:11 88:7,11,13 92:2 93:21,24 94:8,9

**exists** 23:3 45:7

**expect** 41:4 72:24

**Experian** 36:24 51:6,16 53:9 88:20,22 89:9,14,23 90:14 91:4,17

**Experian's** 88:14

**explain**  11:25 38:1 59:24 61:18 76:17 83:5 84:14 85:13

**Explained**  72:3

**explains**  52:14

**extent**  58:10 75:14 93:8

---

**F**

**F-I-S-E-R-V**  37:24

**face**  15:5

**fair**  10:14 16:1 19:20 22:8,10 38:9

**fall**  24:13

**familiar**  16:14 20:7 22:18 35:18 36:19,20,24

**fashion**  81:25

**fast**  7:2

**fax**  62:3

**faxed**  84:17

**FCRA**  6:14 22:14,16,19 23:4 51:2

**FDCPA**  6:14 16:12,20 18:14 19:1,2 20:13,15,16,22,23 21:3,15 22:9,22 35:15

**feel**  9:22

**female**  19:21

**fide**  94:15

**file**  39:5 61:7 72:8

**filed**  6:12 26:15 36:18 87:12 93:3, 12

**files**  74:21,23

**fill**  50:4

**finalized**  50:13

**financial**  38:5

**find**  24:12 52:15 53:11

**fine**  30:18 66:3

**finish**  7:9

**Fink**  62:7,8 87:17

**firm**  12:10,17,19,22 13:10,15,21

**FISERV**  37:22 38:18 39:9,12 40:9, 12,16 43:12 44:4 45:1 48:2 51:8

55:10 63:14 77:22,23

**flimsy**  25:25

**folks**  21:17

**follow**  45:13

**footprint**  45:19,21

**foreclose**  15:7

**foreclosing**  15:10

**foreclosure**  12:3 13:13,24 15:11, 12 46:21,25 59:19 83:15 85:6 87:12,22 93:3,12

**foreclosure//borrower**  62:1

**foreclosures**  12:2 28:25

**forget**  34:16

**forgive**  85:19

**form**  9:11 10:15,21 15:16,23 16:4,9 17:11,22 18:3 19:1 20:14 21:11 22:25 23:6,16 24:4 25:11,17,21 26:3,9,17 27:9 29:19,23 31:7 32:4, 19,23 33:4,9,20,25 34:11,22 35:20 38:10 39:6,13 44:15 45:2,15 46:6, 12,18 47:2,7,13 48:15,20 49:6 50:14 51:16 55:5 56:13 70:13 73:4 74:20 75:5 77:12 79:7,19,20 81:1, 10,15 82:1,9,21 86:20 87:6,14,20 88:4,23 89:5,16,25 90:11,20 91:5,6, 9,17,22,25 92:7,12,16,24 93:6,15 94:19 95:6

