# Exhibit E

Atkinson-Baker Court Reporters
www.depo.com

1       UNITED STATES DISTRICT COURT
2       WESTERN DISTRICT OF NEW YORK

3    MARK MACRIS,                    )
4         Plaintiff,                 )        CERTIFIED COPY
5    v.                              )
                                     )   Civil Action No.
6    EXPERIAN INFORMATION            )   17-CV-361
     SOLUTIONS, INC. and             )
7    SPECIALIZED LOAN SERVICING,     )
     LLC,                            )
8                                    )
         Defendants.                 )
9                                    )
                                     )
10   _____)

11

12

13              RULE 30(b)(6) DEPOSITION OF

14      EXPERIAN INFORMATION SOLUTIONS, INC. and
15            SPECIALIZED LOAN SERVICING, LLC,

16          BY AND THROUGH LORETTA POCH

17              LITTLETON, COLORADO

18              AUGUST 14, 2018

19

20

21   ATKINSON-BAKER, INC.
     COURT REPORTERS
22   (800) 288-3376
     www.depo.com
23

24   REPORTED BY:  TERRY H. EDWARDS,
     Registered Professional Reporter
25   FILE NO.:  AC03E10

1  servicer.

2      Q    Can you tell me the kind of work that SLS

3  typically does?

4      A    Yes.  We service mortgage loans for

5  investors, meaning we are the face to the borrower.

6  We collect their monthly mortgage payments,

7  disburse taxes and insurance, foreclose if it

8  becomes necessary, conduct loss mitigation, try to

9  resolve delinquencies, and if we are unable to and

10  we wind up foreclosing and going through a

11  foreclosure sale, then we sell the property for

12  many of the investors after the foreclosure is

13  complete.

14      Q    You say loss mitigation.  Does SLS collect

15  debts on behalf of its clients?

16      MR. MCGRATH:  Objection as to form.

17      A    We attempt to resolve a delinquency with

18  borrowers, get a loan performing.  We do not

19  collect deficiencies.

20      Q    (BY MR. ANDREWS)  With respect to default

21  accounts, does SLS attempt to collect moneys on

22  those accounts for its clients?

23      MR. MCGRATH:  Object as to form.

24      A    We attempt to get the monthly mortgage

25  payments brought current.

Atkinson-Baker Court Reporters
www.depo.com

1     Q   (BY MR. ANDREWS)  Okay.  So is it fair to

2  say a regular part of SLS's practice is to collect

3  defaulted debts for its clients?

4     MR. MCGRATH:  Objection as to form.

5     A   That is a small part of our business.

6     Q   (BY MR. ANDREWS)  Is it something that SLS

7  does regularly?

8     A   Yes.

9     MR. MCGRATH:  Objection as to form.

10     A   Yes.  We work defaulted loans regularly.

11     Q   (BY MR. ANDREWS)  Does SLS provide

12  training in FDCPA compliance?

13     A   Yes.

14     Q   Are you familiar with that training?

15     A   I am.

16     Q   Can you describe the training to me?

17     A   When you're a new hire at SLS, you go

18  through initial training, and it's a 2-week

19  intensive training, and one of the modules is

20  FDCPA.  And then annually every employee is

21  recertified by going to a training module and

22  passing a test.

23     Q   A written test?

24     A   It's electronic.

25     Q   Well, you said there's a 2-week training

1        A    I don't know.

2        Q    (BY MR. ANDREWS)   Okay.   Do you know if

3   that procedure, as it exists today, was the same as

4   it was back in 2016 with respect to FCRA training

5   and compliance?

6        MR. MCGRATH:   Objection as to form.

7        A    As to annual recertification, it is the

8   same.

9        Q    (BY MR. ANDREWS)   But outside of the

10  annual, you're not sure?

11       A    Correct.

12       Q    Let's talk about the current matter.   At

13  some point, did SLS attempt to collect debt from

14  the plaintiff -- in this Western District of New

15  York case, Mark Macris?

16       MR. MCGRATH:   Objection as to form.

17       A    There were communications between SLS and

18  both Mr. and Ms. Macris, both verbal and in

19  writing.   Monthly billing statements were sent,

20  solicitations for loss mitigation were sent, and

21  Mr. Macris called in several times to discuss

22  making monthly payments.