**forms**  34:15 50:16

**forwarded**  69:7

**foundation**  88:24

**frame**  34:9

**Fred**  9:17

**full**  8:11 42:5,6 43:15

**furnisher**  50:1 51:1

---

**G**

**gave**  59:5

**general**  32:9 39:16 76:8

**generating**  44:25

**gentleman**  9:17

**gestures**  7:14

**Getzville**  43:23

**gist**  50:7,8

**give**  7:13 10:3 24:7 83:12

**global**  20:9 40:18 44:23 46:4 50:11 51:12 63:21 77:24 79:16,17

**good**  9:2 14:7 55:17 95:14

**Google**  49:1

**gotcha**  42:12 84:3

**gracefully**  59:4

**grade**  38:1

**gray**  49:7,8 50:5

**Great**  95:15

**ground**  6:24

**group**  26:10 32:24,25 60:3 61:5 67:5,6 69:8 81:18,20

**guarantee**  7:2

**guess**  19:20

**guidelines**  33:17 35:16

**guru**  10:12

**guys**  56:9

**gv**  63:21 64:23 70:21

---

**H**

**half**  13:1

**handle**  13:12 20:4 21:25 27:8,13, 16,19 28:20 29:3,13 30:20 31:1,9 75:10 81:4 95:16

**handled**  20:10 21:24 27:7 29:18 31:11 35:8 54:23

**handles**  20:21 21:2,7,14 22:13,15 27:23 31:4 81:20

**handling**  21:17 22:5 26:2,5 32:12 61:25 62:6 78:4

**hands**  25:16

**hard**  39:5

**head**  7:14 21:20,24

**headings**  53:24

**hear** 18:19 65:22

**helpful** 66:4

**Hernandez** 83:24

**hierarchy** 10:19 26:14,21 27:3,6 76:5 77:10,19

**high** 10:19 11:5,24 14:16 20:10

**higher** 77:10,18

**highest** 11:3

**Highlands** 8:16

**hire** 16:17

**history** 38:7 40:11 56:14 57:2

**hit** 48:19 82:17

**home** 84:20 85:7

**hour** 60:12

**house** 9:6

**housed** 38:17 46:4 74:19

**houses** 38:3 40:13

**Humpty** 25:23

---

**I**

**I-N-D** 42:17

**i.e** 84:6

**ID** 53:23 54:5 61:5,20 76:1 79:22 80:3,10,21 81:24 82:3 83:6 84:8 85:4,15

**idea** 31:25 32:16 90:18

**identification** 30:6 36:5 68:2 88:11 93:21 94:8

**identified** 26:12 27:4 41:18 68:20 75:1 84:11

**identifier** 41:6 42:20

**identifiers** 41:9

**identify** 30:11 36:15 41:1

**image** 44:17 45:4,10,12,14

**imaged** 44:22 51:12 63:21 64:23 70:21

**images** 40:15

**imaging** 40:12,16,17,22 69:8

**impact** 87:22

**in-house** 8:22 9:14 10:24 19:7 21:14 22:13 33:18 62:6 75:9

**inbound** 61:22 73:13

**included** 18:17

**income** 72:15 85:20 86:4,7,14

**Ind** 43:25

**indicating** 45:3 62:20

**indication** 81:22 82:10

**indicator** 42:20

**individual** 6:20 18:1 47:20

**info** 71:19 72:4 83:20

**information** 12:4 32:22 38:4,5 39:17,19 40:3 41:18,20 44:4 48:5, 12 49:21 50:4 51:4 58:5,10 61:7,22 76:21 83:8,20 84:7 88:14 92:4,18

**initial** 16:18 18:16 20:17 51:18 52:6

**initially** 41:18 49:23 50:1 73:6

**initiate** 60:17

**input** 92:5

**inputs** 44:25

**inquire** 88:2

**insisting** 62:1

**instance** 29:16

**instructed** 40:25

**instructing** 18:8

**instructor** 18:6

**insurance** 15:7

**intended** 82:15,19

**intensive** 16:19

**intentionally** 94:23 95:10

**intentions** 83:14 84:20

**interaction** 17:25

**interest** 56:24 72:1

**interested** 23:25 83:22

**internal** 21:2

**interpret** 91:21 92:11

**interruption** 12:11

**invalid** 65:11

**investigate** 33:8

**investigating** 71:11

**investigation** 50:19 53:8,19 54:16 64:4,6,12 65:24 71:3 81:23 91:3

**investors** 15:5,12

**involve** 47:15

**involved** 47:5 65:23

**involvement** 86:17

**issue** 31:19 50:14 67:10

**issued** 65:7,12 67:12 68:9

**item** 57:2 65:21 66:14,15 71:22

**items** 72:7,10,11,13

---

**J**

**James** 30:15

**job** 12:18 28:18 32:6

**John** 41:4

**judgement** 87:18

**judgment** 87:21 88:2 93:2

**July** 51:6 90:24 93:2,11

**jump** 7:8

**June** 86:24

**junior** 27:1,2,5,11,12

---

**K**

**K-O-R-B** 9:19

**Kenneth** 43:3,11

**key** 92:6

**keyed** 48:18

**Kimberly** 40:19

**kind** 10:12 13:23 15:2 24:20 25:25 26:21 29:4,14 31:8 40:24 48:18

**Kirsten** 90:2,6,10

Atkinson-Baker Court Reporters
www.depo.com

Index: Kline..meaning

**Kline**  13:8

**knowledge**  10:1,16 74:5,17

**Korb**  9:17,23 10:24

**Korb's**  9:20

---

**L**

**La**  12:21

**law**  12:10,17 13:3,10,12,21,23

**lawsuit**  6:18

**layman's**  12:1

**learned**  18:1

**learning**  17:3 19:6 21:22,25

**legal**  10:13 93:7

**letter**  30:4,12 63:8,20 64:23 68:18 70:12,21 75:3,7 78:20,24 79:19,20, 21 80:14,25 82:13,15,18 84:11 88:9

**letters**  88:7

**level**  11:3 20:11 26:23 47:6,15

**liable**  71:25 84:6,7 85:24

**limited**  58:5

**Linda**  85:10

**lines**  67:11 68:8

**liquidated**  25:13

**list**  40:24 49:1

**listed**  75:24

**listen**  72:12,17,23 73:22 74:3,9

**listened**  74:1

**literally**  18:4 67:24

**LITTLETON**  6:1

**live**  18:7

**lived**  83:13

**LLC**  6:13

**loaded**  56:16

**loan**  6:13,17 14:3,25 15:18 23:23, 25 28:20,22,24 29:11 30:12 38:3,6, 7 39:17,19,20 40:10,14,15 41:3,5,8, 11,13,22,24 42:1 44:7,16 47:15 51:11 56:14,15,19 58:3 63:7,15,17