23            Sometimes he would ask about loan

24  modification, and sometimes he would say he wasn't

25  interested in loan modification.   Ms. Macris

Atkinson-Baker Court Reporters
www.depo.com

1        Q    So we see that this is an Order of

2   Reference, and then if we look at the caption there

3   is a plaintiff, U.S. Bank National Association as

4   Trustee for the SROF-2013-S3 Remic Trust 1?

5        A    Yes.

6        Q    Does that refresh your recollection as to

7   who SLS's client may be?

8        A    Yes.

9        Q    Is that still SLS's client with respect to

10  this account?

11       MR. MCGRATH:  Objection as to form.

12       A    I don't know if this property has been

13  liquidated or not, meaning at REO sale.

14       Q    (BY MR. ANDREWS)  Are you aware if at any

15  time prior to the sale of the property if the

16  account changed hands?

17       MR. MCGRATH:  Objection as to form.

18       A    I'm not aware of a change.

19       Q    (BY MR. ANDREWS)  As far as you know, that

20  would've been SLS's client throughout this process?

21       MR. MCGRATH:  Objection as to form.

22       A    Yes.

23       THE WITNESS:  I'll put Humpty Dumpty back

24  together here real quick.

25       Q    (BY MR. ANDREWS)  Kind of flimsy.  So is

1    there someone at SLS that's in charge, or a

2    supervisor, of handling e-Oscar disputes?

3        MR. MCGRATH:  Objection as to form.  Asked and

4    answered.

5        A    The handling of e-Oscar disputes?

6    Customer support.

7        Q    (BY MR. ANDREWS)  You're not aware if it's

8    one person?

9        MR. MCGRATH:  Objection as to form.

10        A    There is not one person.  It's a group.

11        Q    (BY MR. ANDREWS)  If a person in that

12    department that you just identified in customer

13    support has a question, is there someone that they

14    can go to in the hierarchy of SLS to have that

15    question answered, regarding a dispute filed by a

16    consumer?

17        MR. MCGRATH:  Objection as to form.

18        A    There are supervisors and managers and

19    officers above the managers that are available.

20        Q    (BY MR. ANDREWS)  Okay.  So let's do this:

21    Can you describe to me kind of the hierarchy for

22    that customer support department?

23        A    Yes.  There is the analysts, regular level

24    department employees, and then they report to a

25    supervisor, supervisors report to managers,

Atkinson-Baker Court Reporters
www.depo.com

```
 1    managers report to officers, junior officers, and
 2    then junior officers report to senior officers.
 3         Q   Are you aware of how far up that hierarchy
 4    you just identified, an analyst, a supervisor, a
 5    manager, a junior officer, and a senior officer,
 6    how far up that hierarchy a dispute could be
 7    handled?  In other words, would a senior officer
 8    ever handle a dispute?
 9         MR. MCGRATH:  Objection as to form.
10         A   I don't know.
11         Q   (BY MR. ANDREWS)  What about a junior
12    officer?  Do you know if a junior officer would
13    ever handle a dispute?
14         A   I don't know.
15         Q   What about a manager?  Do you know if a
16    manager would ever handle a dispute?
17         A   I don't know.
18         Q   What about supervisor?  Do you know if a
19    supervisor would ever handle a dispute?
20         A   I don't know.
21         Q   Analyst?  Do you know if --
22         A   Yes, they do.
23         Q   An analyst handles disputes?
24         A   Yes.  And then it would be up to them to
25    escalate if they needed assistance, or if there
```

```
 1        Q    (BY MR. ANDREWS)  Does SLS have protocol
 2   with respect to how much time it takes to process
 3   the dispute?
 4        MR. MCGRATH:  Objection as to form.
 5        A    Not that I'm aware of.
 6        Q    (BY MR. ANDREWS)  So there's no protocol
 7   in terms of how long it's going to take them to
 8   investigate a dispute?
 9        MR. MCGRATH:  Objection as to form.
10   Misstates.
11        A    Not that I'm aware of.
12        Q    (BY MR. ANDREWS)  Back in 2016, was there
13   any protocol in place for how complete SLS would
14   process a dispute?
15        A    Not that I'm aware of.
16        Q    With respect to any e-Oscar dispute, were
17   you aware of any guidelines from SLS's client or
18   in-house on how long it should take for SLS to
19   respond to a dispute?
20        MR. MCGRATH:  Objection as to form.
21        A    Not that I'm aware of.
22        Q    (BY MR. ANDREWS)  Is it SLS's position
23   that it has a responsibility to respond to disputes
24   that come directly from the consumer?
25        MR. MCGRATH:  Objection as to form.
```