64:23 65:2 70:20 71:23 72:3,7,14 76:22,23,24 85:6,10 86:9,25

**loan-level**  46:13 87:8

**loan-specific**  47:17

**loans**  15:4 16:10 47:16

**local**  12:3

**locating**  40:8

**log**  72:25

**long**  11:16 12:25 13:1,17,25 14:12 19:23 33:7,18 54:10 66:5 84:4

**longer**  58:20 71:25

**looked**  43:10

**Loretta**  6:4 8:13

**loss**  15:8,14 23:20 85:9

**lost**  59:1

**lot**  10:16 52:3,9

**Lucent**  8:16

---

**M**

**Macris**  6:11 23:15,18,21,25 30:13, 23 36:18 57:22 58:18 59:8,14 61:6, 23 63:18 67:19 68:9,13 71:12 72:22 74:6,15 76:20 80:25 82:6,7,14 83:20 84:16 85:5,25 86:5,8,11 87:1, 11,18,21 88:7 89:13 93:2,11 94:17, 22 95:2,10

**Macris's**  29:18 51:5 52:1 53:1 64:4 75:3 86:14,18 87:2,10,19

**made**  9:1,22 29:10 49:4

**mail**  84:18

**mailed**  83:21 84:17

**mailing**  38:4 39:18 62:3 83:10,11 84:19

**main**  43:12

**majority**  32:11,13

**make**  9:9 29:25 41:14 47:24 65:18 79:6

**makes**  37:11

**making**  23:22 47:20

**male**  19:21

**management**  28:25 32:24 38:8

**manager**  27:5,15,16

**managers**  26:18,19,25 27:1

**managing**  12:24

**manual**  28:4,11

**manually**  48:17 92:5,19

**manuals**  18:11,14

**March**  59:25 61:17

**mark**  6:10 23:15 24:21 30:1,3,13 36:3 61:23 67:19 68:1,9,13 71:24 72:1 76:20 82:6,14 83:19 84:16 85:5 93:2,11

**marked**  30:6 36:5,7 68:2,4 88:11, 13 93:21,24 94:8

**markmacris@yahoo.com**  67:16 68:10,14,21

**markmacris@yahoo.com.**  65:8, 13

**master**  49:1

**match**  41:10 43:11

**matches**  84:8

**materials**  17:14,20

**math**  14:7

**matter**  9:7 10:25 23:12 41:7

**matters**  10:13 91:16

**Mcbride**  8:24

**MCGRATH**  10:15,21 15:16,23 16:4,9 17:11,22 18:3 20:14 21:11 22:25 23:6,16 24:4,15,21 25:11,17, 21 26:3,9,17 27:9 28:12 29:19,23 31:7 32:4,19,23 33:4,9,20,25 34:11, 22 35:20 36:13 38:10,19,23 39:6,13 43:17 44:15 45:2,15,24 46:6,12,18 47:2,7,13 48:20 52:5,11 55:5 56:3, 13 57:12 58:2,9 59:3,10 65:14 66:2, 5 70:6,13 73:4,15 74:20 75:5,11 76:12 77:12 78:9 79:4 81:1,10,15 82:1,9,21 86:20 87:6,14,20 88:4,23 89:5,16 90:11,20 91:5,18,22 92:7, 16,24 93:6,15 94:1,11,19 95:6,15

**meaning**  15:5 25:13 60:13 72:15 80:19 85:24

**means**  6:19 11:25 60:16 72:4,5

**meant**  82:13

**medication**  8:8

**Meinhold**  13:22

**memorializing**  53:6

**memory**  55:2

**message**  53:23,24 54:9 63:11,20 66:8 70:18 72:10

**messages**  57:10 61:4 71:5 83:5,17

**met**  19:13,15

**middle**  43:2,15

**Miller**  43:23,24

**minute**  57:9 59:2

**minutes**  45:25 52:9

**mischaracterize**  20:25

**misrepresent**  54:22

**missing**  52:15

**misstates**  33:10 46:19 70:14 81:16

**mistake**  82:16

**mit**  85:9

**mitigation**  15:8,14 23:20

**modification**  23:24,25 61:10 86:2

**module**  16:21 22:11

**modules**  16:19

**moment**  94:11

**moneys**  15:21

**monthly**  15:6,24 23:19,22

**mortgage**  13:13,24 14:25 15:4,6, 24 38:7 40:13 41:14,15 57:24 59:16 61:11 86:2

**mouth**  10:3

**move**  14:14 80:1

**multiple**  21:16,17 37:5 71:22

**Multz**  12:21

---

**N**

---

**named**  9:17 51:24 93:11

**names**  39:17

**naming**  6:12

**National**  25:3

**necessarily**  57:15

**needed**  27:25 51:10 71:22 72:7,10, 11

**negative**  60:7

**nods**  7:14

**noise**  52:2

**nonpublic**  41:20

**normal**  10:8

**notation**  53:6 54:15 59:24 60:21 61:18 62:5 63:2,9 78:15

**note**  40:13 44:24,25 45:3,13 53:10, 18 54:2 56:3 61:24 63:24 64:11,15 67:18 69:19 80:12 85:25

**noted**  72:8

**notes**  38:6,14,16 39:1,4,5 40:11 45:1 51:9,17 53:10 54:12,19,22 58:1,25 67:18 69:15 76:17 77:11,18 78:5,16,23 80:9 81:23 82:2,10 85:14