Atkinson-Baker Court Reporters
www.depo.com

1   that SLS treats all communication as if it was a

2   written communication?

3       A    No.

4       Q    Does SLS have a policy that calls for

5   distinction on how to treat written communication

6   versus oral communication coming from the consumer?

7       A    We have a policy with regard to all

8   written communications how they're handled and the

9   timeliness of the response, and we have a policy

10  regarding verbal communications and the response.

11      Q    Are those response times different if it's

12  verbal versus written communication from the

13  consumer?

14      A    All communications must be in compliance

15  with FDCPA.  With regard to written responses, they

16  must be in accordance with RESPA guidelines.

17      Q    Okay.  Let's talk a little bit about SLS's

18  procedure responding to disputes.  Are you familiar

19  with that procedure?

20      MR. MCGRATH:  Objection as to form.

21      A    Are you talking about written disputes?

22      Q    (BY MR. ANDREWS)  I'm talking about an

23  e-Oscar dispute.

24      A    Yes.

25      Q    Let's go through it step by step.  Okay?

Atkinson-Baker Court Reporters
www.depo.com

```
 1        A    Okay.

 2        Q    So let's look at --

 3        MR. ANDREWS:  We'll mark -- let's mark the

 4   whole thing.

 5        (Exhibit 2 marked for identification.)

 6        Q    (BY MR. ANDREWS)  I'm showing you a

 7   document marked as plaintiff's Exhibit 2.  It's a

 8   series of documents Bates stamped SLS 371 through

 9   SLS 857.

10        .    Have you seen this stack of documents

11   prior to today?

12        A    Yes.

13        MR. MCGRATH:  Take a look at it.

14        A    Yes.

15        Q    (BY MR. ANDREWS)  Okay.  Can you identify

16   for me SLS 371 through 374?

17        A    These are SLS responses to an e-Oscar

18   dispute filed by Mr. Macris.

19        Q    Okay.  You testified that you're familiar

20   with that process, the ACDV, you're familiar with

21   that term?

22        A    Yes.

23        Q    That comes from -- the CRA in this case,

24   looking at SLS 371 Experian.  Are you familiar with

25   that?
```

Atkinson-Baker Court Reporters
www.depo.com

```
1        A    Yes.
2        Q    How does the analyst get this?
3        A    It comes electronically through the
4    e-Oscar dispute system.
5        Q    Okay.  You testified that there's multiple
6    analysts, correct?
7        A    Yes.
8        Q    How does it get to analyst Seth, for
9    example, with Brian?
10       A    I don't know.
11       Q    After it makes its way to the analyst, and
12   your testimony is you're not sure how that
13   particular analyst gets assigned it; is that
14   correct?
15       A    That's correct.
16       Q    Does that analyst look up the account
17   that's in dispute?
18       A    Yes, they do.
19       Q    How do they do that?
20       A    They look in our servicing platform.
21       Q    What's that?
22       A    It's called FISERV.
23       Q    Can you spell it?
24       A    F-I-S-E-R-V.
25       Q    What do you mean by "servicing platform"?
```

Atkinson-Baker Court Reporters
www.depo.com

1   Explain it to me like I'm in third grade, if you

2   can.