**notice**  57:22

**NT**  54:8 72:2 79:12 84:4 85:16

**number**  41:3,8,24,25 42:2,4 52:12 53:15,22 54:10 66:14,18 71:18,21 76:19 80:21 83:18 84:3,4 85:7,8 90:3,4,5

**numbers**  39:18,19 41:17,19

---

**O**

---

**oath**  7:22

**Object**  15:23 45:2 58:2 81:1 87:6

**Objection**  10:15,21 15:16 16:4,9 17:11,22 18:3 20:14 21:11 22:25 23:6,16 24:4 25:11,17,21 26:3,9,17 27:9 28:12 29:19,23 31:7 32:4,19, 23 33:4,9,20,25 34:11,22 35:20

---

38:10 39:6,13 44:15 45:15 46:6,12, 18 47:2,7,13 48:20 55:5 56:13 70:13 73:4 74:20 75:5,11 76:12 77:12 81:10,15 82:1,9,21 86:20 87:14,20 88:4,23 89:5,16 90:11,20 91:5,18,22 92:7,16,24 93:6,15 94:19 95:6

**objections**  24:9

**obligated**  58:19 59:15

**obligation**  7:23

**obligations**  57:24

**obtained**  11:4 46:5,7

**occasion**  10:10 91:16

**occur**  34:10

**occurrence**  81:13

**October**  56:23

**odd**  83:1

**odds**  61:2

**office**  9:17 14:10

**officer**  27:5,7,12

**officers**  26:19 27:1,2

**oftentimes**  7:9

**open**  40:21 65:4 66:9

**Operator**  52:17

**opposed**  31:14 43:14 60:14

**oral**  35:6

**order**  7:14 25:1 30:14 57:15 60:5 63:5 64:21 70:19 76:22

**orders**  61:25

**original**  39:19

**outbound**  61:6 73:13 83:19

**oversight**  19:11

**oversimplifying**  50:7

**overview**  20:9

**ownership**  85:20

---

**P**

---

**P-O-C-H**  8:13

**p.m.** 73:18 93:19 95:17

**package** 71:24

**pages** 51:22

**paid** 56:19 57:4

**Palumbo** 90:2,6,10

**paragraph** 94:15

**paralegal** 11:7 12:23 13:14

**parents'** 85:8

**part** 16:2,5 31:20 44:13 79:8 80:8

**parties** 74:10

**parts** 81:14

**party** 71:7

**Paso** 11:10

**passing** 16:22

**Patricia** 79:22 80:10,13,16,21 81:24

**Patrick** 8:24,25 9:5

**pay** 72:15 79:16 86:9

**payment** 29:10 38:7 40:10 56:14, 23 57:2

**payments** 15:6,25 23:22 28:22

**payoff** 83:23,25

**PDF** 40:21

**pending** 93:12

**people** 17:7,8 21:16

**perfect** 45:20 52:8 66:6 67:25

**perform** 67:5 91:2

**performed** 64:6,9

**performing** 15:18

**period** 17:1,14 18:17,18 20:17

**person** 6:25 17:6,9 18:8 26:8,10,11 66:19,20 69:10,11 90:18 91:21

**personal** 29:21

**phone** 39:18 42:3 71:17 72:12 74:8 83:9 85:8 90:3

**phrase** 67:1

**picking** 24:19

**pieces** 41:20

**place** 20:2 33:13 39:1 66:19

**plaintiff** 6:10 23:14 25:3 46:21 79:8

**plaintiff's** 30:8 36:7 38:15 48:8 51:7,15 53:5 63:7 68:4,18,19,22 70:11,24 71:12 75:3 78:19,21 79:20 80:11,24 82:5 84:11 88:6,13 92:1 93:24