3        A    Okay.  It houses all of the loan

4   information, borrower, borrower's mailing address,

5   property address, financial information regarding

6   the loan, all servicing notes regarding the loan,

7   and the mortgage loan payment history.

8        Q    So is it an account management system?  Is

9   that fair to say?

10       MR. MCGRATH:  Objection as to form.

11       Q    (BY MR. ANDREWS)  As you understand that

12   term?

13       A    Yes.

14       Q    When you say there's notes, if we look at

15   the remainder of plaintiff's Exhibit 2, starting at

16   381 [sic] through 857, are those the notes that

17   you've referenced that would be housed in the

18   FISERV --

19       MR. MCGRATH:  I want you to take a look.  You

20   said through [587]?

21       MR. ANDREWS:  Yeah, 381 through -- 857.  I'm

22   sorry.

23       MR. MCGRATH:  857.

24       A    Yes.

25       Q    (BY MR. ANDREWS)  Okay.  Would there be

Atkinson-Baker Court Reporters
www.depo.com

1        Q    Do you know if it's something -- that

2    first screen you just described, is that possible

3    that analyst could print off that information

4    onto --

5        A    Yes.

6        Q    Okay.  So after that first screen, what

7    then -- what would the analysts do next after

8    locating the account and looking at the first

9    screen on the FISERV?

10       A    They would look at the loan payment

11   history, these servicing notes.  They would look at

12   the imaging system, which is separate from FISERV,

13   but that houses the note, the mortgage, the

14   assignments, correspondence regarding the loan, any

15   images related to the loan.

16       Q    Is that imaging separate from FISERV?

17   What is that imaging connected to?

18       A    It's called Global Viewpoint.

19       Q    Is Kimberly separate software?

20       A    It is.

21       Q    Is the analyst able to open up a PDF of

22   the imaging?

23       A    Yes, they are.

24       Q    Okay.  Is there kind of like a punch list

25   that the analyst is instructed to go through to

Atkinson-Baker Court Reporters
www.depo.com

1    MR. ANDREWS:  Okay.

2    (Recess taken from 11:15 a.m. to 11:25 a.m.)

3    Q    (BY MR. ANDREWS)  Those documents that are

4  housed in that Global Viewpoint software, are those

5  obtained from SLS's client?

6    MR. MCGRATH:  Objection as to form.

7    A    Those are obtained from the prior

8  servicing company that transferred the servicing to

9  Specialized.

10    Q    (BY MR. ANDREWS)  Does SLS ever request

11  documents from the clients?

12    MR. MCGRATH:  Objection as to form.

13    A    The clients don't do loan-level work.

14    Q    (BY MR. ANDREWS)  Just so I understand

15  then, anytime SLS receives e-Oscar's review, their

16  protocol is they're never going to contact a client

17  relative to that dispute?

18    MR. MCGRATH:  Objection as to form.

19  Misstates.

20    A    When you say client, you mean in this case

21  the plaintiff in the foreclosure action?

22    Q    (BY MR. ANDREWS)  Correct.

23    A    That is correct, we would not.

24    Q    Okay.  And that's just not for this

25  particular case.  That's for any foreclosure

Atkinson-Baker Court Reporters
www.depo.com

```
1    action?
2         MR. MCGRATH:   Objection as to form.
3         A    That's correct.
4         Q    (BY MR. ANDREWS)   Okay.  You just
5    testified that the client isn't involved in that
6    level of activity on the account; is that right?
7         MR. MCGRATH:   Objection as to form.
8         A    That's right.
9         Q    (BY MR. ANDREWS)   Okay.  Is there anything
10   that would prevent SLS from reaching out to the
11   client to request certain documents that might be
12   beneficial with respect to a response to this view?
13        MR. MCGRATH:   Objection as to form.
14        A    Because we know on these trusts that they
15   do not involve themselves loan level on any of the
16   loans.  We would not reach out to them for document
17   specific -- or loan-specific documents.
18        Q    (BY MR. ANDREWS)   When SLS receives any
19   e-Oscar dispute, do they ever contact the consumer
20   or the individual making the dispute?
21        A    I don't know.
22        Q    Do you know if there's a written procedure
23   policy with respect to whether they contact the
24   consumer when they make a dispute?
25        A    I'm not aware of one.
```

1      Q    So going back to the analyst then who has

2   reviewed the screens on the FISERV software, what

3   do they do next with respect to that procedure

4   responding to the e-Oscar dispute?