**platform** 37:20,25 39:10

**pleading** 24:20

**Poch** 6:4 8:13

**point** 23:13 50:1 64:3,14 80:8 85:12

**policy** 10:16 34:2,6 35:4,7,9 47:23 73:1,21 77:17

**pop** 44:19

**portion** 79:6

**portions** 28:20

**position** 9:20 11:23 14:8,15,16 30:20,25 31:21 32:8 33:22 60:9 93:1,10

**possession** 51:25

**post** 11:5

**PPV** 79:13,14,15

**practice** 13:3,23 16:2 22:5 44:12, 14

**pre-** 87:3

**predecessor** 79:15

**preparation** 8:18 10:25 73:23

**preparing** 94:6

**present** 10:24 19:14

**presentation** 18:25 19:4

**presently** 18:13

**president** 10:20

**press** 50:6

**pretty** 55:17

**prevent** 47:10

**previously** 14:17 19:14 21:1,13 30:18 68:8 73:20 91:11 92:2

**print** 40:3 50:9 55:24

**printed** 56:1,2 57:16

**printout** 55:21

**prior** 8:25 11:16 25:15 30:9 36:11 46:7 51:19 58:10,22 68:5 86:16 87:2,18 88:2 89:4 93:25 94:10

**problem** 56:4

**procedure** 20:2 23:3 34:3 35:18, 19 39:4 47:22 48:3 73:1 81:3,6

**procedures** 10:17 21:8

**proceeding** 93:3,12

**proceedings** 12:13 95:17

**process** 22:19 25:20 28:2 33:2,14 36:20 65:24

**produced** 39:22 53:3 77:14

**producing** 56:4

**production** 24:8 39:25 51:19 52:6, 7,13,23

**proof** 72:15 85:20 86:4,7

**proper** 41:22

**property** 15:11 25:12,15 38:5 39:17 41:11 44:9 45:5 83:8,13,15

**protocol** 21:8 28:11 33:1,6,13 45:13 46:16 78:1

**provide** 8:5,9 16:11 17:1 50:25 65:17 81:8 84:22 89:14

**provided** 17:14,20 20:17 30:7 49:21 50:1 51:5,17,18 59:4 88:15, 21 90:15 91:11 92:23

**providing** 6:19 12:3 72:4 89:4

**pulled** 49:8,9

**punch** 40:24

**punched** 50:19

**purpose** 95:4

**pursuant** 6:11 70:10

**put** 25:23 51:20 74:23

---

**Q**

---

**QCD** 69:2,3,10

Atkinson-Baker Court Reporters
www.depo.com

**qualified** 34:13

**qualify** 34:13 72:13

**question** 7:4,8,19 8:2,3 12:16 19:20 21:19 22:15 26:13,15 30:24 52:21 58:16,17 59:7,13 71:2 79:10 82:20 87:24,25 88:25 94:16

**questions** 28:1,24 54:20 95:15

**quick** 25:24

**quickly** 7:5

**quitclaim** 69:4,7,17

**QWR** 65:7,12

**QWRS** 34:16

**R**

**raised** 94:15

**Ranch** 8:16

**random** 24:20

**range** 24:9 52:15

**rapidly** 53:11

**reach** 47:16 75:9 83:14

**reached** 75:18

**reaching** 47:10

**reactive** 61:8,12

**read** 30:17 42:25 54:11 65:18,22 66:10 68:8 71:4 78:12 79:10,11

**reading** 65:15 66:3 95:16

**real** 25:24

**reason** 8:5 54:21 83:12 84:21 90:9, 12

**recall** 8:9 12:9 13:6,19 14:8 17:20 18:10,12 24:5 49:2 55:3 74:1 88:9

**receipt** 81:19

**receive** 69:2 81:7 89:11

**received** 28:22 30:13 55:3 56:10, 18 57:22 63:4 64:21 69:17 70:11, 18,25 76:22 80:16,24 84:5,18

**receives** 46:15 47:18

**receiving** 86:16 91:3

**recently** 14:21 51:17

**recertification** 18:21,22 22:20 23:7

**recertifications** 22:7

**recertified** 16:21

**recess** 46:2 73:18 93:19

**recollection** 25:6

**record** 7:1,10,15 8:12 12:4,12,14 30:5 43:17,19,20 45:19 51:20 59:10,11,12 64:16,17,18,19 65:15 70:6,7,8 71:4 72:18 73:2,12,19 78:9,10,11,12,25 79:2,3,4,8,11 80:5,6,7 93:18,20,22