5      A    Once they verified the information is

6   correct, an electronic response is sent to the

7   dispute.

8      Q    So if we look at plaintiff's Exhibit 2,

9   SLS 371, the electronic response, would that be --

10   if we look at the top right, there's a column that

11   says Response Code, and that's got 01.  Is that

12   account information accurate as of the date

13   reported?  Is that what would be transmitted

14   electronically?

15      A    This entire form is, but that's our

16   specific response.

17      Q    Is that response manually typed in by the

18   analyst, or is it already kind of keyed in?  So if

19   you hit 01, that statement is what shows up?

20      MR. MCGRATH:  Objection as to form.

21      A    I've never done it, so I don't know the

22   answer.

23      Q    (BY MR. ANDREWS)  Do you know if there's

24   other response codes other than that 01?

25      A    I was looking at the Credit Bureau Codes

1    and -- you know just on Google, their master list,

2    but as I sit here I can't recall.

3         Q    Can you walk me through what entries would

4    also be made on what you're electronically sending

5    back to the Credit Bureau?

6         A    In the rest of the form, other than the

7    upper right-hand Response Code, anything in gray is

8    our response.  Anything not in gray was pulled from

9    the Credit Bureau.  The Credit Bureau pulled it at

10   the time they sent the dispute to us.

11        Q    So looking down -- 371, there's a

12   Compliance Condition Code, and there's a blank

13   underneath it towards the bottom -- are you with

14   me?

15        A    Yes.

16        Q    And then next there's an SCC, and then

17   below that there's BO.  Do you see that?

18        A    Correct.

19        Q    Do you know what BO stands for?

20        A    I do not.

21        Q    That was information that was provided

22   from the Credit Bureau when they sent over the ACDV

23   initially?

24        A    Yes.

25        Q    Do you know if that BO designation was at

1     one point initially provided by the furnisher, in

2     this case SLS, to the Credit Bureau?

3          A    I don't know.

4          Q    So once you fill out the information

5     that's in gray, and you electronically send it, you

6     press a button and it goes?  I may be

7     oversimplifying it, but that's the gist?

8          A    That is the gist.

9          Q    Okay.  Do you print out or scan that ACDV

10    response and attach to your system?

11         A    It is saved in Global Viewpoint.

12         Q    Okay.  This says draft.  Is there a

13    finalized version that went out?

14         A    The issue is this is an e-Oscar form, and

15    they have never gotten rid of their watermark.

16    It's on every one of their forms.

17         Q    Even though it says draft, this is what it

18    looks like when the analysts updated the

19    investigation and punched that button and it went

20    back?

21         A    That's correct.

22         Q    Okay.  Do you know what the Compliance

23    Condition Code is?

24         A    I do not.

25         Q    Do you know if you have to provide, as a

Atkinson-Baker Court Reporters
www.depo.com

1    furnisher, compliance condition codes to adhere to

2    the FCRA?

3         A    I do not know.

4         Q    So any information SLS would have about

5    Mr. Macris's dispute that was provided through

6    Experian, it looks like July 26, 2016 as stated on

7    SLS 371, which is plaintiff's Exhibit 2, that would

8    all be derived from either/or the FISERV screen

9    documents and Account Summary notes; is that right?

10        A    And if needed, the review of the actual

11   loan documents.