**recorded** 72:22,23,25 73:6,7,10,12

**recordings** 73:22 74:2,5,8,12,17, 19

**redacted** 53:12 57:9 71:20 78:8

**refer** 6:16 91:7

**reference** 25:2 30:14 68:24

**referenced** 38:17 63:8 68:7

**referencing** 66:21 70:24

**referring** 29:20 42:21

**refi** 72:6

**refinanced** 72:1,3

**reflect** 43:14

**reflects** 53:18

**refresh** 25:6

**Refused** 71:25

**regard** 31:10 35:7,15 41:13 76:19 86:25

**regular** 16:2 26:23

**regularly** 16:7,10

**relate** 51:25 53:1

**related** 40:15

**relative** 6:18 46:17 53:8 74:2 78:17 93:3

**relieved** 57:24

**remainder** 38:15

**remember** 12:15,20

**remembered** 55:18

**Remic** 25:4

**remove** 71:23 72:5 76:22 85:25

**removed** 60:6 61:24 64:25 70:23 76:22 85:7 87:11

**removing** 63:6 64:22 70:20 76:24

**REO** 25:13

**repeat** 7:3 34:24

**rephrase** 7:7

**reply** 34:21

**report** 26:24,25 27:1,2 60:7 69:20

**reported** 48:13 87:10,22 92:5,18 95:9

**reporting** 22:8,10 31:17,19 84:8 86:17,18,23,24 87:2,5,19 88:3

**represent** 88:19

**request** 31:16 32:15 42:8,11,23 43:5,22 46:10 47:11 61:10,11 63:19 64:4 65:11 69:9 73:9,12 78:3 83:10 86:2

**requested** 59:19 71:6 83:23,25

**requesting** 84:16 86:4,7,13

**requests** 32:9 34:14 66:19 73:5

**required** 34:14 69:19,22

**requirement** 19:2

**research** 29:11 80:16,22

**resend** 65:10 69:24 70:1,3

**resent** 83:11

**Residential** 13:13,24

**resolve** 15:9,17 72:4,6

**resolved** 79:13

**resolving** 72:5

**RESPA** 35:16

**respect** 15:20 20:18 21:6 23:4 25:9 31:18 33:2,16 47:12,23 48:3 64:4 66:7 68:16,17 71:11 76:5 94:16

**respond** 7:10 32:18 33:19,23 34:4, 14,21 44:13 80:18

**responded** 34:8

**responding** 35:18 48:4

**response** 7:15 9:10,13,23 35:9,10, 11 42:9,13,23 43:6,24 44:5 47:12 48:6,9,11,16,17,24 49:7,8 50:10 54:13 58:7 67:19 68:22 75:2 76:6 78:2,20 80:17,22 81:9,25 88:14,22 89:4 90:23,24 91:17 92:3,15