12        Q    Which would be imaged in the Global

13   Viewpoint?

14        A    That's correct.

15        Q    Okay.  Other than plaintiff's Exhibit 2,

16   which is the ACDV form from Experian, and those

17   Account Summary notes which you recently provided,

18   as well as you provided some documents or initial

19   disclosures, and the prior document production,

20   which I think we probably put on the record as --

21   I'll just say it again, Bates 051 through 370 --

22        A    Do you want me to look at a few pages?

23        Q    No, no.  Other than those documents I just

24   named, are there any other documents that SLS would

25   have in their possession that would relate to

Atkinson-Baker Court Reporters
www.depo.com

```
 1        A    I do.  I lost the page.  I'll take you
 2   back to it in just a minute.
 3        MR. MCGRATH:   You need a sticky.
 4        THE WITNESS:   Terry gracefully provided it.
 5   She gave it to me when I got this.
 6        A    It's much easier when it's electronic and
 7   you're word searching.  Your question was
 8   specifically when Mr. Macris contacted us?
 9        Q    (BY MR. ANDREWS)  Correct.
10        MR. MCGRATH:   Off the record.
11        (Discussion off the record.)
12        MR. ANDREWS:   Back on the record.
13        Q    (BY MR. ANDREWS)  The question was, was
14   August 24, 2015 the date Mr. Macris first contacted
15   SLS disputing that he was responsible or obligated
16   on the mortgage?
17        A    Yes.
18        Q    It was also the first time that he
19   requested that he be dropped from the foreclosure
20   action?
21        A    Yes.
22        Q    Let's look at 6-26.  Are you with me?
23        A    I am.
24        Q    Can you -- can you explain the notation,
25   the first one, on March 26, 2016?  It starts with
```

```
 1        Q    So is it SLS's policy and procedure to
 2   record all communications telephonically it has
 3   with customers or consumers?
 4        MR. MCGRATH:   Objection as to form.
 5        A    If the borrower requests that the call not
 6   be recorded, then -- so initially, they can ask
 7   that the call not be recorded, and then a
 8   supervisor call them back on an unrecorded line.
 9   But if the caller does not request that the call
10   not be recorded, it should be recorded.
11        Q    (BY MR. ANDREWS)   Okay.  Assuming there's
12   no request not to record, is it recorded regardless
13   of whether it's an inbound or an outbound call?
14        A    Yes.
15        MR. MCGRATH:   I'm going to need to take a
16   break.
17        MR. ANDREWS:   Okay.
18        (Recess taken from 12:40 p.m. to 12:47 p.m.)
19        MR. ANDREWS)   Back on the record.
20        Q    (BY MR. ANDREWS)   You previously testified
21   that the policy is that it is okay to have these
22   recordings, but you didn't listen to the recordings
23   in preparation for today's deposition testimony; is
24   that right?
25        A    That's right.
```

1        MR. MCGRATH:   Object as to form.

2        A    Yes.

3        Q    (BY MR. ANDREWS)   Is there a procedure in

4    which SLS allocates what analyst is going to handle

5    what dispute?

6        A    I have not seen the procedure.

7        Q    Is it routine for one analyst to receive a

8    written dispute and for another analyst to provide

9    a written response to that dispute?

10       MR. MCGRATH:   Objection as to form.

11       A    Yes.

12       Q    (BY MR. ANDREWS)   That's a common

13   occurrence, to have two different analysts work two

14   different parts of the dispute.

15       MR. MCGRATH:   Objection as to form and

16   misstates.

17       A    The correspondence comes in and is scanned

18   and assigned to the customer support group.   That's

19   one analyst, the receipt.   Then it gets to that

20   group and the analyst in that group handles it from

21   there.

22       Q    (BY MR. ANDREWS)   Is there any indication

23   in the Account Summary notes of the investigation

24   that Patricia, that that analyst teller with ID

25   30614 did to fashion that response?

1   look at 683.

2        A    Okay.

3        Q    And the same thing, what does that state?

4        A    The date is 9-6-2016.  Teller ID 1985.

5   Transaction Type Code DM.  Mark K. Macris checking

6   status of the loan.  Advised foreclosure sale date

7   9-27-16.  Advised spoc verified removed home number

8   (716) 632-1564.  It's his parents' phone number.

9   He said not working on loss mit.  He asked if he is

10  still on the loan.  Advised yes, Linda C.