**responses** 7:13 8:9 9:8 12:5 35:15 36:17

**responsibilities** 32:7

**responsibility** 33:23 34:3

**responsible** 57:23 59:15 75:24

**rest** 49:6 71:19

**result** 88:10

**results** 88:8

**returning** 83:9

**returns** 72:16

**reveal** 75:12

**reverse** 52:11

**review** 46:15 51:10 63:25 64:24 70:22 78:3

**reviewed** 18:10 48:2 52:22 55:23, 24 57:11,19 64:1 88:21 89:4

**reviewing** 12:5 18:14 55:16,19 57:18

**reviews** 18:19

**rid** 50:15

**right-hand** 49:7

**risk** 11:24 14:16

**RMA** 61:8,9 85:18 86:1

**Road** 43:23,24

**role** 28:15

**routine** 22:5 44:14 81:7

**rules** 6:24

---

**S**

---

**SADV** 84:20,23

**sale** 15:11 25:13,15 69:13 83:23 84:21 85:6

**save** 56:8 69:10

**saved** 50:11 69:8 77:24

**scan** 50:9 69:10

**scanned** 69:8 81:17

**SCC** 49:16

**school** 11:5

**scope** 58:3 76:12 91:23 93:7,16

**scratch** 79:23

**screen** 39:14,16 40:2,6,9 43:12,13 44:12 51:8 55:12,15,23

**screens** 48:2

**scroll** 57:3 66:5

**searching** 59:7

**section** 22:8 65:3,6,17,18

**security** 39:18 41:16,19,24 42:2

**seek** 75:9 83:14

**sell** 15:11

**sells** 29:8

**send** 50:5 61:8 65:7,11 67:5,10 77:25 88:7

**sending** 49:4 60:5

**senior** 27:2,5,7

**separate** 21:2 40:12,16,19

**September** 56:20,21,24 57:4

**series** 36:8 67:18 71:4 75:1

**Serve** 55:22

**service** 15:4 32:17,25

**servicer** 15:1

**services** 60:2

**servicing** 6:13,17 14:3 28:20 30:13 37:20,25 38:6 39:9 40:11 41:12 46:8 53:10 55:11 58:3

**set** 22:5 52:12

**Seth** 6:9 37:8 44:23,25 52:20 58:13 80:2

**Shapiro** 13:21

**short** 83:22

**show** 44:24 78:23

**showing** 36:6 52:4,5 61:24 68:3,18 78:19 88:12 93:23

**shown** 79:5

**shows** 48:19 80:1

**sic** 34:15 38:16 62:17

**signed** 30:15

**signing** 95:16

**similar** 21:7 22:9,11

**single** 41:5 85:12

**sit** 49:2 67:22 74:4

**sitting** 18:4

**skip** 72:2

**skipped** 67:11

**slides** 19:1,3,5 22:10

**slow** 7:4,6

**SLS** 6:16 9:20,24 10:8,13,20 11:1, 23 14:4,6,8,23 15:2,14,21 16:6,11, 17 19:7,24 20:4,21 21:3,9 22:1,6,13 23:13,17 24:1,19 26:1,14 28:15 31:24 32:17 33:1,13,18 34:2,20 35:1,4 36:8,9,16,17,24 42:7 44:14, 21 46:10,15 47:10,18 48:9 50:2 51:4,7,24 53:1,8,13 54:22 55:3 56:10,18 57:1,22 58:3,19,23 59:15 60:17 61:15,25 62:6 63:6 64:3 68:22 70:10,16,25 71:3,10,13 72:18,21 74:7,25 75:9,13,14,21 77:21 81:4 86:4,17 87:4,9,16,25 88:7,15,20 89:3,8,24,25 90:4,5,6, 10,16 91:2,12 92:2,12,22 94:15,17 95:1

**SLS's** 6:17 8:14 16:2 19:1 22:5 24:2,8 25:7,9,20 33:17,22 35:17 46:5 58:5 73:1 75:2 77:16 91:25 93:1,10

**small** 16:5

**Smith** 13:8 41:4

**Social** 41:16,19,24,25 42:2

**software** 18:2 40:19 46:4 48:2

**solicitations** 23:20

**speak** 7:2,5 10:10 45:19

**specialized** 6:13,16 14:3 28:9 30:12 46:9

**specialty** 9:25

**specific** 22:4,12 47:17 48:16 61:14

**specifically** 17:4 55:19 59:8

**specifics** 22:2

**spell** 9:18 37:23 56:7

**spent** 32:11,13

**spill** 62:11

**spoc** 85:7,11

**Springs** 11:12

**SROF-2013-S3** 25:4

**SSN** 84:8

**stack** 36:10

**stamped** 36:8

**stand** 65:20 79:14 86:1

**standard** 92:20

**stands** 42:19 49:19 60:2

**start** 53:21 54:2 70:15

**started** 14:8 61:13

**starting** 8:25 38:15 61:18 83:4

**starts** 52:13 59:25

**state** 8:11 30:15 58:19 76:18 83:5, 17 85:3

**stated** 51:6 72:1 83:12 84:18

**statement** 48:19

**statements** 23:19 75:1

**states** 61:19 62:5 63:12 68:12 70:10 71:25

**stating** 61:23 67:19

**status** 56:11 63:15,17 83:10,15 85:6,16,17,22 86:25

**step** 35:25

**sticky** 24:12 59:3

**stop** 7:3

**stored** 39:2

**strike** 29:24 39:10 74:18

**structure** 28:8

**struggling** 52:15

**stubs** 72:15

**Stuck** 52:17

**subdivision** 32:8

**submit** 62:2

**subset** 60:8,10

**substance** 75:12,18

**summary** 51:9,17 58:25 78:15 80:9 81:23

**supervisor** 26:2,25 27:4,18,19 73:8 76:23 77:1,3,4,7,9 78:1,2,6,16

**supervisors** 26:18,25

**supplemental** 52:6

**support** 26:6,13,22 28:23 29:6,13 31:3,4,11,14,20 32:7 60:3,10 81:18

**supposed** 41:9 45:13

**Supreme** 30:16 87:13 93:4,13

**sworn** 6:5

**system** 17:15 37:4 38:8 40:12 43:14 44:20,24 45:9,11 50:10 55:10 78:23 82:2

**systems** 12:4

---

## T

**T-Y-P** 69:13

**table** 56:1

**takes** 33:2

**talk** 6:25 23:12 35:17

**talked** 60:4 61:23 83:19

**talking** 35:21,22 44:8 45:5 64:20 82:5

**task** 66:24 67:5,8 69:16 70:1

**taught** 22:23

**tax** 72:16

**taxes** 15:7

**Teakwood** 82:7

**team** 21:23

**telephonically** 73:2

**teller** 53:23 54:5 61:5,20 65:2,9,25 71:18,21 72:9 76:1,19 79:12,22 80:3,10,21 81:24 82:3 83:6,18 84:3, 9,15 85:4,15

**teller's** 62:3

**tellers** 65:23 66:1

**telling** 67:2

**tend** 7:1

**term** 36:21 38:12

**terms** 12:1 33:7 39:20

**Terrace** 82:7

**Terry** 59:4

**test** 16:22,23 18:23 19:4 22:10 65:2,10

**testified** 6:6 11:17,22 14:17,18,20 19:14 21:1,14 36:19 37:5 47:5 58:4 73:20 74:11 91:11 92:2

**testify** 12:6 58:11

**testifying** 6:21

**testimony** 6:19 8:6 11:17 21:1 34:18,25 37:12 58:5 73:23 91:12

**thing** 30:4 36:4 44:22 45:18 56:7 61:3 85:3

**third-party** 14:25

**thought** 21:1

**tickler** 65:21 66:16,18

**tight** 67:22

**time** 6:25 7:3 8:1 9:24 13:1 25:15 32:1 33:2 34:9,15 45:12 49:10 56:10 57:22 58:18 59:18 64:7 71:3 74:2 75:8 87:10 89:17 94:4