11       Q    What is spoc?

12       A    Single point of contact.

13       Q    Can we look at 684?  Can you explain those

14  notes?

15       A    Yes.  Dated 9-14-2016.  Teller ID 1833.

16  Transaction Type Code NT.  Deal status change.

17  Status changed to denied of 9-14-2016 comment.

18  Comments:  RMA needs to be completed by both

19  borrowers.  Divorce decree doesn't forgive

20  ownership to either borrower, proof of income for

21  each borrower for last 30 days.

22       Q    When it says deal status change, what does

23  that mean?

24       A    Meaning to change who was liable on the

25  note, to remove Mr. Macris was denied.

Atkinson-Baker Court Reporters
www.depo.com

1      Q    What does RMA stand for?

2      A    Request for modification -- mortgage

3    assistance.

4      Q    And SLS is requesting proof of income for

5    both Mr. and Ms. Macris?

6      A    Yes.

7      Q    Why are they requesting proof of income?

8      A    To see that Ms. Macris had the ability to

9    pay the loan on her own.

10     Q    Wasn't it each borrower?  It doesn't just

11   say Ms. Macris.

12     A    It does say each borrower.

13     Q    Do you know why they're requesting

14   Mr. Macris's income?

15     A    I don't know.

16     Q    So prior to receiving the e-Oscar dispute,

17   did SLS have any involvement in reporting

18   Mr. Macris's credit data to any credit reporting

19   agency --

20     MR. MCGRATH:  Objection as to form.

21     Q    (BY MR. ANDREWS)  -- regarding the

22   account?

23     A    We began reporting to all four Credit

24   Bureau's in June of 2014, and that was reporting

25   the status of the loan with regard to both Mr. and

Atkinson-Baker Court Reporters
www.depo.com

1   Ms. Macris.

2        Q    Prior to reporting Mr. Macris's credit

3   data for this account -- and again this is pre-

4   dispute, did SLS ever contact its client to verify

5   the accuracy of what it was reporting?

6        MR. MCGRATH:   Object as to form.

7        A    The client would not have been contacted

8   because they would not have had loan-level data.

9        Q    (BY MR. ANDREWS)   Was SLS aware at the

10  time it reported Mr. Macris's credit data on the

11  account in May of 2016 that Mr. Macris was removed

12  from the foreclosure action that was filed in New

13  York Supreme Court, Erie County area.

14       MR. MCGRATH:   Objection as to form.

15       A    I don't know.

16       Q    (BY MR. ANDREWS)   Did SLS ever contact its

17  client or its client's attorney Davidson & Fink to

18  clear Mr. Macris as judgement debtor prior to

19  reporting Mr. Macris's credit data in May of 2016?

20       MR. MCGRATH:   Objection as to form.

21       A    Whether Mr. Macris was a judgment debtor

22  in the foreclosure would not impact how we reported

23  credit.

24       Q    (BY MR. ANDREWS)   That wasn't my question.

25            My question was, did SLS ever contact

Atkinson-Baker Court Reporters
www.depo.com

1      Q    (BY MR. ANDREWS)  Yeah.

2      A    I don't know.

3      Q    Okay.  Do you know what documents SLS

4   reviewed prior to providing the ACDV response?

5      MR. MCGRATH:  Objection as to form.  Asked and

6   answered.

7      A    I don't know.

8      Q    (BY MR. ANDREWS)  Did SLS get a copy of

9   the correspondence from Experian, the e-Oscar

10  dispute?

11     A    Yes, we did receive e-Oscar dispute.

12     Q    What I'm asking is, did you get a copy of

13  the dispute from Mr. Macris that he sent to

14  Experian?  Did Experian provide you a copy of that

15  actual dispute?

16     MR. MCGRATH:  Objection as to form.  Vague as

17  to time.

18     A    I don't know.

19     Q    (BY MR. ANDREWS)  If we look over at the

20  far right column, there's a Date Sent and then

21  there's 7-26-2016.

22     A    Correct.

23     Q    That's the date that Experian sent ACDV to

24  SLS?

25     A    I don't know.  This isn't an SLS form.