**timeline** 28:24

**timeliness** 35:9

**times** 23:21 35:11 71:22 91:15

**title** 9:21 10:4,19

**TLR** 69:6

**today** 6:11,15,22 8:6 19:15 23:3 30:9 36:11 68:5 74:4 93:25 94:10

**today's** 8:18 11:1,16 55:16,20

73:23

**told** 71:7 92:10

**Tony** 61:8 76:24 77:1,6,25 78:3,6, 16,17

**top** 48:10 53:22 83:4 88:16 90:23

**topics** 58:7

**towns** 44:9

**track** 22:23

**train** 17:21 20:4

**trained** 41:3

**training** 16:12,14,16,18,19,21,25 17:1,2,5,10,15,17,19,23 18:11,13 19:11 20:1,7,8,13,17 21:3,5,6,15, 18,22,25 22:3,9,14,19 23:4

**Trans** 53:23 54:7 70:17

**transaction** 53:23 54:9 57:10 70:18 71:4,18 83:7,17,18 84:4 85:5, 16

**transfer** 55:11

**transferred** 46:8

**translate** 69:14

**transmitted** 48:13

**treat** 34:12,21 35:5

**treats** 35:1

**trial** 91:12

**trials** 12:7 14:18,20

**trouble** 11:15

**true** 41:6 62:23

**trust** 24:5 25:4

**trust's** 24:6

**Trustee** 25:4

**trusts** 47:14

**truth** 7:23

**truthful** 8:5,9

**TSK** 69:12,13,23 70:3

**TUESDAY** 6:1

**turn** 24:17,19 94:14

**Twelve** 13:18

**TY** 64:25

**TYP** 69:13,23 70:3

**type** 13:3 14:23 28:11 53:23 54:7 60:13 65:2,10 70:17 71:18 79:12 83:7,19 84:4 85:5,16 91:9

**typed** 48:17 92:19

**typically** 15:3

---

**U**

**U.S.** 25:3

**UF** 63:12

**Uh-huh** 24:18 63:3

**unable** 15:9 65:3 66:8 67:1,2

**underneath** 42:14 49:13

**understand** 6:21 7:6,18,22 10:4 31:13 38:11 46:14 60:16

**understood** 7:16,20 9:10

**underwrite** 71:23

**unit** 28:9,16

**units** 28:19 32:10

**unknown** 42:24

**unrecorded** 73:8

**unredact** 65:17

**unredacted** 65:15 79:6,7

**UPB** 39:19,20

**Update** 83:10

**updated** 50:18 63:12 84:19

**upgraded** 79:17

**upper** 49:7

**upside** 52:16

**User** 55:15 56:6

---

**V**

**V-E-R-I-F** 42:17

**vacant** 83:9

**Vague** 89:16

**VC** 63:12

**verbal** 7:13,15 23:18 35:10,12

**verbiage** 52:4

**Verif** 43:25

**verified** 42:19 48:5 61:6,22 71:19 76:20 83:8,20 84:7,8 85:7

**verifier** 90:2

**verify** 41:21 45:5 87:4

**version** 50:13 65:16

**versus** 35:6,12

**vice** 10:20

**Victor** 60:23

**victorious** 60:22,24

**view** 41:10 44:13,19 45:9 47:12

**viewed** 45:10,12,14 88:17

**viewing** 44:24

**Viewpoint** 40:18 44:23 46:4 50:11 51:13 63:22 77:24 79:16,18

**violations** 6:14

**Vision** 79:16

---

**W**

**walk** 49:3

**wanted** 24:15 83:20

**watermark** 50:15

**Western** 6:12 23:14

**wind** 15:10

**word** 10:2 59:7 69:21 82:25

**words** 27:7 44:20

**work** 10:7,8 12:2,22 13:25 15:2 16:10 32:2 46:13 65:21 66:14,15 81:13

**workday** 32:18

**worked** 9:24 12:9,17,23 13:7,8,14, 20,21 14:4,6,9,10

**working** 10:3,6 19:23 41:2 85:9

**works** 62:10

**would've** 25:20 54:23 90:15

**wrapping** 69:21

**wraps** 70:19

**writing** 23:19

**written** 16:23 28:3,11 34:14,19,21
35:2,5,8,12,15,21 39:4 47:22 81:8,9

**wrong** 29:13 67:4 71:7 82:17

———————————————
Y
———————————————

**yay** 24:11

**Year** 13:1

**years** 11:5,21 13:2,18 14:1,13
17:17 19:25 83:13

**York** 6:12 23:15 30:15 43:23,24
82:7 87:13 93:4,13

———————————————
Z
———————————————

**ZIP** 29:12